IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. |
| v. | |
| ELCHONON SCHWARTZ | 1:24-CR-371-SDG |
| A/K/A ELIE SCHWARTZ | |

## Government's Sentencing Memorandum

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Kelly K. Connors, Assistant United States Attorney for the Northern District of Georgia, and by Lorinda I. Laryea, Acting Chief, and Matthew F. Sullivan, Trial Attorney for the Fraud Section of the U.S. Department of Justice Criminal Division, files this brief sentencing memorandum, in advance of Defendant Schwartz's sentencing on May 19, 2025. On February 12, 2025, Schwartz pled guilty pursuant to a plea agreement to one count of wire fraud. Consistent with the plea agreement, the government will recommend that Schwartz be sentenced at the low-end of the advisory Guidelines range.

## Background

At all times relevant to Schwartz's offense conduct, he was the co-founder and CEO of a privately held commercial real estate firm, The Nightingale Group LLC (d/b/a Nightingale Properties). (PSR ¶ 8.) Beginning in May 2022, Schwartz solicited investments in commercial real estate properties in Atlanta, GA ("Atlanta Financial Center") and Miami Beach, FL ("Lincoln Place") through a commercial real estate crowdfunding investment website, CrowdStreet Marketplace, ("CrowdStreet"). (*Id.* ¶¶ 9-10.) In total, Schwartz

raised approximately $62.8 million from over 800 investors through CrowdStreet for investments in the Atlanta Financial Center (approximately $54 million) and Lincoln Place (approximately $8.8 million). (*Id.* ¶¶ 12, 16, 19.)

Under Schwartz's agreements with CrowdStreet, the investors' funds were to be held in segregated bank accounts, which were controlled by Schwartz, until the closing of each respective project. (*Id.* ¶ 21.) For example, the Private Placement Memoranda for the two investments stated that "[t]he proceeds from this Offering will be used to purchase, lease, reposition, and extensively renovate" the properties, and the Subscription Agreements for each investment stated that Schwartz would only "use any proceeds from this Offering, net of any organizational and offering expenses, to fund" the investment in each property. (*Id.* ¶¶ 21-22.) Similarly, the Operating Agreements for each investment further provided that Schwartz had a fiduciary duty to safeguard the funds and prohibited commingling or use of the investors' money in ways that did not benefit the investments. (*Id.* ¶ 23.)

Notwithstanding these representations and restrictions regarding the use of the CrowdStreet investor funds, and before either the Atlanta Financial Center or Lincoln Place transaction closed, Schwartz misappropriated and converted the CrowdStreet investor funds for his own use. (PSR ¶ 24.) Beginning in June 2022 and continuing through June 2023, Schwartz transferred substantially all of the money raised from investors through CrowdStreet for the Atlanta Financial Center and Lincoln Place projects out of the segregated bank accounts, including by directing money to his personal bank account, personal brokerage account, and accounts for other, unrelated commercial real estate investments affiliated with, and controlled by, Schwartz. (PSR ¶ 32.) Among

other numerous examples, Schwartz took the funds raised from the CrowdStreet investors and bought luxury watches, paid down his American Express bill, invested in stocks and options in his personal brokerage account, and covered payroll expenses for his commercial real estate businesses unrelated to the CrowdStreet projects. (*See* PSR ¶¶ 25-31 (detailing various examples of Schwartz's misuse of CrowdStreet investor funds).)

In June 2023, the scheme unraveled when Schwartz and the entities he controlled resigned as the managers overseeing the CrowdStreet investments in the Atlanta Financial Center and Lincoln Place. (*Id.* ¶ 40.) An independent manager was appointed to investigate the use of CrowdStreet investor funds and to develop a plan to attempt to recover funds for the CrowdStreet investors. (*Id.*) The independent manager determined that substantially all of CrowdStreet investor funds had been moved to bank accounts controlled by Schwartz prior to her appointment and, in mid-July 2023, the independent manager notified the CrowdStreet investors that the corporate entities that Schwartz had formed to receive funds for their investments in the Atlanta Financial Center and Lincoln Place had each filed for Chapter 11 bankruptcy. (*Id.* ¶¶ 41-42.); *see also In re ONH AFC CS Investors LLC*, 23-bk-10931 (D. Del.).

### *Probation's Guidelines Calculation*

In the final PSR, Probation calculated Schwartz's advisory Guidelines range based on the following:

- Base Offense Level of 7 because the offense of conviction has a statutory maximum term of imprisonment of 20 years or more. (PSR ¶ 73 (citing USSG § 2B1.1).

- 22-level increase because the loss from the offense was more than $25 million. (PSR ¶ 74 (citing USSG § 2B1.1(b)(1)(L))).

- 4-level increase because the offense resulted in substantial financial hardship to 5 or more victims. (PSR ¶ 75 (citing USSG § 2B1.1(b)(2))).

- 2-level increase because the Defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense. (PSR ¶ 77 (citing USSG § 3B1.3)).

