

NIGHTINGALE



LINCOLN PLACE

**PRIVATE PLACEMENT MEMORANDUM**

**OF**

**ONH 1601 CS Investors LLC**

**(a Delaware Limited Liability Company)**

**(the "Company")**

**$15 Million**

**Dated: July 15, 2022**

THE MEMBERSHIP INTERESTS OF THE COMPANY ("INTERESTS") HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH INTERESTS IS RESTRICTED. THE INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE COMPANY FOR ANY PURPOSES, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE FEDERAL AND STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE COMPANY.

THE INTERESTS DESCRIBED HEREIN MAY BE ACQUIRED FOR INVESTMENT PURPOSES ONLY, AND NOT WITH AN EYE TOWARDS RESALE. PURCHASERS OF SUCH INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE INTERESTS DESCRIBED HEREIN ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY THOSE PERSONS WHO CAN SUSTAIN A LOSS OF THEIR ENTIRE INVESTMENT.

ONH 1601 CS Investors LLC, a Delaware limited liability company (the "Company"), is offering membership interests (the "Interests") in the Company (as further described herein, the "Offering") in a private placement pursuant to exemptions from registration found in Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act") and Regulation D promulgated thereunder by the Securities and Exchange Commission (the "SEC") to investors (individually, an "Investor," and collectively, the "Investors"). The Manager of the Company is One Night Holdings LLC, a Delaware limited liability company (the "Manager" or "Sponsor"). The minimum investment in the Company is $25,000, provided that the Manager may accept smaller investments in its discretion. All Investors purchasing Interests shall become members (the "Members") of the Company, subject to admission under the terms and conditions of the LLC Agreement (as described below). The Interests are being sold by the Company with an expected closing of sales on or about December 31, 2022, but the closing of the Offering may occur at another date at the sole discretion of the Manager of the Company. The Company was formed to, indirectly, purchase and own the real property located at 1601, 1605, and 1619 Washington Ave, Miami Beach, FL (the "Property"). The Company has taken and may also take any further action incidental and conducive to the furtherance of the aforementioned purposes.

Capitalized but undefined terms in this Private Place Memorandum (this "Memorandum") have the meanings assigned to them in the Limited Liability Company Agreement of ONH 1601 CS Investors LLC (the "LLC Agreement").

The business address and telephone number of the Company is:
One Night Holdings LLC
c/o Nightingale Properties LLC, its Manager
Attn: Elie Schwartz



Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend" or "believe," or the negatives thereof or other variations thereon or comparable terminology. Similarly, statements that describe the Company's future financial condition, results of operations, objectives, strategies, plans, goals or future performance and business are also forward-looking statements. Due to various risks and uncertainties, including those described herein in the sections labeled "RISK FACTORS" and "CONFLICTS OF INTEREST," actual events or results or the actual performance of the Company may differ materially from those reflected or contemplated in such forward-looking statements.

Certain factors that might cause a difference in our economic performance include, but are not limited to, the following:

- changes in national, regional and local economic conditions;
- changes in local and national real estate conditions and valuations;
- competition;
- the condition of the capital markets;
- changes in interest rates;

- ☐ continued volatility and uncertainty in the credit markets and broader financial markets that, among other things, may reduce the availability of mortgage funds which may render the sale or refinancing of any of the Properties difficult or impracticable;
- ☐ changes in real property tax rates;
- ☐ changes in supply of and demand for competing properties;
- ☐ the ability to renew leases, lease vacant apartments or re-lease apartments as existing leases expire or are terminated;
- ☐ energy and supply shortages;
- ☐ environmental uncertainties and natural disasters;
- ☐ changes in, or the failure or inability to comply with, government regulation;
- ☐ the strength of the United States economy in general;
- ☐ changes in U.S. tax law or accounting principles, policies, practices or guidelines;
- ☐ future terrorist attacks or military operations in the U.S. or abroad;
- ☐ other risks inherent in the real estate business, including tenant defaults and illiquidity of real estate investments; and
- ☐ the impact of pandemics such as the recent outbreak of COVID-19 or other sudden or unforeseen events that disrupt the economy, including but not limited, the impact of such events on tenants ability to make rent payments and government regulations that limit or freeze the ability to evict non-paying tenants.

If one or more of the factors affecting the Company's forward-looking information and statements proves incorrect, then its actual results, performance or achievements could differ materially from those expressed in, or implied by, forward-looking information and statements contained in this Memorandum.  Therefore, the Company cautions you not to place undue reliance on its forward-looking information and statements.

This Memorandum has been prepared solely for the information of the person (or their representative) to whom it has been delivered by or on behalf of the Company (each such person, an "Offeree"), and should not be reproduced, distributed, or used for any other purpose. No person has been authorized in connection with the private placement described herein to give any information or make any representations other than as contained in this Memorandum, the LLC Agreement, or the Company's Subscription Agreement, as the same may be amended, supplemented, or otherwise modified from time to time.

The Manager will provide to each offeree of Interests and/or its representative, prior to the closing of the sale of Interests to such offeree, the opportunity to ask questions of, and receive answers from, the Manager or a person acting on its behalf concerning the terms and conditions of this offering and to obtain any additional information which the Manager possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the information set forth herein.  Inquiries should be directed to the Manager at the address set out above.

**NOTICES**

Investment in the company involves a high degree of risk, is speculative, and is suitable only for accredited investors with substantial financial resources and without the need for liquidity. See "risk factors." Each investor should consult with his, her, or its own financial, legal, and tax advisors concerning an investment in the company before purchasing any interest therein.

The interests offered hereby have not been registered under the Securities Act of 1933, as amended, or under the laws of any state or other jurisdiction. The interests are subject to restrictions on transferability and resale. Among other things, no transfer may be made without the approval of the Company, which approval may be granted or withheld in its sole discretion. Moreover, even if the Company permits a transfer, such transfer may be made only if permitted in compliance with all applicable securities laws pursuant to registration or exemption therefrom. For these and other reasons, investors should be aware that they may be required to bear the financial risk of an investment in the company for an indefinite period of time.

The Company will not be registered as an investment company under the Investment Company Act of 1940, as amended (the "the 1940 Act").  The Manager is not registered as an investment adviser under the Investment Advisers Act of 1940, as amended or any state securities act.  Each investor will be required to represent, and provide information that will permit the manager or its agent to verify, that it is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D of the Securities Act.

The information contained in this Memorandum supersedes all other information potential investors may have received from the Company.

This Memorandum shall not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of interests in any jurisdiction in which such offer, solicitation, or sale is not authorized or to any person to whom it is unlawful to make such offer, solicitation, or sale. No person has been authorized to make any representations concerning the Company that are inconsistent with those contained in this Memorandum. Prospective investors should not rely on any information not contained in this Memorandum.

The Interests have not been recommended by any Federal or state securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document.

Prospective investors should not construe the contents of this Memorandum as legal, tax, or financial advice. Each prospective investor should consult its own professional advisors as to the legal, tax, financial, or other matters relevant to the suitability of an investment in the Company for such investor.

This Memorandum contains summaries of certain provisions of documents relating to the purchase of the Interests and potential loan transactions, management agreements and other agreements.  Such summaries do not purport to be complete and are qualified in their entirety by reference to the texts of the original documents that are available upon request.  If descriptions or terms in this Memorandum are inconsistent or contrary to descriptions or terms in such agreements, then the full agreement, and not the summary contained in this Memorandum, shall control.

Certain information contained herein containing industry and other economic trends and performance are based on or derived from information obtained from third party sources.  Certain

4

information regard the Property have been obtained from the seller of the Property. Each of the Company and the Manager believes that such information is accurate and that the sources from which it has been obtained are reliable. The Company and the Manager cannot guarantee the accuracy of such information, however, and have not independently verified the assumptions on which such information is based.

Any estimates and projections included herein as to events that may occur in the future are based upon the judgment of the Manager as of the date of this Memorandum. Whether or not such estimates or projections may be achieved will depend upon the Company's achieving its overall business objectives and the availability of funds, including funds from the sale of Interests. The Company does not guarantee that any of these projections will be attained. Actual results will vary from the projections and such variation may be material.

This Memorandum is qualified in its entirety by reference to the limited liability company agreement of the Company and the investor subscription agreements attached hereto, which should be carefully reviewed prior to purchasing an Interest.

The delivery of this Memorandum does not imply that the information herein is correct as of any time other than the date set forth on the first page of this Memorandum. The Company reserves the right to modify any of the terms of this offering.

It is the responsibility of any person or entity wishing to purchase the Interests to satisfy himself herself or itself as to the full observance of the laws of any relevant territory outside the United States in connection with any such purchase, including obtaining any required governmental or other consents or observing any other applicable formalities.

**PRIVACY NOTICE**

BY COMPLETING AN APPLICATION TO SUBSCRIBE FOR INTERESTS PROSPECTIVE INVESTORS WILL PROVIDE THE MANAGER AND THE COMPANY WITH "NONPUBLIC PERSONAL INFORMATION" ABOUT THEMSELVES (INCLUDING FINANCIAL INFORMATION TO SUPPORT THEIR ASSERTIONS THAT THEY MEET THE FINANCIAL QUALIFICATIONS TO SUBSCRIBE). THE MANAGER AND THE COMPANY WILL OBTAIN AND DEVELOP ADDITIONAL NONPUBLIC PERSONAL INFORMATION ABOUT MEMBERS (SUCH AS CAPITAL ACCOUNT BALANCES AND AMOUNTS AND DATES OF ADDITIONAL CAPITAL CONTRIBUTIONS AND WITHDRAWALS) AS A RESULT OF THEIR INVESTMENT IN THE COMPANY. THE MANAGER AND THE COMPANY GENERALLY DO NOT DISCLOSE THIS INFORMATION TO THIRD PARTIES, OTHER THAN SERVICE PROVIDERS WHO MUST OBTAIN ACCESS TO THAT INFORMATION IN ORDER TO PERMIT THE MANAGER OR THE COMPANY TO CONDUCT THEIR AFFAIRS (E.G., AUDITORS, ACCOUNTANTS, BROKERS, ATTORNEYS, AND OTHER CONSULTANTS). THE MANAGER AND THE COMPANY RESTRICT ACCESS TO SUCH INFORMATION INTERNALLY TO THOSE PERSONNEL WHO NEED THE INFORMATION IN ORDER TO CONDUCT THE MANAGER'S AND THE COMPANY'S BUSINESS.

BY EXECUTING A SUBSCRIPTION AGREEMENT, EACH PROSPECTIVE INVESTOR ACKNOWLEDGES THAT, WHILE THE MANAGER WILL USE ITS REASONABLE BEST EFFORTS TO KEEP THE PROSPECTIVE INVESTOR'S INVESTMENT IN THE COMPANY AND THE INFORMATION THAT PERSON PROVIDES CONFIDENTIAL, (I) THERE MAY BE CIRCUMSTANCES IN WHICH APPLICABLE LAW OR REGULATIONS RELATING TO COMBATING TERRORISM OR MONEY LAUNDERING OR OTHERWISE THAT MAY REQUIRE THE RELEASE OF NONPUBLIC PERSONAL INFORMATION TO LAW ENFORCEMENT OR REGULATORY OFFICIALS, (II) THE MANAGER MAY PRESENT THE SUBSCRIPTION AGREEMENT OR ANY NONPUBLIC PERSONAL INFORMATION TO REGULATORY BODIES OR OTHER PARTIES AS MAY BE APPROPRIATE TO ESTABLISH THE AVAILABILITY OF EXEMPTIONS FROM CERTAIN SECURITIES AND SIMILAR LAWS OR THE COMPLIANCE OF THE MANAGER OR THE COMPANY WITH APPLICABLE LAWS, AND (III) THE MANAGER MAY DISCLOSE THE SUBSCRIPTION AGREEMENT, THE INFORMATION INCLUDED THEREIN, OR OTHER NONPUBLIC PERSONAL INFORMATION RELATING TO ANY MEMBER'S INVESTMENT IN THE COMPANY WHEN REQUIRED BY JUDICIAL PROCESS OR, TO THE EXTENT PERMITTED UNDER APPLICABLE PRIVACY LAWS, TO THE EXTENT THE MANAGER CONSIDERS THAT INFORMATION RELEVANT TO ANY ISSUE IN ANY ACTION, SUIT, OR PROCEEDING TO WHICH THE COMPANY IS A PARTY OR BY WHICH IT IS OR MAY BE BOUND.

IF A MEMBER HAS INSTRUCTED THE COMPANY OR THE MANAGER TO SEND DUPLICATE REPORTS TO THIRD PARTIES PURSUANT TO THE SUBSCRIPTION AGREEMENT, THE MEMBER MAY REVOKE THOSE INSTRUCTIONS AT ANY TIME BY SENDING A WRITTEN NOTICE TO THE MANAGER AND THE COMPANY INDICATING THAT A PREVIOUSLY AUTHORIZED THIRD PARTY IS NO LONGER AUTHORIZED TO RECEIVE THE MEMBER'S REPORTS.

## SUMMARY OF TERMS & CONDITIONS

Pursuant to the terms of this Memorandum, the Company is seeking to raise approximately $15.0 million by selling Interests but the Manager may elect in its discretion to accept a lesser or greater amount at Closing. The following is a summary of certain information set forth more fully elsewhere in the Memorandum, the LLC Agreement, and the other documents referenced herein, and is qualified by other information contained herein and therein. All such documents are available from the Company upon request. If there are any inconsistencies or conflicts between the terms and conditions of this Memorandum and the terms and conditions set forth in the LLC Agreement, the terms and conditions of the LLC Agreement shall control.

