IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

United States of America,

      versus

Elchonon "Elie" Schwartz.

Criminal Action Number
1:24-CR-371-SDG

## **Defense Sentencing Memo**

I.    <u>Elie's criminal conduct was a shocking departure from a long record of meticulously honest professional conduct</u>

Elie Schwartz's criminal conduct was a stark departure from thirty years of ethical business dealings. In letters of support, numerous investors and business partners, past and present, attest to Elie's transparency and honesty in his business practice. (*See* Exh. 3). Elie didn't just do what was legally required of him, but often went out of his way to make sure that service providers, investors and others did not lose money, even when he had no obligation to do so. (*See, e.g.,* Exh. 3 at 47). He was transparent with his partners and investors, and kind to his employees. (*See, e.g.*, Exh. 3 at 51, 72, 79).

1

Elie is also blessed with the capacity and drive to work an insane amount, often working 16 hours or more per day, six days a week, with little sleep. (*See* Exh. 5 at 8-9, 14). He has perfectionist tendencies, and the combination of these traits allowed him to achieve amazing success at what he put his mind to. Before the Atlanta and Miami deals which led to this case, he had never failed to close a real estate deal, often overcoming significant setbacks which normally would have doomed an acquisition. (*See, e.g.,* Exh. 3 at 3).

But his boundless belief in his own abilities, seemingly justified by his record of success, caused him to take outsized risks. He was almost too comfortable with high-pressure, high-risk investment ventures. (*See* Exh. 3 at 14-15). His former business partner left in part because he couldn't accept the level of exposure required for the deals Elie wanted to pursue.

Before the Atlanta and Miami deals, Elie had always worked with investors with whom he had or could develop a personal relationship. Many were high-net-worth private investors, while others were institutional investors, but even with those, he worked to get to know the personnel involved, so they could develop mutual trust. That was

different with the CrowdStreet funding, because Elie had no contact with the individual investors, only with the CrowdStreet intermediaries. Although he didn't realize it at the time, that ended up making a critical difference in how Elie viewed the investors and their funds.

Another difference was that before using CrowdStreet, it was common practice in the investment communities in which Elie worked for the purchaser to use investment funds for deal-related expenses, before the deal closed. The funds were always repaid when the deal closed, and again, Elie had never failed to close a deal. But that was something which was explicitly disallowed by the CrowdStreet investment agreements; the escrow was sacrosanct, to remain untouched until the deals closed. And this was a critical provision of the agreements, one which investors relied on, to protect their money and prevent exactly the kind of catastrophic loss which occurred here. Not only did Elie fail to honor that contractual obligation, but he knew going in that he was going to need to access that money to keep the deals afloat.

The Atlanta and Miami deals also occurred at a time when the market was rapidly changing, and the climate was different from anything Elie had faced before. His company's portfolio was almost exclusively commercial real estate. When the pandemic hit and people stopped going to the office, the commercial market began an unprecedented downturn. The value of the buildings his company owned was going down, and investors were failing to heed capital calls which Nightingale was forced to issue. NPG covered the capital costs out of its own reserves. Those reserves seemed plentiful at first, but as the pandemic and the downturn continued, Nightingale's cash dwindled.

Nevertheless, as any seasoned investor knows, a down market is a great time to shop for bargains, and to Elie and NPG, the Atlanta and Miami properties looked like just that. The CrowdStreet investors clearly thought so too. But as Elie sought to lock in other investments to be able to close the deals, the commercial market continued to soften. At the same time, interest rates began to spike, and month by month, as NPG was unable to nail down the necessary additional investors, affordable capital moved further out of reach. With no other funds

4

available, Elie had to draw more and more frequently from the escrow accounts to try to keep the deals alive, and then for personal expenses too.

Elie always thought, perhaps out of hubris, that he would pull the deals and his companies out of the nosedive, right up to the moment when the last desperate effort to recoup his losses failed, the money ran dry, and the plane slammed into the ground. But from the outset, while his promises not to touch the escrow funds may have been fraudulent, and while his confidence in his own ability to close any deal under any circumstances may have been unjustified, Elie never intended the investors to lose their money. He always intended and believed he would make it work out in the end.

II.  <u>Elie has made uncommon efforts to begin to repay the victims, and extraordinary efforts to cooperate</u>

A.  <u>Elie has already returned approximately $17 million to the investors</u>

Before the deals ultimately failed, while Elie was scrambling to nail down the investors needed to complement the CrowdStreet funds, and despite being in desperate need of cash, he offered the investors the opportunity to rescind their investments, something that was not

required under the terms of their investment agreements. Many took him up on the offer, and NPG refunded approximately $10 million in this way. These investors, while still victims, were made whole long before any investigation, let alone prosecution.