- 3-level reduction for acceptance of responsibility and timely pleading guilty. (PSR ¶ 80 (citing USSG § 3E1.1)).

Accordingly, Probation determined that Schwartz's advisory Guidelines range is 121-151 months' imprisonment based on a Total Offense Level of 32 and Criminal History Category I. (PSR ¶¶ 82, 87; Part D. Sentencing Options).

*Objections to the PSR*

The PSR preserved objections for both Schwartz and the government related to the final PSR's finding that victims suffered substantial financial hardship. After a review of the victim impact statements (*see* PSR ¶¶ 71a-71u), the PSR concluded that "15 victims stated they experienced substantial financial hardship" which "resulted in substantial losses to their retirements, having to take out student loans for their children, downsizing homes, taking out loans/lines of credit, and having to delay retirement." (PSR ¶ 75.) Based on this substantial financial hardship, the PSR applied a 4-level increase for causing a substantial financial hardship for 5 or more victims under USSG § 2B1.1(b)(2)(B). (*Id.*) In addition, having personally caused substantial financial hardship, the PSR found that Schwartz did not qualify for a 2-level reduction as a Zero Point Offender. (PSR ¶ 81.) This finding regarding substantial financial hardship resulted in Schwartz's Total Offense Level increasing from 28 in the initial PSR to 32 in the final PSR. The PSR preserved objections for both Schwartz and the government on these two issues.

**Argument**

**A. The Court should sustain the parties' objection to substantial financial hardship.**

There is no doubt that the hundreds of victims in this case lost considerable sums as a result of Schwartz's fraud. However, facts concerning the underlying investments with Schwartz make the issue of whether victims have suffered "substantial financial hardship" under the Guidelines less apparent.

Before investing, individuals had to make certain representations, including that they were "accredited investors" eligible to invest through CrowdStreet in the Atlanta Financial Center and Lincoln Place projects. *See* 17 C.F.R. § 230.501(a) (defining "accredited investor"). Investors entered into a Subscription Agreement,[1] in which the investor represented that it was an "accredited investor." *See* Ex. A (Atlanta Financial Center Subscription Agreement) p. 7 ¶ 7(d); Ex. B (Lincoln Place Subscription Agreement) p. 7 ¶ 7(d). The Subscription Agreements for each CrowdStreet investment detailed the specific net worth or income requirements to be an accredited investor and required that each investor indicate the basis under which they qualified as an accredited investor. *See* Exs. A & B at 4 (Accredited Investor Questions). As relevant here, individuals were considered "accredited investors" if they had (i) a net worth, or a joint net worth with that person's spouse, exceeding $1,000,000 (not including the value of the investor's primary residence and any loans secured by the residence); or (ii) an income that exceeded $200,000 in each

---

[1] A Subscription Agreement is an agreement that defines the terms for a party's investment in a private placement offering. *See* Subscription Agreement: Definition, What's Included, and Rules, https://www.investopedia.com/terms/s/subscriptionagreement.asp.

of the prior two years (or $300,000 joint income with a spouse) and reasonably expected the same income for the current year. *Id*.

In addition, the Subscription Agreements required that investors make certain representations regarding the investment's risk and illiquidity, as well as the investor's financial resources. In particular, investors represented that they could bear the economic risk of a potential total loss of their investments, acknowledged that they may not be able to transfer or monetize their investments for an indefinite period of time, and warranted that they had no need for immediate liquidity in the investments. Exs. A & B pp. 7-8 ¶ 7(c), 7(f), 7(i). As CrowdStreet, itself, explained on its website:

> Offerings published on the Crowd Street Marketplace are exposed to a number of risk factors, including illiquidity and the potential for a full loss of capital, and are not registered and monitored by the SEC. Therefore, they are only available to those investors who have the baseline knowledge of such investments, their associated risks, and can bear the burden of full loss of capital.

*See* Accreditation, https://www.crowdstreet.com/knowledge/accreditation-overview.

In addition to the Subscription Agreements, the Private Placement Memorandum ("PPM")[2] for each project noted that each investor must be an accredited investor and further advised of the high level of risk and illiquid nature of the investments. *See* Ex. C (Atlanta Financial Center PPM) pp. 1, 4, 8, 11, 30, 52-53; Ex. D (Lincoln Place PPM) pp. 1, 4, 8, 11, 27, 50-51.

---

[2] A Private Placement Memorandum provides information to investors in a private placement and typically outlines the objectives, risks, and terms of the investment. *See* Offering Memorandum: Definition, Example, Vs. Prospectus, https://www.investopedia.com/terms/o/offeringmemorandum.asp.