Prospective Investors should read the entire Memorandum and the LLC Agreement (including any amendments thereto) carefully before making any investment decision regarding the Company and should pay particular attention to the information in this Memorandum under the headings "RISK FACTORS" and "CONFLICTS OF INTEREST". In addition, potential Investors should consult their own tax, legal, and financial advisors in order to understand fully the consequences of an investment in the Company. Capitalized terms used herein, but not otherwise defined, will have the meaning provided in the LLC Agreement.

| | |
|---|---|
| The Company | ONH 1601 CS Investors LLC is a Delaware limited liability company formed on July 15, 2022. The Company's membership interests are called "Interests." The Company is governed by the Limited Liability Company Agreement of ONH 1601 CS Investors LLC (the "LLC Agreement"). |
| The Manager | The sole initial Manager of the Company is One Night Holdings LLC, a Delaware limited liability company (the "Manager" and "Subordinated Return Member"). It is anticipated that the Manager will be the sole manager of the Company. The Manager shall be responsible for all management of the Company and have authority to oversee all operations of the Company. The Manager may appoint officers of the Company to whom certain of the day-to-day management and operations may be delegated subject to the Manager's oversight. |
| Priority Return Member | Priority Return Member shall mean each of the other persons (the "Priority Return Members") set forth on Schedule A annexed hereto and made a part hereof (each of the Subordinated Return Member and each of the Priority Return Members are sometimes referred to herein as a "Member" and collectively, as the "Members"). |
| The Property | The Company was formed to, indirectly, purchase and own the real property located at 1601, 1605, and 1619 Washington Ave, Miami Beach, FL (the "Property").  The Company will invest in the Property indirectly by acquiring an interest in ONH 1601 Mezz LLC (the "Interim LLC").  The Interim LLC will be have two members, the Company and ONH 1601 Investors LLC (the "Parallel LLC"). The Interim LLC in turn will hold 100% of the equity interests of NG 1601 WASHINGTON AVE LLC (the "Property Owner").  The Property Owner will acquire approximately 100% of the Property. |
| The Offering | The Company is seeking investment capital for the Interests issued pursuant to the Offering in an amount of approximately $15.0 Million, at the Manager's sole discretion. The Manager (and/or its affiliates) is making capital contributions of not less than 10% of the total investment capital. Therefore, the aggregate amount raised from Investors in the Offering will represent the value of approximately no more than 90% of the outstanding Interests in the Company as of the Closing. The minimum capital contribution of each Member with respect to |

| | |
|---|---|
| | the Interests is $25,000.00, subject to the Manager's discretion to accept subscriptions for lesser amounts. The Manager anticipates closing the purchase of Interests on or about December 31, 2022 (the "Closing Date"). The Manager, at its sole discretion, may provide for an earlier or a later Closing Date. The Manager may choose to reject any proposed subscription by a potential Investor, in whole or in part, and return any proposed Capital Contribution in respect of a rejected subscription by a potential Investor. The Offering shall be deemed closed on the Closing Date determined by the Manager after the Manager accepts each such proposed subscription in the Offering as it determines in its discretion. |
| Suitability & Qualification for Investment | Each Investor will be required to represent that the Investor meets the suitability standards set forth in the Subscription Agreement. Each Investor will be required to represent, and provide information that will permit the Manager or its agent to verify, that the Investor is an "accredited investor" as that term is defined in rule 501(a) of Regulation D of the Securities Act.<br><br>Prospective Investors interested in acquiring Interests are required to review the Company's Subscription Agreement and return it to the Company. An Investor must pay one hundred (100%) percent of the Investor's Capital Contribution on or at the time of subscription by ACH or wire transfer of immediately available funds, in accordance with the instructions set forth in the section of the Subscription Agreement entitled "Instructions to Subscribers".<br><br>Upon acceptance by the Manager in its sole discretion of a completed and executed Subscription Agreement by a potential Investor and the Company's receipt of the Investor's Capital Contribution, the Investor would then be admitted as a Member of the Company. |
| Sources of Funds / Use of Proceeds | The Company seeks to raise approximately $15.0 million in this Offering. The proceeds from this Offering will be used to purchase, lease, reposition, and extensively renovate Lincoln Place. |
| Loan | The Manager has a signed term sheet from Granite Point Mortgage Trust ("A-Note Lender") for senior financing in an amount not to exceed $56,100,000.00 (the "Mortgage Loan") with a floating interest rate for the Mortgage Loan fixed at a per annum rate equal to the sum of (i) 465 basis points plus (ii) the value of the 1-month SOFR ("ie. Term SOFR). The loan matures in twenty-four months (24 months or 2 Years) and is full-term interest-only (i.e. no Amortization). The Manager also has a signed term sheet from Glacier Credit Strategies ("B-Note Lender") for subordinate financing in an amount not to exceed $29,000,000.00 (the "Mortgage Loan") with a floating interest rate for the Mortgage Loan fixed at a per annum rate equal to the sum of (i) 1250 basis points plus (ii) the value of the 1-month SOFR ("ie. Term SOFR). The loan matures in twenty-four months (24 months or 2 Years) with two (2) one (1) year extension options and is full-term interest-only (i.e. no Amortization).<br><br>The Manager currently expects to accept approximately $15.0 million in subscriptions for Interests if the Manager elects to proceed with the proposed Mortgage Loan from Senior Lender.<br><br>If the Manager elects not to close on the Property for any reason by December 31, 2022, subscription funds from potential Investors will be returned. Any subscription funds not accepted will be returned without interest or other earnings |

| | |
|---|---|
| | thereon. The preferred return on an Investor capital contribution to the Company will begin to accrue when subscriptions are accepted by the Manager. |
| Withdrawal of Members | A Member may not withdraw from the Company as a Member. Members generally will not have any ability to redeem their Interests. |
| Transfer Restrictions | Each Member's right to Transfer (as defined in the LLC Agreement) any portion of its Interest is restricted pursuant to the terms of the LLC Agreement, the Securities Act, and the rules and regulations thereunder. Interests are not assignable or transferable (except by operation of law) without the prior written consent of the Manager. The transfer, sale, assignment, or exchange of any Interest will not be permitted if it would result in termination of the Company's treatment for federal income tax purposes. Transfers of Interests will only be permitted in accordance with the terms of the LLC Agreement. |
| **Distributions** | **Distribution of Available Cash and Capital Proceeds**<br><br>The Manager shall distribute cash available for distribution, as determined by the Manager, no less often than quarterly.  Distributions from the Property Owner will be made 100% to the Interim LLC.  Distributions by the Interim LLC will be made (i) first, 100% to the Manager until the Manager receives the (a) Acquisition Fee (b) Loan Carve-Out Guarantor Fee (c) a portion of the Construction Management Fee (the "Priority Distribution"); and (ii) all additional distributions to the Company proportionately based on their capital contributions to the Interim LLC.<br><br>Distributions by the Company will be made in accordance with the following order of priority:<br><br>(i)    First, to the Priority Return Members, pro rata, in accordance with their respect initial Capital Contributions, until such time as each of the Priority Return Members shall have received a cumulative annual preferred return of eight percent (8%) on the amount of their initial Capital Contributions as set forth on Schedule A annexed hereto;<br><br>(ii)    (Second, in the event that any Member or Members has made an Additional Capital Contribution to the Company, to all such Members, pro rata in proportion to the amount of the Additional Capital Contributions made by such Members to the Company, until all such Additional Capital Contributions are repaid in full;<br><br>(iii)    Third, in the event that any Member or Members has made a Member Loan to the Company, to all such Members, pro rata in proportion to the amount of the Member Loans they have made to the Company, until all such Member Loans and all interest accrued thereon are repaid in full;<br><br>(iv)    Fourth, to each of the Priority Return Members, pro rata, in proportion to their respective Membership Percentages, until the cumulative amounts distributed to each Priority Return Member pursuant to this Section 5.2(b)(iv) equal such Member's Unreturned Capital Contribution; and<br><br>(v)    Fifth, thirty percent (30%) to the Subordinated Return Member and seventy percent (70%) to the Priority Return Members, allocated among the Priority Return Members pro rata based on their respective Membership Percentages until the Target IRR Achievement Event. |

| | | |
|---|---|---|
| | (vi) | Thereafter, fifty percent (50%) to the Subordinated Return Member and fifty percent (50%) to the Priority Return Members, allocated among the Priority Return Members pro rata based on their respective Membership Percentages |
| | | "**Internal Rate of Return" or "IRR**" means the internal rate of return a particular Member achieves on its investment in the Company, which internal rate of return shall be that certain interest rate that, when used as a discount rate, causes: (i) the net present value (as of the date of computation) of the aggregate distributions made to a Member by the Company pursuant to the applicable provisions of this Agreement from the Effective Date through the date on which such internal rate of return is computed, to equal (ii) the net present value (as of the date of computation) of all Capital Contributions made by such Member to the Company from and after the date of Closing through and including such computation date.  For purposes of this definition, the internal rate of return shall be determined using annual compounding periods, by using "XIRR," where the XIRR has the meanings assigned to such terms by Microsoft Excel.  The IRR shall be calculated on the basis of the actual number of days elapsed over a 365 or 366-day year, as the case may be. |
| | | "**Target IRR Achievement Event**" means the first event upon which the IRR of the Priority Return Members equals or exceeds twenty percent (20%). |
| Conflicts of Interest; Payments to the Manager | The fact that a Member or an affiliate of a Member or the Manager is employed by or is directly or indirectly interested in or connected with any person or entity employed by the Company to perform a service, or from or with which the Company may purchase any property or have other business dealings, shall not prohibit the Manager from employing or otherwise dealing with such person, provided that any such dealings shall be arms' length and at no higher cost than market rates; and neither the Company nor any of the Members shall have any rights in or to any income or profits derived therefrom. Each of the Members acknowledge that the Manager or an affiliate of the Manager may provide services to the Property, including serving as property manager with respect to the Property.  The Company expects to pay or bear the following fees to the Manager or its affiliates: | |
| | (i) | an asset management fee equal to two percent (2%) of the "gross rents" generated by the Property; |
| | (ii) | a property management fee equal to three percent (3%) of the "gross rents" generated by the Property; |
| | (iii) | an acquisition fee equal to two percent (2%) of the gross purchase price for the Property (which will be reduced by any Priority Distributions paid to the Manager); |
| | (iv) | a loan cave-out guarantor fee equal to one-half percent (0.5%) of the total financing (which will be reduced by any Priority Distributions paid to the Manager); |
| | (v) | a portion of the construction management fee equal to three hundred thousand dollars ($300,000) (which will be reduced by any Priority Distributions paid to the Manager); |
| | (vi) | in connection with any capital improvements, a construction management fee of 3.00% of hard costs (paid upon completion) |
| | (vii) | upon the sale of the Property, a disposition fee equal to one percent (1.0%) of the gross sale price for the Property; |

| | |
|---|---|
| | (viii) upon each financing (other than the initial financing incurred in connection with the closing of the Property) refinancing of the debt secured by the Property (including mezzanine debt), a fee equal to one-half percent (0.5%) of the gross loan amount; and<br><br>(ix) a leasing override fee (payable upon commencement of rent) equal to one percent (1%) of the lease amount of all new leases of space at the Property (including any renewals, extensions, or expansions thereof).<br><br>Certain inherent conflicts of interest may arise from the Manager's actions on behalf of the Company and its other interests. The Manager's and its affiliates also carry on investment activities for other clients, including other properties or real estate investment vehicles controlled by any of the foregoing or their affiliates in which the Company will have no interest. The Manager will devote to the Company only as much of its time as is necessary or appropriate, in its judgment, to manage the Company's activities. Future investment activities by the Manager, including the establishment of other real estate investment vehicles, some of which may also follow investment programs substantially similar to that of the Company, may give rise to additional conflicts of interest. |
| Risk Factors | THE INVESTMENT PROGRAM OF THE COMPANY IS SPECULATIVE AND INVOLVES SIGNIFICANT RISK OF LOSS.  EACH PROSPECTIVE INVESTOR IS ENCOURAGED TO READ THE "RISK FACTORS" SECTION OF THIS MEMORANDUM FOR A DISCUSSION OF CERTAIN RISKS ASSOCIATED WITH AN INVESTMENT IN THE COMPANY. |
| Other Fees & Expenses | The Company also expects to pay or bear fees to other independent consultants and contractors to perform professional services, particularly in the areas of legal, tax, real estate brokerage, renovation, design, and environmental assessment.<br><br>At Closing, the Company will pay to CrowdStreet, Inc a Deployment Fee estimated to be one million three hundred and fifty thousand dollars ($1,350,000). The Company will also pay or bear a technology fee to CrowdStreet, Inc. for use of its online marketplace, estimated to be two hundred and ninety two thousand and five hundred dollars ($292,500). CrowdStreet, Inc. is not affiliated with the Manager.<br><br>The Company will also bears the expenses of the Offering (including legal and accounting fees, legal costs, comprehensive insurance programs in the Manager's discretion, travel, "blue sky" filing fees and expenses and out-of-pocket expenses). The Company does not intend to retain any placement agent or incur any other brokerage fees in connection herewith.<br><br>For the avoidance of doubt, the Company's net income or loss for any period shall be net of all expenses incurred by the Company, including, without limitation, administrative expenses, compensation and benefits for officers and other employees, depreciation, amortization, interest expense, rent, overhead, and other expenses. Notwithstanding the forgoing, the Company does not expect to have employees. |
| Indemnification; Limitations of Liability | Pursuant to the LLC Agreement, the Manager and its affiliates will be entitled to indemnification from the Company if they are a party, or threatened to be made a party, to any pending, completed or impending action, suit or proceeding of any kind, whether civil, criminal, administrative, arbitrative or investigative (whether or not by or in the right of the Company) by reason of (a) being or having been a Manager of the Company, (b) being or having been a member, manager, partner, |