After the deals failed, Elie and NPG voluntarily entered into a binding agreement with an independent manager, under which his personal and corporate assets were all disclosed, with the understanding that the manager would liquidate the assets and distribute the proceeds pro rata back to the victim investors. (Exh. 1, Letter of former counsel James Loonam, at 1).

Elie cooperated with the manager far beyond what was required by the agreement. He created a detailed, 25-page outline of all of NPG's and his own assets, describing not only their nature and location, but providing valuable advice on how to maximize their sale value. Elie also offered to use his own knowledge and connections to help sell the assets, though the manager spurned his offer.

Elie also voluntarily went to his children, both adults and minors, and asked them to relinquish assets in trusts which he had established for them years before. (Exh. 1 at 1). Those assets did not belong to and

6

were not under the control of Elie or NPG, and the children's trusts

were legally impregnable. Neither Elie nor his children had any legal

obligation to offer up those assets. But Elie felt a strong moral

obligation to do so, and made sure the funds in those trusts also went to

the victims. From these and other assets which were liquidated,

another approximately $7 million has been returned to the investors,

and the sale of other assets is still pending. (An additional almost $4

million has been raised, but that has gone to the fees of the trustee and

her lawyer, rather than to the victims.)

      B.  <u>Elie provided both the road map and the evidence for the
SEC's and DOJ's investigations</u>

When the SEC and DOJ began investigating, Elie was completely

cooperative. Instead of using lawyers to fight subpoenas and discovery

requests, instead of hiding behind his Fifth Amendment right to remain

silent, Elie sat down with the agents and lawyers and methodically

explained everything. (*See* Exh. 1 at 2). He answered all their questions

about his business, his accounts, his assets, his spending, and the

CrowdStreet deals. He provided open access to NPG's records and

accounts, voluntarily uploading gigabyte upon gigabyte of documents to cloud storage for the investigators to pore over.

Elie saved the SEC and DOJ hundreds if not thousands of hours of investigation. As Elie's lawyer at the time reports, "The AUSA communicated that he had just opened the investigation, he was learning the case from us in real time, and that after our presentation 'it really is just a matter of the calculation of loss. We have to get educated on this.'" (Exh. 1 at 2). By doing all that, Elie demonstrated an extraordinary acceptance of responsibility, before he even received a target letter.

C. Independent manager Anna Phillips has made false accusations that Elie has not been cooperative with the asset liquidation process

Ms. Phillips has written a letter to the DOJ's victim advocate alleging that Elie has been uncooperative with the bankruptcy process, and taking the extraordinary step of trying to tell the Court that it should not apply the Guidelines' provision for acceptance of responsibility. The defense objects to the Court considering the letter in any way, because, first, she is not a victim nor does she represent any victims in this criminal case. Second and more importantly, her letter is

not sufficiently reliable for the Court to find any facts asserted in it to be true by a preponderance of the evidence, as the Court must for any fact it relies on at sentencing. The defense agrees with the Court's ruling that if Ms. Phillips wants the Court to consider any facts related to the bankruptcy proceedings, she must testify under oath. (Doc. 16).

Attached as Exhibit 2 is the letter of Patrick Jackson, Elie's bankruptcy counsel. In it, he lays out (and backs up with citations to attached transcripts of proceedings in bankruptcy court) how Ms. Phillips has previously testified under oath that Elie has been cooperative with the bankruptcy and asset liquidation process. Mr. Jackson also explains how the trustee has acted in bad faith and contrary to the interests of the victims in refusing to accept an offer on Elie's condominium which would result in a higher distribution to the victims than other offers that she has, for inexplicable reasons, insisted that Elie accept. And finally, Mr. Jackson explains how the manager has violated the agreement with Elie by refusing to pay 10% of his ongoing earnings, which under the agreement she agreed to pay Elie to allow him to support himself and his family. Mr. Jackson will be present at sentencing and available to testify if need be.

The bankruptcy court also appears to find favor with the arguments that Mr. Jackson has advanced on behalf of Elie and the other Schwartz family members he represents. At a hearing on May 12, 2025, the bankruptcy judge specifically said that he didn't think that the positions taken by Elie were contrived or pretextual, and thought that he was proceeding in good faith by raising them with the court.