The final PSR concluded that 15 victims experienced a substantial financial hardship that resulted in "substantial losses to their retirements, having to take out student loans for their children, downsizing homes, taking out loans/lines of credit, and having to delay retirement." (PSR ¶ 75). While the government recognizes the harm inflicted on victims in this case, some of the victims identified in the PSR reported hardships as a result of other factors, such as health concerns and unrelated investments, that do not support a finding that the *offense* resulted in substantial financial hardship.[3] In addition, application of this enhancement should be viewed in relation to the representations that investors made that they qualified as "accredited investors" with a certain level of net worth and/or personal income, could bear the economic risk of a potential loss of their investments, and understood the illiquidity of the investments.[4] Given these unique circumstances, the government will ask the Court to sustain the objection preserved for both parties.[5]

---

[3] The Guidelines contain a list of non-exhaustive factors to consider when determining whether the offense resulted in a substantial financial hardship to a victim, specifically, "(i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit." U.S.S.G. § 2B1.1 Application Note 4(F).

[4] To be clear, the fact that victims did not suffer a "substantial financial hardship" under the Guidelines in no way undermines the severity of Schwartz's fraud scheme or the victims' rights to receive full restitution.

[5] If the Court sustains the objection, the Court should calculate the Guidelines based on the initial PSR, which included a total offense level of 28 and advisory Guidelines range of 78 to 97 months. Neither party objected to the Guidelines outlined in the initial PSR, which are detailed in the chart in the Conclusion section below.

**B. The nature and circumstances of Schwartz's offense warrant a low-end Guidelines sentence that would reflect the seriousness of the offense, promote respect for the law, provide for just punishment, and afford adequate deterrence.**

Through his fraud scheme, Schwartz used CrowdStreet investor money to bankroll his lavish lifestyle. There are numerous examples of Schwartz using CrowdStreet investor funds to pay for luxury watches, a waterfront Miami Beach condominium, and venture capital investments. (*See* PSR ¶¶ 25-31.) This fraud scheme was not an accident or a single instance of poor judgment. Schwartz's scheme involved a sustained course of conduct to raise money from CrowdStreet investors on the pretense that their investments would be kept safe and only used for the Atlanta Financial Project and Lincoln Place. The investor victims in this case were not big banks or hedge funds, but individual investors who came to CrowdStreet to find a place to invest their hard-earned money. The victims' money is now gone with a long and uncertain road ahead as to whether they'll recover their money that Schwartz misused in his fraud scheme. A sentence that includes a meaningful term of incarceration is necessary to reflect the magnitude of the fraud scheme in this case and to promote respect for the law by demonstrating such financial fraud will not go unpunished.

Quickly after his scheme unraveled, Schwartz was cooperative with the civil and criminal authorities and ultimately accepted responsibility in a pre-indictment guilty plea. These facts lessen the need for specific deterrence. There is, however, a significant need for a meaningful term of imprisonment in this case to ensure adequate general deterrence. As the Eleventh Circuit has

explained:

> General deterrence is more apt, not less apt, in white collar crime cases. The reason is that economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, which makes them prime candidates for general deterrence. White collar criminals often calculate the financial gain and risk of loss of their crimes, and an overly lenient sentence sends the message that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.

*United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022) (quotations and citations omitted); *see also United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) (explaining that "general deterrence is an important factor in white-collar cases, where the motivation is greed"). Accordingly, in white collar cases such as this—with over 800 victims and over $62 million in loss—a substantial sentence will serve as a critical deterrent to others who may engage in such fraud schemes. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]"); *see also Howard*, 28 F.4th at 210 ("We have encouraged our district court colleagues to keep in mind that criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." (quotations and alterations omitted)).

**Conclusion**

Based on the foregoing, the government believes that Schwartz's advisory Guidelines range is 78-97 months' imprisonment based on the following:

| Guideline | Offense Level/ Enhancement |
|---|---|
| USSG § 2B1.1(a)(1) (offense of conviction has a statutory maximum term of imprisonment of 20 years or more) | 7 |
| USSG § 2B1.1(b)(1)(L) (loss from the offense was more than $25 million) | +22 |
| USSG § 2B1.1(b)(2)(A)(i) (offense involved 10 or more victims) | +2 |
| USSG § 3B1.3 (abuse of position of private trust) | +2 |
| USSG § 3E1.1 (timely acceptance of responsibility) | -3 |
| USSG § 4C1.1 (zero-point offender) | -2 |
| **Total Offense Level** | 28 |

At sentencing, pursuant to the terms of its Plea Agreement with Schwartz, the government will recommend that the Court sentence Schwartz at the low-end of the advisory Guidelines range.

Respectfully submitted this 14th day of May 2025.

THEODORE S. HERTZBERG
*United States Attorney*

LORINDA I. LARYEA
*Acting Chief*
*Fraud Section, Criminal Division*

/s/ KELLY K. CONNORS
*Assistant United States Attorney*
Georgia Bar No. 504787
kelly.connors@usdoj.gov

/s/ MATTHEW F. SULLIVAN
*Trial Attorney*
New York Bar No. 4785952
matthew.sullivan2@usdoj.gov