| | |
|---|---|
| | officer or director of any other entity at the request of the Company, or (c) serving or having served in a representative capacity for the Company in connection with any partnership, joint venture, committee, trust, employee benefit plan or other enterprise, against all expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties, awards, costs, amounts paid in settlement and liabilities of all kinds, actually incurred by such person or entity incidental to or resulting from such action, suit or proceeding to the fullest extent permitted under the Delaware Limited Liability Company Act. The Manager may cause the Company to purchase insurance on behalf of such person against liability asserted against or incurred by such persons, whether or not the Company would have authority to indemnify such person directly against the same liability under the provisions of the Delaware Limited Liability Company Act.<br><br>The Manager will not have any liability to the Company or the other Members for monetary damages resulting from conduct which does not constitute willful wrongdoing or intentional disregard of the terms of this Agreement. |
| ERISA and Other Tax Exempt Entities | Entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and other tax-exempt entities may purchase Interests in the Company.  The Company intends to limit the direct and indirect investments in the Property Owner by investors subject to Title I of ERISA, Section 4975 of the Internal Revenue Code of 1986, and any entities the underlying assets of which are deemed include plan assets pursuant to ERISA to less than 25% of the Property Owner's total capital contributions.  However, the Manager may permit investments by plan asset investors to exceed such limit and either qualify as a real estate operating company or otherwise comply with ERISA. |
| Tax Considerations | Any discussion of tax considerations in this Memorandum is not intended to be, and should not be construed as, tax advice to any particular Member.  Members are strongly urged to consult their own tax and financial advisors with respect to the tax consequences of an investment in the Interests of the Company in any jurisdiction in which the Member resides, is domiciled, does business or otherwise. |
| Tax Exempt Investors | The Company may generate unrelated business taxable income (such as unrelated debt financed income) which would require entities otherwise exempt from Federal income tax to incur tax liability in respect of such income. |
| Non-U.S. Investors | Non-U.S. Members are taxed on the gain derived from the dispositions of U.S. real property interests (including gain allocated pursuant to the LLC Agreement upon a sale of such property interests) and certain interests in entities owning such property. Non-U.S. Members are required to treat gain or loss from dispositions of U.S. real property as if the gain or loss were "effectively connected" with a U.S. trade or business and, therefore, are required to pay U.S. taxes at regular U.S. rates on such gain or loss. Generally, the Fund will be required to withhold a portion of any gain attributable to the U.S. real property interest realized to the extent such gain is allocated to a foreign Member. Similar requirements may apply upon a sale of a Member's interest in the Company. Interests in the Company owned or treated as owned by a Non-US. individual at the date of death of such individual may be included in such individual's estate for U.S. federal estate tax purposes. |
| Amendments to the LLC Agreement | The LLC Agreement may be amended or modified from time to time only by a written instrument adopted by two thirds in interest of the Members. |

*[Remainder of this Page Intentionally Left Blank]*

# ORGANIZATIONAL CHART



- *   * is a newly formed LLC
- *   Other than Elie Schwartz, no other individual or entity owns 10% or more of the indirect interests in the Borrower
- *   Other than Elie Schwartz, no other individual or entity owns 10% or more of the indirect interests in ONH Promote LLC
- *   One Night Holdings LLC is 100% owned and controlled by Elie Schwartz, which owns 100% of ONH 1601 Investors LLC
- *   One Night Holdings LLC is the Non-Member Manager of ONH 1601 Mezz LLC

STRICTLY PRIVATE & ABSOLUTELY CONFIDENTIAL

 

# LINCOLN PLACE ("THE PROPERTY")

Nightingale Properties (the "Sponsor" or "Nightingale") is pleased to present the opportunity to invest in Lincoln Place at 1601 Washington Avenue ("the Property" or "1601 Washington"), a 307,981 SF landmark trophy mixed-use project located at the northeast corner of Washington Avenue and 16th Street, in the heart of Miami's "Wall Street South" in Miami Beach.

The Sponsor is executing a value-add business plan to enhance the Property's value in a market with strong secular demand drivers and tech-fueled tailwinds by leasing up vacancies.

Built in 2002 as a build-to-suit for LNR Partners, an affiliate of Starwood, the Property was fully occupied for nearly 20 years until Starwood moved out in early 2022. With Starwood recently developing its new headquarters down the street, Lincoln Place now provides a tremendous opportunity to capitalize on Miami's record-setting growth through a transformative and strategic renovation that will convert Lincoln Place into one of Miami Beach's most desirable office buildings.

The renovation, which is already underway and immediately began after Starwood vacated in early 2022, will total $8 million of offensive leasing-related capital improvements, including but not limited to a new lobby, state-of-the-art tenant amenities, mechanical improvements, vacant space prep, and a targeted spec-suite program.

The capital program has been thematically designed to capture the demand of tech and financial service tenants with immediate occupancy needs with over 70,000 SF of pre-built spec suites, evidenced by the recent leasing at the Property and in the submarket. Once complete, 1601 Washington will provide tenants with a best-in-class combination of modern amenities and a luxury location at over a 50% rent discount to competitive properties. In addition to the Property's office space, Lincoln Place also features 21,686 SF of highly desirable street-level retail in an 8-story building adjacent to a 5-story, 499 space parking structure spanning 168,094 SF.

With Miami Beach's emergence as a high-growth submarket with superior supply and demand fundamentals, the considerable amount of leasing volume occurring nearby, and the combination of this best-in-class product and attractive price point, the Property is well-positioned to attract a wide variety of tenants, resulting in an accelerated and efficient lease-up.

# INVESTMENT HIGHLIGHTS

**LOCATED IN THE HOTTEST CITY IN THE WORLD – "WALL STREET SOUTH"**

Capital, companies, and people are moving to Miami in droves. People are moving because of the city's lack of state and local income taxes, pro-business environment, fast-growing economy, affordability vs. other major cities, and the beautiful sunny lifestyle. The Magic City was thriving pre-pandemic and is now burgeoning at an unprecedented pace.

Miami Beach is a magnet for top technology and finance companies drawn by its character, colorful murals, pedestrian-friendly streets, and unique restaurant and bar concepts. Silicon Valley transplants such as Andreesen Horowitz signed a lease in Miami Beach within the last year. The most important companies in the world are looking to Miami Beach for their next corporate move, with big-name technology and finance companies leading the charge. Unprecedented multi-family and mixed-use development projects promise to enhance the 24-hour live-work-play dynamic in Miami Beach.

**MIAMI BEACH: FLORIDA'S MOST COVETED OFFICE MARKET**

- **New York's 6th Borough**: COVID-19 proved to be a catalyst for 1601 Washington and the overall Miami Beach office market as tenants migrated from around the globe, with a large concentration stemming from NYC – Miami Beach unofficially became NYC's "Sixth Borough". This new tenant base will be critical in driving the absorption of Class A+ space in Miami and supporting outsized rent growth, as even the most trophy Miami rents are affordable relative to what these tenants were previously paying in NYC, with asking Class A rents 25% of lower in Miami.
- **Space Absorption**: Major market entrants include Apollo, Point72, Millennium Management, Blackstone, and Citadel, all of whom have taken large blocks of space – if this southern migration continues, and just ~5% of NYC's Class-A office market (500 million SF) relocated to Miami (24 million SF), all of Miami's Class-A office space would be absorbed.
- **Supply / Demand Imbalance**: The Miami Beach market has a finite supply pipeline, and developers face headwinds, including global inflation and rising construction costs, which will continue to drive rents, leasing velocity, and pricing at existing assets such as 1601 Washington.

**JOB GROWTH FUELING LEASING DEMAND**

- **FLORIDA** - 1,681,345 MORE JOBS resulting in an overall 20.3% Growth Rate 2011-2021 Q2
- **SOUTH FLORIDA** - 465,241 MORE JOBS resulting in an overall 18.3% Growth Rate 2011-2021 Q2
- **MIAMI-DADE** - 136,425 MORE JOBS forecasted through 2028 11.0% Growth Rate
- **+1.27 million** Employees as of July 2021 with 2.7% employment growth, nearly double the national average (1.5%)
- Miami tech job growth grew 29% in Q2 2021, faster than any other major U.S. city

# INVESTMENT HIGHLIGHTS

**SUPPLY CONSTRAINED, ULTRA HIGH BARRIER TO ENTRY MARKET**

Throughout Miami Beach, vacant land is scarce, with residential, hotel, and retail being the highest and best use for the sites that may exist. Developable land trades at a premium, and strictly enforced building codes limit the height and density of any future developments. Multi-family development still represents the most efficient economic use of land moving forward, and future office development looks to be few and far between, making Lincoln Place an extremely attractive opportunity. Additionally, many of the existing improvements in Miami Beach are protected by the National Register of Historic Places code of Federal regulations. As a result, the Miami Beach office submarket is severely supply constricted.

**MARKET ABSORPTION OUTPACING COMPLETIONS**

Since the beginning of 2012, Miami has seen 5.9 million SF of positive net absorption compared to just 4.6 million SF of completions, a ratio of 1.3 SF absorbed for every 1 SF delivered. Of the 175,000 SF of net absorption in Q1 2022, 72% were Class A properties. Net absorption has outpaced completions in eight out of the last ten years. With strong demand for office space from new-to-market tenants and limited office development sites, this trend is expected to continue for the foreseeable future.

**HIGHLY ATTRACTIVE, CONSERVATIVE UNDERWRITTEN RENTS**

Upon completion of the Sponsor's Capital Plan, the Property will boast a new main building lobby, renovations to multi-tenant floors common areas, a new tenant Lounge, conference center, and new common area and restroom finishes putting the asset in line, and even above most Class A assets across Miami Beach.

With these comparable and competing properties achieving rents above $100 PSF NNN, the Sponsor's underwritten rents of $65 to 70 PSF FS are well below these other premium buildings. Given that tenants will be getting the same boutique office experience as these +$100 to $120 PSF NNN ($120 to $150 PSF FS) assets, in combination with a location in a highly desirable neighborhood, Lincoln Place presents an extremely attractive option for tenants in the market who want high-quality space but do not want to have to break the bank to do so.

**ADJACENT TO THE $620 MILLION MIAMI BEACH CONVENTION CENTER**

Nestled in the heart of Miami Beach, adjacent to Lincoln Place, the state-of-the-art Miami Beach Convention Center offers flexible special event and exhibition spaces near beautiful beaches, fine dining, and 5-star resorts. The MBCC welcomes more than 600,000 visitors annually. Newly re-imagined following a $620 million renovation completed in 2019, MBCC is positioned as one of the world's premier convention centers.

# INVESTMENT HIGHLIGHTS

## THE ULTIMATE LIVE-WORK-PLAY ENVIRONMENT

- **Incredible Population Growth**: Miami has emerged as one of the world's most livable cities – nearly 1,000 residents are moving to Florida per day, with the highest concentration being to Miami
- **Diverse Workforce**: Miami opens the doors for employers to diversify their employee base being the top location for diverse and well-educated talent in the United States - nearly ~60% of the population holding a Bachelor's degree or higher in Miami comes from a minority ethnic background

## NATION'S BEST PERFORMING OFFICE MARKET & EXTREME RENT GROWTH

The Miami Beach office submarket has historically demonstrated exceptional market fundamentals. It consistently outperforms almost every other submarket in the Southeastern United States. Class A office space in Miami Beach has averaged 93% occupancy over the last decade. It has maintained a 94% or higher occupancy over the previous five years. The submarket has demonstrated robust rental rate growth, increasing 60.8% since 2013. After a year of astounding office leasing demand, Miami has become synonymous with the "Roaring 20s" resurgence. Miami's annual rent growth was healthy, heading into the pandemic, averaging 5% since 2015, and 2.5% over the last 12 months. Over the next three years, Miami office inventory is projected to grow by a modest 1% compounded annual growth rate; meanwhile, the surge of institutions and new entrants into South Florida is projected to outpace the new supply aggressively. Even conservative forecasting projects Class A Office Rents to grow by an additional 27% over the next 5 years

## MARKET-LEADING PARKING RATIO WITH SIGNIFICANT IN-PLACE INCOME

Miami Beach is a parking-constrained market and one of the busiest tourist destinations in the world. This presents the ability to capture significant upside in parking revenue from the additional transient and non-tenant event and hotel overflow parking especially given the favorable parking ratio at the Property. The 4.5 per 1,000 Parking Ratio (per Office NRA) at Lincoln Place compares well to the market average of 1.5 to 2.0 per 1,000. Furthermore, the asset generates ~$150k/month in NOI attributed to parking with a largely vacant building, indicating the upside potential once the Sponsor capitalizes on their business plan.

## FLEXIBLE & ADAPTABLE FLOOR PLATES

The asset presents a prime opportunity for global, corporate, and regional headquarters. The adaptable floorplans are perfect for high-tech, innovative & creative companies ranging from approximately 8,000 SF to 21,000 SF.