Based on the victim impact statements, it appears that Ms. Phillips has been regularly making the same accusations raised in her letter to the victims, on calls to "update" them on the proceedings. This has, understandably, made the victims even more upset with Mr. Schwartz, and infected their statements to the court and their views on how the Court should sentence him.

III.    Guidelines adjustments for causing "substantial financial hardship" are not supported

The PSR adds 4 offense levels based on the assertion that 15 victims suffered "substantial financial hardship." (PSR ¶ 75). The PSR also fails to deduct 2 levels pursuant to the "zero point offender" of § 4C1.1, again based on the assertion that some victims suffered substantial financial hardship. (PSR ¶ 81). Neither of these

adjustments is correct, because of the speculative and long-term nature of the investments, which the investors had to specifically acknowledge before they were allowed to invest.

First, even if Elie had not withdrawn the money from the escrow accounts and then gone bankrupt, there was no guarantee that the investors would ever have made any money. Both the Atlanta and Miami projects were speculative real estate ventures, with no guaranteed rate of return, indeed no guaranteed return at all. Elie had a good prior track record. Approximately 90% of his prior projects had made money for his investors, sometimes a little, sometimes a lot. But the other 10% didn't work out, and the investors lost all of their money.

There are lots of reasons this can happen, and could have happened specifically with these projects. With both Atlanta and Miami, Nightingale was trying to take advantage of the depressed commercial real estate market and acquire these properties at a discount, but was betting that the market would begin to pick back up. That hasn't really happened; the commercial real estate market has continued to suffer, and leasing rates and prices per square foot have not recovered appreciably since the pandemic. At the Atlanta Financial

Center specifically, since NPG's attempted acquisition of the property failed, the two largest tenants have left the Center. Projects fail to become profitable for other reasons too: a shift in the market might mean tenants want new buildings instead of renovated buildings; interest rates may spike; tariffs or inflation might cause renovation costs to balloon; or any number of other reasons.

But aside from what has actually happened to the market, each investor knew going in that the project was speculative. Each investor was required to acknowledge that the investment was highly illiquid, i.e. that the funds would not be available in the near future. They also had to certify that they had the ability to bear the risk, up to a complete loss. While the certification did not use precisely the phrase "substantial financial hardship," in essence the investors were agreeing that a complete loss would not constitute the same. Thus, no investor can reasonably say that they expected or were counting on profits from their investment to fund their retirement, their children's education, or anything else.

Each investor was also required to and did certify in writing that they were an "accredited investor." For a natural person to qualify as an

accredited investor, they must have net worth of at least $1 million, exclusive of the value of their primary residence, or have earned at least $200,000 ($300,000 combined income if married) the previous year and expect to earn the same in the current year, or be the holder of a specific license in good standing (e.g. Series 7, Series 65, or Series 82). 17 C.F.R. § 230.501 (SEC Reg. D, Rule 501). Thus, every investor certified essentially that they were wealthy and sophisticated. They knew they might lose their entire investment.

Second, even if the projects had been successful and investors had made a profit, the timeline would have been long. The prospectuses outlined a multi-year renovation schedule, followed by a ramp up leasing period, and investors would not have begun to get distributions until at least four or five years after each deal closed. At this point in time, in 2025, even if the deals had closed in a timely fashion, the renovations had come in on budget, and tenants had lined up to sign leases and move in, investors would not yet have seen much if any returns. So for victims to say they have had to significantly change their financial plans because they lost their money is not based on any reasonable expectations.

IV.  <u>Elie Schwartz is an amazing person, who has already done an extraordinary amount of good in this world, and undoubtedly will continue to do more</u>

The outpouring of letters of support (and the defense did not even include all the letters which were submitted) shine a light on Elie from many different angles, as a friend, a father, a business partner, a community supporter, a congregant, an employer, a son and a brother. They all speak to his unassuming generosity, not just with his money, but with his time, his care, and his attention. He makes people feel heard, seen, and appreciated. He has built community. He has lifted up so many people, changed and saved lives, careers, marriages, and families.

It's not possible to easily summarize the diversity of people whom Elie has touched, nor the diversity of ways in which he has and continues to help. We have shared so many letters (see Exhibit 3) because a mere handful of cherry picked anecdotes could not convey the depth and breadth of Elie's positive influence in the world. Collectively, these letters show that this is who Elie really is, has always been, and always will be. And his concern extends to the victims. Just as Elie has thrown himself into every project he has ever taken on, he is

determined to make the victims whole and erase his debt, moral as well as financial. And unlike many defendants, he actually has the skills, experience, and connections to achieve that goal.