# INVESTMENT HIGHLIGHTS

**"SILICON BEACH" - WHY TECH IS CHOOSING MIAMI**

- Miami has been dubbed "Silicon Beach"
- Miami Mayor Francis Suarez has taken an active role in recruiting new tech firms to Miami
- South Florida's tech talent is growing at one of the fastest rates among the major markets, with 18% growth between 2015-2020, second
- only to Los Angeles and ahead of other major markets such as San Francisco, Boston, and New York
- Florida added 10,522 new tech jobs in 2021, the 2nd most of any state behind Texas
- The average salary from these jobs was nearly $80,000
- Venture Capital investment is driving tech growth
- $4.6 Billion of venture capital investment in Miami in 2021, more than 3x the average of the last 5 years
- SoftBank recently committed $100M to fund technology companies based in Miami
- Miami is a global cryptocurrency hub
- The world's largest Bitcoin Conference is hosted in Miami

**WHY FINANCE IS CHOOSING MIAMI**

- Low tax and pro-business environment
- Significantly discounted office rents compared to other major MSA's
- High quality of life that attracts young professionals
- Executive housing in close proximity to the urban core

*"Miami is poised to be the next capital of capital. There's never been a place in the history of humanity where private equity firms, hedge funds and investment banks have converged with venture capitalists, start-up founders and entrepreneurs. They've always been segregated on two different sides of the country — in Manhattan and Silicon Valley. But now they're all coming here to Miami."*

-Francis Suarez, Mayor of Miami

**A GATEWAY, GLOBAL CAPITAL MARKET**

Global Institutional Investment via NYC into Miami / Southern Florida has proliferated over the last five years, with annual investment growing by over 130% since 2017. As investors observe and benefit from Florida's tax-free environment and the favorable tailwinds experienced by the market post-COVID, Miami / SoFL is undoubtedly the most coveted real estate market in the country.

- **Last 5 Years**: $17 Billion Acquisitions Closed in Miami / Southern Florida by NYC-based Capital
- **2020 - 2021 YTD**: Since 2020, NYC-based Investors have transacted ~$8 Billion
- **Last 2 Years**: 8 of the 20 most active capital groups are based in NYC, representing $3 Billion in transactions across 52 acquisitions
- **Present**: NYC-based capital currently hold the most assets in Miami apart from local owners, ~500 Properties valued at $60 Billion

# INVESTMENT DRIVERS

**~13% Discounted Price for Immediate Value**: The Sponsor originally purchased Lincoln Place in 2016 with a separate equity partner. Due to the explosive growth seen in Miami as of late, the Sponsor's equity partner pushed the Sponsor to sell the deal. The Sponsor wanted to remain in the deal due to their recognition of the upside potential at Lincoln Place through a value-add repositioning and lease-up of vacancy, understanding there was a significant amount of "meat on the bone" triggered by the market growth. The Sponsor ran a marketed process for sale, receiving bids from prospective Buyers between $92 million and $95 million. The Sponsor was able to negotiate with their equity partner to accept a recapitalization purchase price of $86 million, where their equity partner will be exiting the deal. Most recently, in March 2022, the Property was appraised by the Sponsor's Lender for $98.9 million.

**Outsized Historical Investor Returns, 30.7% IRR & 2.0x EM Average**: Nightingale is a name-brand, institutional-grade Enterprise Sponsor with a primary focus on office assets. To date, realized returns to Nightingale's investors have amounted to an average of 30.7% IRR and 2.0x equity multiple (net to the Investor) through multiple economic cycles, demonstrating and consistent track record of outsized returns.

**Institutional & Sophisticated Enterprise Sponsor**: Founded in 2005, and led by Elie Schwartz, Nightingale is known in the industry as one of the most agile, creative, and operationally savvy institutional-grade real estate investors, owner-operators, and developers in the country. Headquartered in New York City, with regional offices in Miami, Philadelphia, Chicago, and Atlanta. Nightingale's track record spans more than 22 states, where they own and manage over 22.0 million SF of office, retail, data center, life sciences, parking, and hotel assets under management. Since its inception, Nightingale's investment pedigree exceeds nearly $10 billion in transactions and the management of over $1 billion of Institutional Equity from Pension Funds and Sovereign Wealth Funds, in addition to $1 billion of Equity from High-Net-Worth Investors and Family Offices.

**Significantly Decreased Risk by Implementing an Interest Rate Cap**: During this uncertain interest rate environment, the Sponsor is significantly de-risking the investment by purchasing an interest rate cap that will cover the hold period. With the forward interest curves constantly increasing, investors have some certainty that outsized interest rate increases will be mitigated. This also creates an opportunity to generate cost savings if interest rates start to stabilize below the interest rate cap.

**Low Basis for a Class A Miami Office**: Lincoln Place is projected to have an attractive basis of $452 PSF, over a 52% discount compared to Miami Office Sales Comps, between $800 PSF and $2,600 PSF, or a market average of $949 PSF. The Purchase Price of $279 PSF is nearly 3.4x lower than the Miami Office Sale Comp set average of $949 PSF.

**Discount to Replacement Costs**: The $452 PSF basis is approximately a 76% discount to Replacement Costs, which are over $1,879 PSF, and increasing due to inflation. The investment provides for an arbitrage opportunity as the delta between the Basis and Replacement Costs widens, triggering by raising materials and labor costs, further increasing the value creation at Lincoln Place considering Replacement Costs are expected to rise to north of $2,000 PSF (assuming a modest 3% growth rate).

## INVESTMENT DRIVERS

**Rising Replacement Costs → Upward Pressure on Rents**: Since 2010, Replacement Costs have increased 7% on average and are expected to increase at a higher rate in the future due to inflation. This historic increase in construction costs will provide an upward lift on rental rates across the entire inventory as exhibited since 2010 in Miami, most notably within the Class A and Trophy subset to which Lincoln Place belongs. This allows the Sponsor to leverage the timeless quality and irreplaceable location of Lincoln Place to quickly lease-up the vacancy and escalate rents without fear of widespread new completions or impending rate ceilings, given the physical supply constraints in Miami Beach with the near-total depletion of pad-ready office development sites.

**Proven Business Plan** - **Renovation Underway & Already Achieving Underwritten Rents**: The Sponsor has already commenced the renovation with strategic pre-built spec-suites offering tenants immediate occupancy. The suites are already achieving the underwritten market rents. This shows that the market is responding well to the Business Plan and exemplifies the opportunity to increase the asking rents as vacancy is leased up, thereby increasing the NOI ahead of underwritten projections and potentially outperforming the underwritten returns.

**Sponsor with Intimate Knowledge of the Property & Value-Add Experience**: The Sponsor has owned the asset since 2016 and is intimately familiar with Lincoln Place's operations, which eliminates acquisition transition risk. With this being a recapitalization, the Sponsor has close knowledge of the property as they are ready Property Managing and Asset Managing the Property, giving them an advantage in executing a value-add strategy compared to an acquiring firm.

**High Visibility Location with Built-In Amenity Base**: Lincoln Place features a 96 (out of 100) Walk Score, with over 70 restaurants nearby, and over 70 retailers within 1 block of Lincoln Road and Collins Avenue, providing tenants a strong amenity base.

**Above-Market Parking Ratio (Competitive Advantage)**: With an on-site parking garage with 499 spaces, the Property features approximately a 4.5 per 1,000 Parking Ratio. The market-standard parking ratio for office building in Miami Beach is approximately 1.5 to 2.0 per 1,000, which means Lincoln Place can offer tenants 50% to 70% more parking spaces.

The factual information stated herein originated from the following sources: Internal Sponsor Databases, CoStar, Newmark, CBRE, Cushman & Wakefield, Blanca Commercial Real Estate, Eastdil Secured, JLL, Fortune, Green Street, Real Capital Analytics, Bisnow, Bureau of Labor Statistics, PWC, ULI, Wall Street Journal

## PLANNED IMPROVEMENTS

The highest achievable value at the Property is through a full gut renovation and improvement of the existing office structure. The building occupies a significant corner at one of the major Miami Beach intersections. It is perfect for a marquee property for new in-bound retail and/or office users seeking high visibility and brand recognition. The improvements reflect a capital upgrade plan, the lease-up of the Class A office and retail space, and an increase in parking income.

- ☐ Modern Lobby Renovation

- ☐ Tenant Amenity Center – Conference Center & WiFi Lounge

- ☐ New, Modernized Elevator Cab Interiors

- ☐ New Parking Garage LED Lighting and Garage Elevator Cab Interiors

- ☐ Vacant Space Prep, including Demo and Base Building Improvements

- ☐ +70,000 SF of Pre-Built Spec Suites Providing Immediate occupancy at Premium Rents

- ☐ New Bathrooms, Common Area Corridors, and Tenant Elevator Lobbies

- ☐ HVAC Replacements to increase energy efficiency

- ☐ Additional ESG Enhancements

- ☐ Anchor Tenants Signage

## PICTURES





# PICTURES





# RENDERINGS













**IMPORTANT NOTE REGARDING FINANCIAL FORECASTS AND PRELIMINARY FINANCIAL INFORMATION CONTAINED HEREIN OR ON CROWDSTREET.COM.**

**IN CONSIDERING WHETHER TO INVEST IN THE COMPANY, YOU SHOULD NOT RELY ON ANY INFORMATION NOT IN THIS MEMORANDUM.**

Any financial projections, pro forma financial statements, or pro forma capitalization provided in connection with discussions of or presentations by the Company, whether in this Memorandum, the LLC Agreement (including any attachments or exhibits to the LLC Agreement), or this Offering or otherwise are forward looking statements. If, in connection with this Offering, you are provided with any financial reports, pro forma statements of profit and loss, estimates, forecasts, projections, cash flow data, or any other statement concerning future Company performance or the performance of any Company holdings, you should carefully consider the following:

**NO REPRESENTATION IS BEING MADE THAT THE COMPANY WILL OR IS LIKELY TO ACHIEVE RESULTS COMPARABLE TO THOSE SHOWN, TO MAKE ANY PROFIT AT ALL, OR TO BE ABLE TO AVOID INCURRING SUBSTANTIAL LOSSES. IN FACT, THERE CAN BE SIGNIFICANT DIFFERENCES BETWEEN PROJECTED PERFORMANCE RESULTS AND THE ACTUAL RESULTS SUBSEQUENTLY ACHIEVED BY ANY PARTICULAR INVESTMENT STRATEGY, INCLUDING THE COMPANY'S INVESTMENT STRATEGY.**

The actual performance of the Company may differ significantly from the results shown based, among other things, on: (1) the ability of the key personnel to negotiate terms similar to the assumptions used to generate the hypothetical performance, (2) the fluctuations in the cost of renovation and operation relating to real estate; and (3) differing market, regulatory, economic and political conditions. See "**RISK FACTORS**". No representation or warranty is made as to the reasonableness of the assumptions made or that all assumptions used in achieving the returns have been stated or fully considered.

The results shown are provided for illustration purposes only. They have inherent limitations because they are not based on actual financial returns but are based on the historical returns and various assumptions of past and future events. The results do not represent, and are not necessarily indicative of, the results that may be achieved in the future; actual returns may vary significantly. In addition, the historical returns used as a basis for this chart are based on information gathered by the Manager or key personnel of the Manager or from third party sources and have not been independently verified.

PROJECTED PERFORMANCE RESULTS HAVE CERTAIN INHERENT LIMITATIONS. UNLIKE AN ACTUAL PERFORMANCE RECORD, SIMULATED RESULTS DO NOT REPRESENT ACTUAL PERFORMANCE. THE PROJECTED RESULTS MAY HAVE UNDER OR OVERCOMPENSATED FOR THE IMPACT OF CERTAIN MARKET FACTORS SUCH AS UNFORESEEN WEATHER CONDITIONS, REGULATORY UNCERTAINTIES, GLOBAL OR DOMESTIC POLITICAL EVENTS, OR SIMPLY THE GENERAL UNCERTAINTY THAT AFFECTS THE REAL ESTATE MARKET. IN ADDITION, PROJECTED RESULTS DO NOT TAKE INTO ACCOUNT CERTAIN FINANCIAL RISKS. NO PROJECTED RESULTS CAN COMPLETELY ACCOUNT FOR THE IMPACT OF FINANCIAL RISK IN ACTUAL OPERATIONS. FOR EXAMPLE, THE ABILITY TO WITHSTAND LOSSES OR TO ADHERE TO A PARTICULAR INVESTMENT OR OPERATONAL PROGRAM IN SPITE OF LOSSES ARE MATERIAL FACTORS WHICH CAN ADVERSELY AFFECT THE ACTUAL OPERATIONAL RESULTS. THERE ARE NUMEROUS OTHER FACTORS RELATED TO THE ECONOMY OR MARKETS IN GENERAL OR TO THE IMPLEMENTATION OF ANY OPERATIONAL OR MARKETING PROGRAM WHICH CANNOT BE FULLY ACCOUNTED FOR IN THE PREPARATION OF PROJECTED PERFORMANCE RESULTS, ALL OF WHICH CAN ADVERSELY AFFECT ACTUAL PERFORMANCE RESULTS.

**[Remainder of this Page Intentionally Left Blank]**

## RISK FACTORS

**THE PURCHASE OF THE INTERESTS OFFERED HEREBY INVOLVES RISKS AND IS SUITABLE ONLY FOR PERSONS OF ADEQUATE FINANCIAL MEANS WHO OR WHICH HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. OFFEREES SHOULD BEAR IN MIND THAT AN INVESTMENT IN THE COMPANY IS SUBJECT TO ALL OF THE RISK FACTORS IDENTIFIED IN THE MEMORANDUM AND OTHERS, WHICH THE MANAGER MAY OR MAY NOT BE AWARE OF AS OF THE DATE OF THIS MEMORANDUM.**

**General Investment Risks**

**The Company is dependent upon the Manager for management decisions.**

The Manager will make virtually all decisions with respect to the management of the Company and the Members will not have a voice in the management decisions of the Company and cannot exercise control over the Manager. The Manager gives no assurance that the Company will operate at a profit. The Company is dependent to a substantial degree on the Manager's continued services. In the event of the withdrawal, dissolution or bankruptcy of the Manager, the business and operations of the Company may be adversely affected.