V.    <u>Elie is remorseful, insightful, and through self-work has already significantly advanced his rehabilitation</u>

Over the last year, Elie has worked extensively with the Aleph Institute, a non-profit which works with individuals facing criminal punishment, addresses root causes of unlawful behavior and, where appropriate, advocates for alternatives to incarceration. Elie has been meeting several times a week with Rabbi Bryski and other Aleph staff, working to understand where he went wrong and why. Elie has also been engaged in intense religious study, in community service, and in therapy. (Exh. 4 at 8, 13). "We have observed his profound shame and remorse for his actions. He feels constant pain knowing that he has caused hardship to his investors, and he is committed to making amends." (Exh. 4 at 3).

> Elie's remorse manifests in his words, and more importantly, in his actions. Those closest to Elie have also observed a profound change in him. Though he remains possessed of his innate optimism, confident that he will transform his recent challenges into opportunities for growth and self-improvement, Elie now recognizes his fallibility and

15

> appreciates that there is more to life than work and financial
> success. He is fully committed to his personal rehabilitation,
> for his own sake as well as for his family and his community.

(*Id.* at 8).

As can be seen from the attached letters and reports, Elie is very family-oriented. As he has continued to reflect on his crimes, this has allowed him to be naturally compassionate towards the victims, as he has always been towards the suffering of others:

> As I think about the tremendous happiness my family gives
> me, I imagine the investors feel the same about their families.
> Reading how my actions harmed not only the investors but
> their families as well, I was overcome with sadness. I think
> about how I would feel if someone harmed my family. I know
> that I can never undo the pain I've caused. All I can do is hope
> that with time I will be able to make money and rectify the
> issue as best I can.

(Letter from Elie Schwartz to the Court, Exh. 6 at 6).

Typical of his every-challenge-is-an-opportunity attitude, Elie has already launched himself on a new but related career as a consultant in high-level real estate acquisitions.

> I have pivoted from owning real estate to working as a
> consultant to assist clients with sourcing debt and equity, as
> well as advising others in putting together real estate deals.
> By taking this path, I am making use of the large rolodex and
> industry knowledge I acquired over 20 years. By working for
> others, I am making sure not to put myself in a position to

hold other people's money. I learned a valuable lesson about my vulnerability in controlling money under extreme circumstances, and now I am ensuring that no matter how much pressure I am under, I won't have access to any funds. In a way, I am protecting myself from myself. I did this not because I think I would have a lapse in judgement again, but because I don't even want to be in the position to have the option to do so.

(Exh. 6 at 4-5).

## VI.    A reasonable sentence

This case does not fit the typical fraud scenario. Elie did not concoct a scheme to defraud 800-plus investors, or steal $63 million. Through a combination of bad luck and outsized self-confidence, he found himself in an unprecedented financially precarious situation. Instead of playing by the rules and accepting that this time he wasn't going to able to close the deals, he went for broke, sure that in the end by sheer force of will he could save the situation. He couldn't. And more importantly, as he now recognizes, he "took on risks with other people's money that I shouldn't have and had no right to." (Exh. 6 at 2).

Elie has not just talked the talk but walked the walk of remorse and remediation. Since before there was even an investigation, he has been working to make the victims whole (and repaid $17 million and

counting), and is determined to finish the job. He engaged in extraordinary cooperation, with the trustee, with the SEC, and with DOJ. His effort to do right is really just a continuation of a lifetime of ethical conduct, a continuum broken by the jagged gap of this case.

As demonstrated by the amazing letters of support, Elie is truly an exceptional person. He hasn't just done a tremendous amount of good in the past before this crime, but has already adjusted his life and his thinking, begun to integrate and learn from his mistakes, and to thus right the ship and be able to continue to play the unique role he has embodied in his family and his community.

In such an unusual situation and for such an unusual person, a custodial sentence is neither necessary nor appropriate. We respectfully ask the Court to impose a term of probation, with conditions as outlined by the Aleph Institute in Exhibit 4.

Dated:  This 14th day of May, 2025.

Respectfully submitted,

s/ Colin Garrett
State Bar No: 141751
Attorney for Elchonon "Elie" Schwartz

Federal Defender Program, Inc.
Suite 1500, Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
(404) 688-7530
Colin_Garrett@fd.org