**There will be no regulatory oversight of the Company's or the Manager's activities**.

The Company is not registered as an investment company under the U.S. Investment Company Act of 1940, as amended (the "1940 Act").  The Company is thus not subject to the disclosure obligations of the 1940 Act and Members will not enjoy the protection such disclosure obligations may provide.  The Manager will not be registered under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

**Members may face risks relating to the limited transferability of interests.**

There is no public market for the Interests and none is expected to develop in the future. Even if a potential buyer could be found, the transferability of Interests is also restricted by the provisions of the Securities Act, and by the provisions of the LLC Agreement. Any sale or transfer of Interests also requires the prior written consent of the Manager. Investors must be capable of bearing the economic risks of this investment with the understanding that Interests may not be liquidated by resale or redemption and should expect to hold their Interests as a long-term investment.

**Risk of dilution – from capital calls or new Member's Distributions are not guaranteed and may not be timely provided.**

The Company is not required to make distributions, and distributions are subject to available cash from operations.  If the Property Owner requires additional funding, the Company may make capital calls or capital may be raised from additional investors and the Members' interest in the Property may be diluted.

**Operations of the Company are subject to conflicts of interest.**

The Manager will use commercially reasonable efforts to conduct Company affairs for the benefit of the Members; however, the Manager and its officers, members, agents and representatives may invest in other activities independently of the Company and may invest in activities for their own account and for others at the same time that they are managing the Company. This may result in conflicts of interest for such persons because of the differences in the economic interests of the persons in such entities or properties. Also, there may be conflicting demands upon the time and efforts of the officers, members, agents or representatives of the Company who are currently, and may in the future, be acting in a similar capacity of other investment ventures similar to this Company, as well as engaging in its own investment activities and independent enterprises.

**Lack of Operating History**.

The Company is newly formed and has no operating history upon which an evaluation of the Company's performance or prospects can be made. While the principals of the Manager and the Manager have experience in acquiring real property, past performance of the Manager is not indicative of the future performance of the Company.

**Sole Investment**.

The Company will be acquiring, through the Property Owner, a single property. Thus, the Company's portfolio will not be diversified, which increases your risk of lossas the performance of the Company will be entirely dependent on a single property. Additionally, because all the Property will be located in a single area (Miami, Florida), a downturn in the local market could have a material adverse impact on the Company's financial condition.

**The ability of the Company to make periodic distributions will be dependent on its ability to generate positive cash flow.**

The Company does not and will not have operations except its indirect investment in the Property. Therefore, the Members' return on their investment and the ability of the Company to make distributions will come solely from net income (if any) generated by the Property and the net proceeds (if any) from the sale, disposition or refinancing of Property.

**The offering is being made on a "Best Efforts" basis with no mandatory minimum or maximum amount.**

There can be no guaranty that the Manager will be successful in raising the targeted offering amount. The Manager has the discretion to accept more or less than its target capital raise in its sole judgment if it determines that such sum is sufficient to effect the acquisition of the Property.

**Real Estate Investment Risks**

**Economic and regulatory changes that impact the real estate market generally may cause the Company's operating results to suffer and decrease the value of the Property.**

**The Company's operating results will be subject to risks generally incident to the ownership of real estate, including:**

- changes in general or local economic conditions;
- changes in supply of or demand for similar or competing office properties;
- changes in interest rates and availability of permanent mortgage funds, which may render the sale of a property difficult or unattractive;
- changes in tax, real estate, environmental and zoning laws;
- deterioration in the financial condition of tenants, buyers and sellers of properties, financial institutions or the capital markets;
- the discovery of violations of environmental laws and regulations, or environmental claims arising in respect of the Property;
- uninsurable losses;
- acts of God; and
- other factors beyond the control of the Company or the Manager.

These and other reasons may prevent the Company from being profitable or from realizing growth or maintaining the value of the Property.

**The Company's cash flow could also be adversely affected by various factors over which the Manager has no control, such as:**

- unseasonable or unforeseen weather conditions;
- an inability to attract tenants on attractive terms, or at all;

- the economic or physical decline of the areas where the Property is located;
- physical damage to the Property;
- the need to periodically renovate, repair, refurbish or reconfigure the Property;
- unforeseen expenses connected to repair or improvement of the Property;
- environmental remediation or compliance;
- increasing operating costs, including real estate taxes and utilities; and
- uninsured losses and lawsuits.

**Actual or threatened epidemics, pandemics, outbreaks, or other public health crises may have an adverse impact on our tenants, our tenants' ability to pay rent pursuant to their leases and the profitability of the Property.**

Our tenants and our business could be materially and adversely affected by the risks, or the public perception of the risks, related to an epidemic, pandemic, outbreak, or other public health crisis, such as the outbreak of COVID-19. As a result of shutdowns, quarantines, actual viral health issues or loss of employment, tenants at the Property may experience reduced or no income for a prolonged period of time, may file for bankruptcy, or may experience other hardships that affect their ability or willingness to make their rental payments. In the event tenants are unable or unwilling to make their rental payments to us, in addition to lost rent, we may incur costs in protecting our investment and re-leasing our property. Additionally, local and national authorities may expand or extend certain measures imposing restrictions on our ability to enforce tenants' contractual rental obligations. Local and national authorities may also reduce or discontinue stimulus and relief programs, implemented in response to such events, which may be providing benefits to our tenants and which may impact their ability to make their rental payments.

**Due to the COVID-19 pandemic or other future epidemics, pandemics, outbreaks or other public health crisis, we may incur increased operating expenses related to cleaning and sanitization supplies and increases in our labor costs**.

The Manager may be limited in its ability to properly maintain the Property and complete any refurbishment of the Property due to social distancing or other restrictions implemented in response to such events. Restrictions inhibiting the Manager's ability to meet with existing and potential tenants could disrupt the Manager's ability to lease vacancies.  The Manager and the Company may also face an increased risk of cyber-attacks due to an increased reliance on remote working as a result of an epidemic, pandemic, outbreak or other public health crisis. In addition, the deterioration of global economic conditions and increases in unemployment as a result of an epidemic, pandemic, outbreak or other public health crisis may ultimately decrease occupancy levels and market rental rates.

Epidemics, pandemics, outbreaks or other public health crises have caused, and may cause in the future, severe economic, market and other disruptions worldwide. Market fluctuations may affect the Company's ability to obtain necessary funds for its operations from lenders.

The ultimate extent of the impact of any epidemic, pandemic, outbreak or other public health crisis will depend on future developments, which are highly uncertain, and cannot be predicted, including the severity of any such epidemic, pandemic, outbreak or other public health crisis and actions taken to contain or prevent their further spread, among others. These and other potential impacts of an epidemic, pandemic, outbreak or other public health crisis, could therefore materially and adversely affect the Company's financial condition and results of operations.

**General economic conditions may affect the timing of sale, finance or refinance of the Property and the sale price or refinancing terms the Company receives.**

The Company may be unable to sell, finance or refinance the Property if or when it decides to do so. The real estate market is affected by many factors, such as general economic conditions, the availability of financing, interest rates, and other factors, including supply and demand for real estate investments, all of which are beyond the Company's control. The Company cannot predict whether it will be able to sell or

refinance the Property for the price or on terms which are acceptable to it. Further, the Company cannot predict the length of time which will be needed to find a willing purchaser and to close the sale of the Property.

**Adverse economic conditions in Miami Beach, FL may negatively impact Members' overall returns.**

If adverse economic conditions occur in Miami Beach, FL, such conditions could affect the real estate values in the area. Therefore, changes in local economic conditions could reduce the Company's income and distributions to Members or the amounts the Company could otherwise receive upon the sale of a property in a negatively affected region.

**Our strategy for acquiring value-enhancement office properties involves greater risks than more conservative investment strategies.**

The Manager's primary strategy is a value-add. Therefore, for this Property, the Manager intends to execute a "value-enhancement" strategy whereby we will acquire the Property in a high-demand neighborhood, invest additional capital, and reposition the Property to increase both average rental rates and resale value. Our strategy for acquiring a value-enhancement office property involves greater risks than more conservative investment strategy. The risks related to value-enhancement investments include risks related to delays in the repositioning or improvement process, higher than expected capital improvement costs, the additional capital needed to execute our value-add program, including possible borrowings or raising additional equity necessary to fund such costs, and ultimately that the repositioning process may not result in the higher rents and occupancy rates anticipated. In addition, our value-enhancement properties may not produce revenue while undergoing capital improvements. Furthermore, we may also be unable to complete the improvements of this Property and may be forced to hold or sell this Property at a loss. For these and other reasons, we cannot assure you that we will realize growth in the value of our value-enhancement multifamily Property, and as a result, our ability to make distributions to our Members could be adversely affected.

**The Company is dependent on its tenants for substantially all of its revenue, so the Company's success is materially dependent on the financial stability of its tenants.**

The success of the Company is materially dependent on rent payments from tenants. If vacancy or delinquency rates are higher than anticipated, it could materially adversely affect the Company's ability to pay its expenses and make distributions to the Members. Vacancy and delinquency rates can also adversely affect the ability to sell or refinance the Property.

**The Company will face renovation risks.**

Renovation involves a variety of risks, including those relating to the variable cost and timely completion of renovation, which may be beyond the control of the Company as result of weather, labor conditions or material shortages, and lease-up velocity and rent levels. These risks could result in unanticipated delays and expenses and could prevent completion of the value enhancements to the Property, any of which could have an adverse effect on the financial condition and results of operations of the Company Costs of materials and labor, post the COVID-19 pandemic, have significantly increased and continue to do so. These increased costs could adversely affect the Company's ability to effectively make improvements to the Property and could negatively impact the Company's ability to make distributions to the Members.

**The Property will be subject to federal law.**

Under the Americans with Disabilities Act of 1990, as amended (the "ADA"), all public properties are required to meet certain federal requirements related to access and use by disabled persons. The Property may not be in compliance with the ADA. If a property is not in compliance with the ADA, the Company may be required to make modifications to such property to bring it into compliance or face the possibility of an imposition of fines or an award of damages to private litigants.

**The Company will face competition from other office buildings, which may limit its profitability and returns to Members.**

Any office building the Company operates or may acquire will most likely compete with numerous competitive office properties. Increasing affordability of rental rates or increased vacancy rates among competitive office properties could adversely affect the Company's ability to retain its tenants, limit lease vacancy, and increase or maintain rental rates.

Moreover, the office investment industry is highly competitive. This competition could reduce occupancy levels and revenues at the Property, which would adversely affect the Company's operations. The Company expects to face competition from many sources, including from other office buildings both in the immediate vicinity and the broader geographic market. In addition, increases in operating costs due to inflation may not be offset by increased office rental rates. The Company may also be required to expend substantial sums to attract new office tenants.

**The Company may face risks relating to its use of leverage.**

The Manager will utilize leverage with the goal of enhancing the Company's returns. In the event it were necessary to do so, the Company's failure to obtain leverage at the contemplated levels, or to obtain leverage on attractive terms, could have a material adverse effect on the Company. The use of leverage has the potential to magnify the gains or losses on the Company's investments and to make the Company's returns more volatile. The use of leverage will subject the Company to the risk that the Company's cash flow will be insufficient to meet required payments of principal and interest, the risk that collateral for secured borrowings will be foreclosed, the risk that indebtedness on the investments will not be able to be refinanced and the risk that the terms of any refinancing will not be as favorable as the terms of the existing indebtedness. The loan documents include various financial conditions, the continued compliance with which may not be completely within the control of the Company. If such financial conditions are not met, the lender may declare any amounts outstanding to be due and payable. If the Company is required to repay borrowings it may be forced to sell the Property at inopportune times or at a disadvantageous price or the Property may become subject to foreclosure.

**The Company may become subject to environmental liabilities.**

Various federal, state and local laws, ordinances and regulations designed to protect the environment may require the Company to investigate and clean up damage to the Property from hazardous materials. These environmental laws often impose liability regardless of whether the property owner knew of, or was responsible for, the damage, or whether the damage occurred before the owner acquired such Property. Also, the presence of hazardous materials on the Property, or the damage caused by those materials, may make it more difficult to sell, rent, or collateralize the Property, in which case net income and any future sale price likely will be reduced. The liability for the costs of cleaning up environmental damage is generally not limited under environmental laws and could exceed the value of the Property and/or the Company's assets. Also, private plaintiffs can sue for personal injury or initiate other causes of action if hazardous materials are found on the Property.

The Company may incur environmental liability and may have to comply with rules and regulations regarding business-related activities on the Property as they affect the environment. The failure to comply with those requirements could result in difficulty in leasing or selling the Property, or monetary penalties and fines to which the Manager, and/or the Company would be subject, in addition to the costs necessary to attain compliance.

**Potential Investors face the risk an offered subscription will be held by the Company for a period and ultimately not accepted.**

The Manager will return excess capital from proposed subscriptions from potential Investors in excess of amounts the Manager determines are reasonably necessary to complete the acquisition of the Property or close the Loan. Any subscriptions accepted by the Manager on behalf of the Company at such time will

begin to accrue the preferred return as set forth in the LLC Agreement. Any proposed subscriptions not accepted at such time will be returned without any interest or any other earnings thereon.

**THE FOREGOING LIST OF SELECTED RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THE COMPANY. POTENTIAL INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX, FINANCIAL, AND LEGAL ADVISORS BEFORE MAKING ANY INVESTMENT IN THE COMPANY.**

# MANAGEMENT

Led by Elie Schwartz, Nightingale Properties is an established vertically-integrated commercial real estate investment firm. Headquartered in New York City, Nightingale's portfolio currently spans more than 22 states where they own and/or manage over 22M square feet of office, retail, data center, life sciences, parking, and hotel assets under management. Since its inception, Nightingale's pedigree exceeds nearly $10B in transactions and the management of over $1B of Institutional Equity from Pension Funds and Sovereign Wealth Funds in addition to $1B of Equity from High-Net-Worth Investors and Family Offices.

Nightingale deploys capital on behalf of itself and its partners through specific and non-specific investments across the capital stack, seeking superior risk-adjusted returns and outsized value creation spanning all risk-return profiles, geographies, asset classes, hold periods, deal sizes, and upside potential. Nightingale leverages its operational strength and problem-solving ability through its strong principles anchored in Property Management, Asset Management, and Construction Management to create value in its properties for its joint-venture and institutional investment partners.

Primarily, Nightingale seeks value-oriented investments with repositioning or redevelopment opportunities in core markets. By leveraging a proprietary network to identify unique real estate opportunities, Nightingale targets well-located assets with intrinsic, under-appreciated value due to operating inefficiencies, undercapitalization, or market dislocation, in addition to core, defensive, truly multi-generational investment opportunities that stand the test of time. Nightingale synergizes the past with the present to maximize investment returns in the future.

Nightingale seeks to be an agile, creative, and operationally savvy institutional-grade real estate investor and owner-operator. Once Nightingale identifies an opportunity, an investment-specific strategy is formulated and designed to in an effort to maximize value on all levels. Nightingale believes that its greatest strength is its ability to move quickly and efficiently through the access of readily available capital with strong teams consisting of in-house Legal, Leasing, Property Management, Construction Management & Engineering, Asset Management, Investment Management, Accounting & Controls, Investor Relations, and Financial Reporting. These elements make Nightingale a powerful yet nimble player in the industry, with a "hands-on" approach to every facet of its verticals.



**Elie Schwartz**
Chief Executive Officer & Founder

**Avi Kollenscher**
Executive Vice President

**Brent Hutchinson**
President of Property Management

**Alex Roth**
Senior Vice President - Asset Management

**Will Hutton**
Senior Director of Acquisitions

**Mike Murray**
Director of Construction & Engineering

**Brian Weinberger**
General Counsel

**Lisa Mamounas**
Director of Corporate Operations

## MANAGEMENT

- ☐ Nightingale is an institutional owner-operator, investor, and developer
- ☐ Established track record of exploiting opportunities and harvesting gains across an array of asset classes, economic environments, and market conditions
- ☐ The hallmark of Nightingale's investment strategy is to seek the highest proportional return for the lowest unit of risk
- ☐ Nightingale's platform executes and manages real estate investments that:
  - o Seek to capitalize on the demand growth created by secular and cyclical trends by targeting high-quality properties across asset classes with defensive demand drivers
  - o Are created through market dislocation, overlooked value, mispricing of risk, and correctable flaws such as tenancy, physical attributes, capital structure, market positioning, or by prior mismanagement
- ☐ Nightingale's institutional-grade operating platform includes a seasoned investment and management team with corporate infrastructure built for effective Business Plan execution across the risk spectrum
- ☐ Nightingale's investment strategy centers around relationship-based transactions by leveraging proprietary deal flow and hyper-localized market knowledge from consistent historical execution with repeat counterparties
- ☐ Nightingale's co-investment platform allows for an alignment of interest and flexibility to approach different risk-return profiles, asset types, hold periods, and deal sizes

**Nightingale Fast Facts**

- ☐ Founded in 2005
- ☐ Privately-held, principal-owned
- ☐ Over 100 employees
- ☐ A proven track record of ownership and management that spans over 22.0M square feet in more than 22 states
  - o **Fun Fact**: Nightingale is the largest privately-owned office landlord in the Philadelphia CBD, owning and managing more than 5M square feet in the market
- ☐ Manager of properties funded by over $1B of Institutional Equity in addition to $1B of Equity from High-Net-Worth Investors and Family Offices
- ☐ Headquartered in New York City with regional offices across the country, including Atlanta, Philadelphia, Chicago, and Miami
- ☐ Established, institutional-grade, and vertically-integrated owner-operator, investor, and developer
- ☐ Proven investment strategy with tried-and-true implementation, dependable Business Plan execution, and a consistent track record of outsized realized returns
- ☐ An entrepreneurial, nimble, prudent, proven, and astute real estate investor with disciplines that are synergistic and complementary to maximize value for its investors

# MANAGEMENT TEAM

**Elie Schwartz – CEO & Founder**

Elie founded Nightingale in 2005. During the Company's first years in business, the partners acquired seventeen commercial properties. Elie negotiates contracts and leases, structured financing, and personally oversees the management of each property in the firm's expanding portfolio. Elie is the classic entrepreneur—the kind of kid who made a mint selling and trading baseball cards and candy growing up. Who made a mini-business out of ordering 10 pizzas and selling it by the slice. So it is no coincidence that his first real job was starting a business. In this case, a network engineering business before pivoting to real estate. Elie began concentrating on commercial property acquisitions in 2003, primarily functioning in an owner's representative capacity and consummated nearly $1B in transactions before founding Nightingale. Since founding Nightingale, Elie has been responsible for over $10B in transactions. Elie is known as a creative and nimble dealmaker and investment manager.

**Avi Kollenscher – Executive Vice President**

Avi's responsibilities include all investment activities, including investment origination, execution, and capital formation. Together with other members on the executive team, Avi oversees development, leasing, and portfolio management efforts.

Prior to Nightingale, Avi spent 20 years at the Related Companies where he most recently served as Senior Vice President. In this role Avi oversaw large-scale development projects exceeding $2 billion across multiple property types and managed a 3 million square foot portfolio of retail assets. Before joining Related Companies, Avi was an analyst in the real estate investment banking group at UBS Investment Bank where he executed a variety of debt and equity offerings, and mergers and acquisitions, across the real estate, lodging, and gaming industries. Avi graduated summa cum laude from the Wharton School at the University of Pennsylvania in 2002 with a bachelor's degree in Finance.

**Brenton Hutchinson – President of Property Management**

Brent's responsibilities include, but are not limited to, oversight of the day-to-day management of Nightingale Realty's 5M square foot portfolio in Philadelphia as well as Nightingale Realty's national portfolio. Nightingale Realty currently owns and manages approximately 20M square feet throughout the country. Brenton joined Nightingale Realty in 2011 through the acquisition of 1700 Market Street where he oversaw the 840,000 SF Class A office building as Property Manager then Director of Property Management. Brenton helped grow and lead the company from 2M square feet under management to the current portfolio size today. Prior to joining Nightingale Realty, Mr. Hutchinson, acted as Property Manager of 1700 Market Street for Transwestern Commercial Services where he began his career. He is an active member within BOMA Philadelphia sitting on the Board of Directors from 2014 – 2017, Co-Chair to the TOBY (The Office Building of the Year) committee from 2012 – 2017 and current Co-Chair to the Annual Golf Outing Committee (his favorite committee so far). Brenton was named CBRE's (Real Estate Manager of the Year – Philadelphia Region) in 2012 after a short stint with the firm while overseeing 1700 Market Street. Brenton graduated from Saint Joseph's University, Haub School of Business, with a Bachelor's of Science in Marketing and later graduated with a Master of Business Administration. Brenton has recently joined the Saint Joseph's University Real Estate Advisory Board as a member to help promote the school and its goal of creating opportunities for students through insights, internships and one day a specialized degree in Real Estate.

# MANAGEMENT TEAM

**Will Hutton – Senior Director of Acquisitions**

Will's responsibilities include all acquisitions, capital markets, dispositions, and capital raising activities for Nightingale. Will is highly regarded in the industry as an identifier of real estate with unrealized potential and intrinsic value, yielding attractive risk-adjusted returns for Nightingale's investors. Will has been instrumental in Nightingale's growth in recent years. Under Will's direction, Nightingale has become the largest privately-owned landlord in Philadelphia and one of the larger buyers of office properties in the country and in New York City. In recent years, Will has been responsible for over $5.0B of transactions at Nightingale and over $3.5B in New York City. A graduate of Cornell University, Will received a Bachelor's of Science in Applied Economics & Management with a minor in Real Estate. Outside of real estate, Will is active in several community leadership, non-profit, and groups supporting the arts in the NYC community. Will participates in local team efforts supporting the National Blood Clot Alliance, the Susan G. Komen Foundation, and the Children's Tumor Foundation. As a purveyor of the arts, Will is a Friend of the Whitney Museum of American Art.

Will's recognitions include the Commercial Observer's Top Young Professionals, Crain's Rising Stars in Real Estate, Commercial Property Executive's Stars to Watch, and Connect Media's Next Generation Honoree. Will was most recently featured in Commercial Observer's Day in the Life.

**Alex Roth – Senior Vice President of Asset Management**

In his role as Director of Acquisitions and Asset Management at Nightingale, Alex Roth is responsible for all property-level matters pertaining to the company's portfolio. Since joining Nightingale in 2012, his daily activities include leasing, acquisitions, capital projects, marketing, capital transactions, and dispositions. Mr. Roth's primary focus is guiding the business plan execution for each asset under management with a hands-on approach. Recent successful executions include; pre-leasing an entire Trophy Office building in SoHo in New York City to a Fortune 5 company at record-setting rent, securing the largest government tenant requirement in competitive bidding process in Philadelphia, re-tenanting the largest vacant office block in North Carolina city during the pandemic, and re-leasing 20% of an office building within 2 months of largest tenant filing bankruptcy during the pandemic. Prior to joining Nightingale, Mr. Roth worked for SRS Real Estate Partners in the Urban Retail Leasing platform. Mr. Roth received a degree in Financial Economics from Binghamton University.

**Paul Wassenbergh – Vice President of Project Management**

Paul manages projects from initial concept to property management turnover. Working with Nightingale's roster of design professionals, general contractors and vendors, Paul develops budgets, manages the design process to assure the budgets are maintained and establishes the overall project plans which are specifically targeted to meet each properties economic goals. He works with Nightingale's asset management team to create a list of viable capital expenditure plans based on the buildings and tenants needs. Paul's ability to work with project teams to review bid proposals, conduct scope meetings and page turns with the design team, and the bidders allows for value to be created at multiple stages of progress. Paul will work with the general contractors purchasing team to assure that scope leveling sheets are established so proper alignment with each trade partner on the project is achieved. Paul has over 16 years of experience in the construction industry with an extensive background in both estimating and purchasing. His strengths include reducing project costs, collaborating with clients, and analyzing project risk. His knowledge and experience allow him to skillfully manage projects with multiple phases and complex logistics.

In his career, Paul spearheaded the construction and development of the following projects, including but not limited to: 111 Wall Street, Yankee Stadium, Dock 72, Citi Field Brewery, St. Francis Hospital's ED and Library, Weill Cornell eLab, PS 263, PS 260, The Laurel, One Jackson Square, 787 11th Avenue, and 375 Pearl.

**The Pillars of Nightingale's Investment Strategy**

| | | | |
|---|---|---|---|
| **1.** Exploit select dislocation & unrealized value | **2.** An opportunistic yet disciplined investment approach | **3.** Swiftly execute sound Business Plans | **4.** Provide best-in-class service |
| **5.** Institutional operations & management | **6.** Led by an experienced team of real estate veterans | **7.** Unlock all avenues of value | **8.** Monetize Investment |



CONSISTENT TRACK RECORD OF OUTSIZED RETURNS

# NIGHTINGALE'S CAPABILITIES & CORE VALUES

**Transactional Velocity**: Nightingale has executed on more than $4B in acquisitions and dispositions in the past 36 months.

**Transaction Types**: Nightingale has proven it is a qualified buyer at many entry points, having executed on everything from fee interest purchases, note purchases, ground lease interests, condominiums to complicated easements, master leases, conversion, de-conversions, adaptive-use, foreclosures, deed-in-lieu transactions, and multi-generational investment sales.

**Asset Types**: Nightingale has executed across a broad range of asset classes - including the lease-up of vacant office buildings, urban retail properties, historical and landmarked hotels, transportation-oriented projects, life sciences, ground-up construction, forward contracts, and forward sales.

**Rapid, Thorough, & Exhaustive**: Nightingale is accustomed to, and in fact embraces, the extreme rapidity required in underwriting and conducting Due Diligence within the limitations and the information inefficiencies that our acquisitions often entail. Far from sacrificing caution and diligence, in each case, Nightingale produces a full Investment Committee memo-like deliverable with an Underwriting & Due Diligence Report that enhances our Investment Partners' ability to make informed decisions. To complement Nightingale's attentiveness to detail, Nightingale utilizes 3rd Party Due Diligence Consultants to supplement their investigations with a forensic-like approach to examining the potential investment.

**Repositioning & Development**: Nightingale has transformed dozens major of properties from tired assets with sleepy rents to competitive assets in their respective submarkets to unlock value overlooked by other real estate investors.

**Negotiation**: Nightingale has been through virtually every type of high stakes and contentious negotiation imaginable, some exceeding $1 Billion in value with the most formidable counterparties across the globe. One of Nightingale's greatest strengths is managing and executing negotiations that consider a highly complex labyrinth of interests and issues while accommodating outcomes that serve the needs of all relevant parties, ensuring a positive outcome for our investors.

| RESILIENCE | THOUGHTFUL EVOLUTION | PURPOSEFUL WORK | HONORABLE ACTION |
|---|---|---|---|
| • **Thrive in challenging conditions**<br>• Take informed, calculated, & prudent risk<br>• Demonstrate grit in hard times<br>• Invest in the team | • **Focus on continual growth & improvement**<br>• Challenge assumptions, debate & refine strategy<br>• Iterate our way to excellence<br>• Commit to personal & professional growth | • **Pursue meaning & connection in our work**<br>• Seek significance, not just success<br>• Build meaningful relationships<br>• Remember, it's supposed to be fun | • **Prioritize long-term good over short-term gain**<br>• Choose what is right over what is easy<br>• Reflect - look in the mirror<br>• Alignment of interests |



Focused Investment Strategy **+** Proven Value Creation Techniques **+** Long-Tenured & Integrated Team **+** Seamless Business Plan Execution **=** Consistent Returns

## NIGHTINGALE'S COMMITMENT TO ESG

**ENVIRONMENTALLY CONSCIOUS INVESTING**

- Reduce energy emissions, water, and waste
- Implement conscientious practices and regularly evaluate to identify sustainability measures
- Utilize low carbon and renewable energy sources to reduce our carbon footprint
- Enhance the position of assets in their markets, reduce obsolescence, and promote resiliency
- Evaluate 3rd Party green building certifications such as ENERGY STAR, LEED, WELL, FITWEL, and WIRED SCORE
- Stewardship of the environment creates long term value.
- Green financing for an improved cost of capital
- Environmentally conscious investing generates real outcomes from operational and tenant cost savings which adds value to enable better exits

**SOCIAL RESPONSIBILITY**

- Investment-Level
  - Promote the importance of ESG to our Property Managers, Leasing Brokers, and Vendors
  - Create a healthy work environment for our tenants and employees
- Corporate-Level
  - Philanthropic Efforts – lead by example
  - Commitment to Diversity
  - Employee Satisfaction & Retention
  - Training, resources, communication, and support
  - Monitor & improve employee engagement
- Property-Level
  - Encourage engagement with local communities through outreach and volunteerism amongst our Property Managers, Tenants, and Employees
  - Support & encourage our suppliers to use responsible and sustainable best practices

**STRONG CORPORATE GOVERNANCE**

- Identify specific sustainability issues and establish goals
- Conduct quarterly property-level assessment of environmental and energy issues
- Monitor and manage compliance with government benchmarking requirements and any additional policy or regulatory changes
- Continue to provide and improve our training on governance topics
- Demonstrate transparency and accountability to our Investment Partners
- Emphasis on legal and regulatory compliance
- Strict adherence to policy and quality control

     

## NIGHTINGALE'S RISK MANAGEMENT FRAMEWORK

**CORPORATE LEVEL**
- Talented, experienced, and dedicated personnel
- Ability and willingness to take full operational control of any aspect of an investment
- Detailed and redundant financial control, monitoring, and audit procedures; proper insurance coverage
- Clear management policies and procedures for all to follow enforced by assiduous management oversight
- Alignment of interests between our investors, our firm, and our employees through performance-based compensation and career development

**PORTFOLIO LEVEL**
- Diversification by product type, geography, industry sector, and risk
- Prudent utilization of leverage
- Investment pace and quarterly hold/sell analysis
- Proper cash management and provision of reserves and contingencies
- Legal documentation and entity level structuring to ensure that under-performing investments are "ring fenced"

**INVESTMENT LEVEL**
- Thorough underwriting of market and asset, assessing the probability of outcomes and impact of risks
- Matching debt and equity capitalization to the characteristics of an investment and the Business Plan

## SELECT PORTFOLIO

### SELECT HOLDINGS | NEW YORK CITY


711 Fifth Avenue


300 Lafayette


111 Wall Street


Whale Square


Kingswood Center


20 East 46th Street

### SELECT HOLDINGS | PHILADELPHIA


1500 Market (Centre Square)


The Bellevue


1500 Spring Garden


True North


1635 Market


1835 Market

41

## SELECT PORFOLIO

### SELECT HOLDINGS | NATIONAL

Lincoln Place – Miami


Regions Tower – Indianapolis


80 Park Plaza – Newark


The Ardmore – Indianapolis


1418 Walnut – Philadelphia


1700 Market – Philadelphia


### SELECT HOLDINGS | NATIONAL

City Center Square – Kansas City


One West Fourth Street
Winston-Salem


First National Bank Building
Minneapolis


Gaviidae Commons - Minneapolis


One Hartsfield Center
Atlanta


# CONFLICTS OF INTEREST

**THE DESCRIPTION HEREIN DOES NOT PURPORT TO BE A COMPLETE LIST OF ALL CONFLICTS OF INTEREST THAT WILL OR MAY ARISE AMONG THE COMPANY, THE MANAGER, THE SPONSORS, THE MEMBERS, OR ANY OF THE AFFILIATES THEREOF. PROSPECTIVE INVESTORS SHOULD REVIEW THE CONFLICTS OF INTEREST PROVIDED HEREIN AND SHOULD REQUEST AND OBTAIN ADDITIONAL INFORMATION FROM THE COMPANY, THE MANAGER, OR THE SPONSORS, AS APPLICABLE, BEFORE MAKING ANY INVESTMENT IN THE COMPANY.**

In the conduct of the Company's business, conflicts may arise between the interests of the Company, the Manager, and the Members. Offerees should be aware of the existence of such conflicts of interest. Among the conflicts which each Offeree should consider are the following:

Neither the Manager nor its senior management personnel are under any obligation to devote their full time to the business of the Company. The Manager and its senior management personnel are required to devote only such time and attention to the affairs of the Company as they may deem appropriate in their respective sole and absolute discretion. Each Member, Manager, officer, or affiliate thereof may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any Member the right to participation therein. The Company may transact business with any Member, Manager, officer or affiliate thereof.

The Property Owner will pay the Manager (I) at the closing of the Property, (i) an acquisition fee equal to two percent (2%) of the gross purchase price for the Property, (ii) a loan carve-out guarantee fee equal to one-half percent (0.5%) of the Total Financing, (iii) a portion of the construction management fee equal to three hundred thousand dollars ($300,000); (II) on an ongoing basis, (i) a property management fee equal to three percent (3%) of the "gross rents" generated by the Property; (ii) an asset management fee equal to two percent (2%) of the "gross rents" generated by the Property; (iii) a construction management fee equal to three percent (3%) of the hard costs of construction (payable upon the completion of the applicable project); and (iv) a leasing override fee (payable upon commencement of rent) equal to one percent (1%) of the lease amount of all new leases of space at the Property, any renewals, extensions, or expansions thereof, and any renewals, extensions or expansions of any existing leases; (III) upon the sale of the Property, a disposition fee equal to one percent (1.0%) of the gross sales price for the Property; and (IV) upon each refinancing of the debt secured by the Property (including mezzanine debt), a refinance fee equal to one-half percent (0.5%) of the gross loan amount. Any agreements and arrangements between the Company and the Manager, which are related persons, are not the result of arms' length negotiations

**[Remainder of this Page Intentionally Left Blank]**

# FEDERAL INCOME TAX CONSIDERATIONS

There are risks associated with the U.S. Federal income tax aspects of an investment in the Company. The following discussion generally summarizes certain material U.S. federal income tax consequences to U.S. taxable investors of an investment in the Company based upon the existing provisions of the Internal Revenue Code of 1986, as amended (the "**Code**"), and applicable U.S. Department of Treasury regulations (the "**Treasury Regulations**") thereunder, current administrative rulings and procedures and applicable judicial decisions. This summary is general and, except as otherwise noted below, may not apply to all categories of investors, some of which may be subject to special rules (e.g., tax-exempt organizations, banks, thrifts, insurance companies, dealers, and other investors that do not own their Interests as capital assets, and non-U.S. investors). The actual tax and financial consequences of the purchase and ownership of an Interest in the Company will vary depending upon the Investor's particular circumstances, and thus this summary is not intended to be a complete description of all tax consequences to the prospective Members with respect to their investment in the Company. No assurance can be given that the Internal Revenue Service (the "**IRS**") or a court will agree with the interpretation of the current federal income tax laws and regulations summarized below. This summary is not intended as a substitute for careful tax planning, particularly since the tax aspects of an investment in the Company are complex and will vary depending on the overall tax posture of each Investor. This summary does not discuss all of the tax aspects that may be relevant to a particular offeree. No advance rulings have been or will be sought from the IRS or any other U.S. state or non-US taxing authority regarding any matter discussed in this Memorandum. Legal counsel to the Company has not rendered any legal opinions with respect to any U.S. Federal income tax consequences relating to the Company or an investment therein. Finally, this summary of certain material tax considerations applicable to the Company is based on existing laws and regulations in force on the date of this Memorandum and no assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that such changes will not be applied retroactively.

**ACCORDINGLY, OFFEREES ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THEIR TAX SITUATION PRIOR TO INVESTING IN THE COMPANY. EACH OFFEREE WILL BE REQUIRED TO REPRESENT THAT THE OFFEREE HAS RELIED UPON THE ADVICE OF THE OFFEREE'S ADVISORS AND REPRESENTATIVES, INCLUDING THE OFFEREE'S TAX AND LEGAL ADVISORS, BEFORE PURCHASING A MEMBERSHIP INTEREST. OFFEREES MUST RELY SOLELY ON THEIR ADVISORS WITH RESPECT TO THE FINANCIAL AND TAX CONSEQUENCES OF THIS INVESTMENT. NO REPRESENTATION OR WARRANTY OF ANY KIND IS MADE BY THE MANAGER, THE COMPANY, OR ANY COUNSEL OR ACCOUNTANTS TO THE COMPANY WITH RESPECT TO ANY FEDERAL, STATE, LOCAL OR FOREIGN INCOME TAX CONSEQUENCES RELATING TO THE COMPANY OR OF AN INVESTMENT IN THE COMPANY. THE TAX AND OTHER MATTERS DESCRIBED IN THIS MEMORANDUM DO NOT CONSTITUTE, AND SHOULD NOT BE CONSIDERED AS, LEGAL OR TAX ADVICE.**

## General

The U.S. federal income tax consequences of an investment in the Company are complex and their impact may vary depending on each Member's particular tax situation. Potential Investors should consider the following U.S. federal income tax risks, among others:

- The Company may be classified as an association, taxable as a corporation, which would deprive Members of the tax benefit of operating in a partnership;
- a Member's share of Company taxable income may, in any period, exceed his, her, or its share of cash distribution from the Company;

- the allocation of the Company's income, gain, loss, deduction and credit may lack substantial economic effect and may be reallocated among the Members in a manner different from that set forth in the LLC Agreement;
- the federal income tax returns of the Company might be subject to audit, in which event any adjustments to be made in the Company's income, gains, losses, deductions, credits, or distributive share of such items would be made in a unified audit with regard to which Members would have little, if any, control; and.
- in the event the IRS or a court determines adjustments are required to the Company's income, gains, losses, deductions, credits, or distributive share of such items, the Company may elect to either pay the associated federal income tax itself or provide the Member with a statement of the Member's share of any partnership adjustment under Section 6226 of the Code, which election is left solely to the discretion of the Company and in which Members would have little, if any, control.

## Company Tax Characterization

The Company intends to be classified and treated as a partnership for U.S. federal income tax purposes and not as an association taxable as a corporation. Under Treasury Regulations, a U.S. non-corporate entity such as the Company is classified as a partnership for U.S. federal income tax purposes, unless it elects to be classified as an association taxable as a corporation. The Company has not elected, and will not elect, to be classified as an association taxable as a corporation. However, the Company could fail to qualify as a partnership for U.S. federal income tax purposes in future years as a result of a variety of developments including, without limitation, characterization of the Company as a "publicly traded partnership" as a result of the volume and nature of contributions and redemptions of capital and transfers of Interests. A publicly traded partnership is any partnership the interests of which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof), and under Section 7704 of the Code, a partnership that meets the definition of a publicly traded partnership may be taxable as a corporation. It is expected that the Company will not be treated as a publicly traded partnership because Membership Interests will not be traded on an established securities market and/or it is expected to qualify for certain safe harbors under the Treasury Regulations pertaining to publicly traded partnerships under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof).

Failure to qualify as a partnership could result in the Company being treated as a corporation subject to an entity-level U.S. federal income tax. Treatment of the Company as an association taxable as a corporation would substantially reduce the anticipated benefits of an investment in the Company. If the Company were determined to be taxable as a corporation, it would be taxable on its earnings at corporate income tax rates and any distributions to the Members would be taxable as dividends to the Members to the extent of the earnings and profits of the Company.

## Taxation of Partnerships and Members

Assuming the Company is classified as a partnership, the Company generally will not incur U.S. federal income tax liability itself. Instead, all Members are required to report on their own federal income tax returns their distributive share of the Company's income, gains, losses, deductions and credits for the taxable year of the Company ending with or within each Member's taxable year, without regard to any Company distributions. Accordingly, a Member's U.S. federal and state tax liability attributable to its investment in the Company could exceed amounts distributed by the Company to such Member in a particular year. The characterization of an item of profit or loss will usually be the same for the Member as it was for the Company.

45

**Allocations**

A Member's distributive share of Company income, gains, deductions, losses and credits for U.S. federal income tax purposes is generally determined in accordance with provisions of the LLC Agreement. However, the IRS may reallocate such items if an allocation in the LLC Agreement does not have "substantial economic effect" or is not in accordance with the Member's respective "economic interest" in the Company. The Manager intends that the LLC Agreement will provide for the allocation of all items of income, gain, loss, deduction, and credit in a manner that has substantial economic effect for U.S. federal income tax purposes. However, if the allocations provided in the LLC Agreement with respect to a particular item were successfully challenged by the IRS, then allocations in respect of such item would be made by the IRS according to its determination of each Member's "interest" in the Company, taking into account all of the facts and circumstances. In some instances, this could result in a Member recognizing a greater or smaller amount of loss, deduction, gain, or income than it would have recognized pursuant to the terms of the LLC Agreement, or in a Member recognizing an amount of loss, deduction, gain, or income at a different time than pursuant to the terms of the LLC Agreement.

**Distributions**

Cash distributions from the Company to a Member generally will not result in the recognition of gain or loss for U.S. federal income tax purposes, provided the Member has sufficient adjusted basis in the Company but will reduce the Member's tax basis in the Company by the amount distributed. However, distributions of cash (and, in certain circumstances, marketable securities) in excess of a Member's adjusted basis in the Company will result in the recognition of gain in the amount of such excess, which gain would generally be taxable as capital gain, but may be ordinary income in certain circumstances. For purposes of these rules, a decrease in the Member's share of Company liabilities (which can result from a variety of types of transactions) is treated as if it were a distribution of cash.

**Limitations on Deductions:**

A.  **Adjusted Basis**: The adjusted basis of a Member's interest in the Company is equal to the amount of cash or the adjusted basis of any property which that Member contributes to the Company: (a) increased by that Member's share of Company liabilities, if any, additional contributions, and allocable share of the Company's income, and (b) decreased (but not below zero) by distributions to the Member from the Company (including constructive cash distributions resulting from a decrease in Company liabilities), and by the Member's allocable share for the taxable year and prior taxable years of the Company's losses.

The Company does not presently intend to borrow funds from any Member. In general, Company recourse liabilities are shared by the Members in the same manner as they share Company losses, and Company non-recourse liabilities are shared by the Members in the same manner as they share Company profits. A Company liability is (1) a recourse liability to the extent that one or more Members bears the economic risk of loss for such liability and (2) a non-recourse liability to the extent that no Member bears the economic risk of loss for such liability

If a Member's allocable share of a Company loss for any Company taxable year exceeds the Member's adjusted basis in the Company at the end of that taxable year, such excess may not be deducted at that time but may be carried over and deducted in subsequent years in which the Member's adjusted basis in his, her, or its Membership Interests at the end of the later taxable year exceeds zero.

B. At-Risk Rules: In addition to the adjusted basis limitation, a Member's ability to deduct Company losses is further limited by the "at-risk" rules under Section 465 of the Code. These rules, which only apply to individuals and certain closely held corporations, allow a Member to deduct losses from an activity only to the extent of the Member's amount "at-risk" with respect to such activity at the close of the taxable year. Each Member will be considered "at-risk" with respect to that Member's capital contribution to the Company. A Member generally is not considered to be "at-risk" for Company liabilities with respect to which the Member has no personal liability.

C. **Passive Loss Rules**: In addition to the adjusted basis limitation and at-risk rules, the ability of a Member that is an individual or a closely held corporation to deduct a share of Company losses is further limited by the passive loss rules under Section 469 of the Code. These rules provide that passive activity losses can only be deducted against passive activity income and cannot be deducted against income from other sources. A "passive activity" is any activity which involves the conduct of any trade or business and in which the taxpayer does not "materially participate". Passive activity" expenses and losses which are not deductible in the year incurred, however, may be carried forward and deducted in a future year in which the investor has sufficient "passive activity" income (either from the Company or from other investments that are passive activities) or when the property generating the losses is sold. Depending on their individual situations, Members may or may not be considered to materially participate in the management of the Company, and the income and losses from the Company may or may not be treated as income or loss from a passive activity. Since the impact of the passive loss rules will vary from Member to Member, all Members should consult their own tax advisor regarding this matter.

D. **Other Limitations**: Section 163(d) of the Code places limits on a non-corporate taxpayer's ability to deduct investment interest expense. Investment interest expense is interest paid or accrued on indebtedness properly allocable to property held for investment. The deduction for investment interest expense is limited to net investment income, which is the excess of investment income over investment expenses and is determined at the partner (i.e., Member) level. Excess investment interest expense that is disallowed under these rules is not lost permanently, but may be carried forward to succeeding years, subject to the Section 163(d) limitations. Net long-term capital gains on property held for investment and qualified dividend income are only included in investment income to the extent the taxpayer elects to subject such income to taxation at ordinary rates.

If the Company is treated as an investor and is not treated as being engaged in a trade or business, then the investment interest expense limitations of Section 163(d) of the Code would apply to any interest expense incurred by a non-corporate U.S. Investor to finance Capital Contributions to the Company and the U.S. Investor's distributive share of interest expense incurred by the Company. In this case, substantially all of the taxable income allocated to a U.S. Investor from the Company in any taxable year other than, in general, net capital gains attributable to property held for investment or fee income, would be investment income for purposes of determining the limitation on deductibility of investment interest.

An Investor's allocable share of the Company's Organizational Expenses and syndication expenses will not be currently deductible. For U.S. federal income tax purposes, the Company may make an election to deduct up to $5,000 (subject to certain limitations) of Organizational Expenses in the year in which the Company begins business and ratably deduct the remainder of such expenses over the 180-month period beginning with the month in which the Company begins business.

The Tax Cuts & Jobs Act of 2017 enacted several changes to the tax laws that may impact investors. Investors should consult with their tax advisors regarding the specific impact of such changes and other tax law with respect to their particular tax situation.

**Liquidation of the Company**

Upon liquidation of the Company, any gain or loss recognized by reason of a distribution of cash and marketable securities to the Members will be considered as gain or loss from the sale or exchange of a capital asset, except to the extent of unrealized receivables and substantially appreciated inventory items. Members will recognize gain on the distribution only to the extent any cash and marketable securities received in excess of adjusted basis, including a reduction in a Member's share of Company liabilities for which no Member is personally liable, exceeds the Member's adjusted basis of its Membership Interests. Loss will not be recognized except under certain limited circumstances. A loss may be recognized as a result of offsetting the capitalized syndication fees of the Company against the liquidation proceeds. Generally, the Member will not recognize gain or loss on the distribution of any property in-kind, and the basis to a Member of any property distributed in-kind is its adjusted basis in the Company, less any money received in the distribution.

**Tax-Exempt Investors - Unrelated Business Taxable Income**

A tax-exempt organization, including tax exempt retirement plans, may be subject to Federal income tax on its share of Company income that would be considered "unrelated business taxable income" under the Code. Interest, dividends, and certain other types of income, including certain rents from real property, are excluded from the definition of "unrelated business taxable income."

A tax-exempt organization, including retirement plans, may also be subject to Federal income tax with respect to "unrelated debt-financed income" under the Code. "Unrelated debt-financed income" is generally income derived from income-producing property with respect to which there is "acquisition indebtedness." In certain circumstances, income from debt-financed real property will be excluded from the definition of "unrelated debt-financed income." It is anticipated that the Company will realize debt financed income and no assurances can be given that the Company will be structured in a manner to provide any exemption from any such tax to any tax exempt investor.

A tax-exempt organization with "unrelated business taxable income" must report its tax liability to the Internal Revenue Service on Form 990-T, Exempt Organization Business Income Tax Return. A tax-exempt organization that is contemplating an investment in the Company is strongly urged to consult its tax advisor with respect to the tax consequences of an investment in the Company.

**Tax Law Subject to Change**

Prospective Investors should recognize that the present U.S. federal income tax treatment of an investment in the Company may be modified by legislative, judicial or administrative action at any time, and any such action may affect investments and commitments previously made. The rules dealing with U.S. federal income taxation are constantly under review by the U.S. Congress and by the IRS and the Treasury Department, resulting in revisions of the Treasury Regulations and revised interpretations of established concepts as well as statutory changes. Revisions in U.S. federal tax laws and interpretations thereof could adversely affect the tax aspects of an investment in the Company.

**State and Local Taxes**

A detailed analysis of the state and local tax consequences of an investment in the Company is beyond the scope of this discussion. Prospective Investors are advised to consult their own tax counsel regarding these consequences and the preparation of any state or local tax returns that a Member may be required to file.

The foregoing summary is not intended as a substitute for professional accounting or tax advice, nor does it purport to be a complete discussion of all tax consequences that could apply to this investment. For example, the foregoing does not discuss tax consequences that may be relevant to particular Investors in light of their personal circumstances and tax consequences of particular investments. In addition, the foregoing does not discuss estate tax, gift tax or other estate planning aspects of this investment, nor does it specifically discuss U.S. Federal income tax rates or the alternative minimum tax. Accordingly, prospective Investors must consult their own tax advisors with respect to the tax effects of this investment, including the effects on their own tax situation.

**TREASURY DEPARTMENT CIRCULAR 230 DISCLOSURE. TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, OFFEREES ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY OFFEREES FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON OFFEREES UNDER THE CODE; (II) SUCH DISCUSSION IS INCLUDED HEREIN BY THE COMPANY IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE COMPANY OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) OFFEREES SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**[Remainder of this Page Intentionally Left Blank]**

## SUITABILITY; LIMITATIONS OF TRANSFERABILITY

This investment is appropriate only for persons who have no need for immediate liquidity in their investments and who have adequate means of providing for their current financial needs, obligations, and contingencies, even if such investment results in a total loss. Investment in the Interests offered under this Memorandum involves a high degree of risk and is suitable only for an investor whose business and investment experience, either alone or together with a purchaser representative, renders the Investor capable of evaluating each and every risk of the proposed investment.

Each person acquiring any Interest in the Company will be required to represent that he, she, or it is purchasing for his, her, or its own account for investment purposes and not with a view to resale or distribution. The Company will sell its Interests only to persons that the Company can verify qualify as "accredited investors" within the meaning of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act").

Investors will be required to execute a Subscription Agreement in the form included in the Subscription Documents and otherwise to demonstrate to the Manager's satisfaction that the Investor is qualified to invest in the Membership Interests. The Manager may decline to accept any Offeree's subscription for any reason or for no reason. Each prospective Investor urged to consult with its own advisors to determine the suitability of an investment in the Company, and the relationship of such an investment to the Investor's overall investment program and financial and tax position. Each Investor will be required to represent that, after all necessary advice and analysis, its investment in the Company is suitable and appropriate, in light of the foregoing considerations.

Each prospective Investor will be required to represent, prior to investment, that (i) it has such knowledge, sophistication, and experience in financial and business matters, including experience in making investments such as in the Company, that it is capable of evaluating the merits and risks of its investment in the Company and is able to bear such risks; (ii) it has obtained, in its judgment, sufficient information from the Company or its authorized representatives to evaluate the merits and risks of such investment; and (iii) it has evaluated the risks of investing in the Company and has determined that an investment in the Company is a suitable investment for such prospective Investor.

**The Manager and the Company Will Require Investors to be Accredited Investors**

This is a private offering made pursuant to exemption from the registration provisions of the Securities Act provided under Regulation D. Under Regulation D, an "Accredited Investor" is a person who or which is:
- a natural person
  - o whose individual net worth, or joint net worth with that person's spouse, at the time of purchase exceeds $1,000,000, excluding the value of the investor's primary residence; or
  - o with individual income (without including any income of the investor's spouse) in excess of $200,000 or joint income with that person's spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year; or
- a corporation, a partnership, a limited liability company or a business trust (other than an employee benefit trust), not formed for the specific purpose of  with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Company; or

- a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Company and whose decision to invest in the Company has been directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the investment; or
- an entity in which all of the equity owners are natural persons or entities meeting the accredited investor standards described above.

**Restrictions on Transfer and Investment Intent**

Each Investor must bear the economic risk of its investment for an indefinite period of time, partially because (a) the Members do not have any right to withdraw or to transfer their Interests without the Company's consent, which may be withheld in its sole discretion and (b) the Interests have not been registered under the Securities Act or any state laws, and, therefore, cannot be sold unless they subsequently are registered under the Securities Act (and such state laws) or an exemption from such registration is available.

Each Investor will be required to represent that the Interest it acquires is being acquired for its own account, for investment purposes only, and not with a view to resale or distribution. The Interests are suitable investments only for sophisticated investors for which an investment in the Company does not constitute a complete investment program and who fully understand, are willing to assume, who are experienced in similar investments, and who have the financial resources necessary to withstand, the risks involved in the Company's proposed investment program and to bear the potential loss of their entire investment in the Company.

**USA PATRIOT Act Compliance**

In the Subscription Agreement, an Investor will also be required to represent that it is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list. The Investor shall also make a representation that payments to the Company were not directly or indirectly derived from activities that would violate anti-money laundering laws and regulations. In addition, in order to comply with the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, as amended (Title III of the USA PATRIOT Act), and OFAC, certain Investors will be required to provide additional identity verification information.

**[Remainder of this Page Intentionally Left Blank]**

## ADDITIONAL INFORMATION

Inquiries concerning the Company (including information concerning subscription procedures) should be directed to:

ONH 1601 CS Investors LLC
One Night Holdings LLC
c/o Nightingale Properties LLC, its Manager
Attn: Elie Schwartz



* * * * *

This Memorandum does not purport to be and should not be construed as a complete description of the Offering, the Company, or of any of the matters discussed herein. The Memorandum is qualified in its entirety by the LLC Agreement. Any potential Investor in the Company is encouraged to carefully review the LLC Agreement and the Subscription Documents and ask and obtain satisfactory response to all questions as may be desirable or necessary before making any investment decision in addition to consulting the Investor's own appropriate legal, financial, and tax advisors.