

**Patrick A. Jackson**
Partner
patrick.jackson@faegredrinker.com
302-467-4210 direct

**Faegre Drinker Biddle & Reath LLP**
222 Delaware Avenue, Suite 1410
Wilmington, Delaware  19801
+1 302 467 4200 main
+1 302 467 4201 fax

faegredrinker.com

May 9, 2025

The Hon. Steven D. Grimberg, U.S.D.J.
United States District Court
1701 Richard B. Russell Federal Building
  and United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303-3309

Re:    *United States v. Elchonon Schwartz*, Case No:  1:24-cr-00371-SDG

Dear Judge Grimberg:

I am writing in response to the March 31, 2025, letter from Anna Phillips, Trustee of the ONH Liquidating Trust, care of her counsel Jorian Rose of Baker Hostetler, to correct certain glaring misstatements and omissions therein, and to provide additional context in evaluating the weight (if any) to be accorded to that letter in connection with Mr. Schwartz's sentencing in the above-referenced proceeding.  Capitalized terms not otherwise defined herein have the meanings ascribed to them in Ms. Phillips's letter.

I represent Mr. Schwartz and the other Schwartz Nightingale Parties ("SNP")[1] in the Bankruptcy Cases in Delaware[2] and related civil litigation in New York state and federal courts. In addition, my firm represents Mr. Schwartz's wife and six children (the "Schwartz Family") in connection with an eviction proceeding brought by the ONH Liquidating Trust in New York state court.

---

[1]    The Schwartz-Nightingale Parties comprise: Mr. Schwartz; One Night Holdings LLC Nightingale Properties, LLC; One Night Properties LLC; ES 28 Holdings LLC; 2 ES28 Investments LLC; Nightingale Property Group LLC; The Nightingale Group, LLC; Nightingale Realty, LLC; Nite Sky Management LLC; AAF 1601 Washington Ave TIC; ONH 2226 Third Ave LLC; Five Park 3003 LLC; 1 Westend PH-A LLC; 320 Mountain Road LLC; 1835 Market Investors LLC; 1635 Market Investors LLC; 1500 Spring Garden Investors LLC; NG 1601 Washington Ave LLC; Midnight Capital Partners LLC; ONH Promote LLC; ES 1 Westend Residence Trust; The Elchonon Schwartz Family Trust; ES28 Investments Trust; ES ONH Trust; and ES Family Life Insurance Trust dated 06.22.2022.

[2]    The Bankruptcy Cases are pending under Case No. 23-10931 (CTG) in the United States Bankruptcy Court for the District of Delaware.  Citations herein to docket items in the Bankruptcy Cases are in the format "[Bankr. D.I. _]."

DMS_US.370882635.3

The Hon. Steven D. Grimberg
May 9, 2025
Page 2

 Mr. Schwartz and the other SNP were originally represented in the Bankruptcy Cases by other counsel, but that counsel stopped doing any work in May 2024 and were later permitted by the Bankruptcy Court to withdraw from the representation for non-payment of their fees.

 Between prior counsel's withdrawal and my firm's engagement on November 12, 2024, Mr. Rose, in my view, attempted to take advantage of Mr. Schwartz's *pro se* status by sending him a dunning letter on November 8, 2024, misrepresenting the import of a discovery order that had been entered by the Bankruptcy Court.[3]  At that time, the ONH Liquidating Trust had also initiated civil proceedings against Mr. Schwartz and the other SNP in New York federal court, and was actively seeking third-party discovery in such proceeding, all without any notice to Mr. Schwartz and the other SNP as required by applicable law.

 When I reached out to Mr. Rose to introduce myself and inquire about (i) the procedural basis for the assertions in the dunning letter and (ii) the third-party subpoenas that appeared to have been improperly issued out of the New York federal proceeding, he did not immediately respond to me.  Rather, Mr. Rose phoned my practice group leader in New York in an apparent attempt to scuttle the engagement, alerting him to prior counsel's withdrawal for non-payment and suggesting that my firm should pass on the representation.  When it became clear we were not going to back down from the engagement, the ONH Liquidating Trust backed off of the assertions in Mr. Rose's dunning letter and withdrew the improper third-party subpoenas in the New York federal proceeding.

 Between my engagement and the entry of Mr. Schwartz's guilty plea in the Criminal Case on February 12, 2025, a number of issues arose between the ONH Liquidating Trust, the SNP, and the Schwartz Family regarding the Settlement Agreement and related matters.  Some of these issues were litigated before the Bankruptcy Court, as discussed below, but several remain unresolved.  I and Mr. Rose had several settlement discussions with respect to many of these issues, during which discussions Mr. Rose suggested that failure to reach a settlement would not bode well for Mr. Schwartz's sentencing because he might be viewed as uncooperative with the ONH Liquidating Trust.

 I took this suggestion as a not-so-veiled threat that if my clients—which include the Schwartz Family and others who had no involvement in the matters giving rise to the Criminal Case—did not accede to the ONH Liquidating Trust's settlement demands, then the ONH Liquidating Trust would submit a statement in connection with Mr. Schwartz's sentencing (and/or urge investors to submit statements, and provide them talking points to include).  I believed at the time, and I continue to believe, that such threat was highly inappropriate.

 My clients did not accede to the ONH Liquidating Trust's settlement demands, and it appears Mr. Rose made good on his threat.  (I understand from Mr. Schwartz's criminal defense

---

[3] The order had granted the ONH Liquidating Trust leave to issue subpoenas under Bankruptcy Rule 2004, subject to the exercise of Mr. Schwartz's rights with respect thereto.  The ONH Liquidating Trust failed to issue any such subpoenas, but nonetheless told Mr. Schwartz in the letter that the order had compelled him to produce documents. The letter also requested Mr. Schwartz to authorize the turnover of electronic documents held by his prior counsel's electronic discovery vendor, Cimplifi, implying that such turnover was required by the discovery order.  This is particularly troubling, given that ONH Liquidating Trust's counsel would have known that the documents held by Cimplifi likely included privileged materials.

The Hon. Steven D. Grimberg
May 9, 2025
Page 3

counsel that there were scores of letters received from investors, raising many of the same points raised in Ms. Phillips's March 31 letter.)

***Additional Context Regarding the Settlement Agreement and the Apartment***

In the Settlement Agreement, which was negotiated and executed without need for any litigation, Mr. Schwartz agreed to pay back the investors' losses in full, with interest and attorney's fees. The other SNP who also signed on to the Settlement Agreement (and are jointly-and-severally liable with Mr. Schwartz for repayment of investor losses) include five trusts that were established for the benefit of Mr. Schwartz's children well before the events giving rise to the Criminal Case. To secure their payment obligations under the Settlement Agreement, Mr. Schwartz and the other SNP agreed to provide security interests in all of their assets, in addition to confessions of judgment, in favor of the ONH Liquidating Trust.

The Settlement Agreement contains a mechanism whereby the net proceeds from the sale of any assets of the SNP are to be shared between the ONH Liquidating Trust (90%) and the SNP (10%). Specifically, the SNP are required to market and sell their assets and direct that all net proceeds from the sales are paid to the ONH Liquidating Trust. And within three days of receiving such proceeds, the ONH Liquidating Trust is required to remit 10% of them to the SNP for the benefit of Mr. Schwartz's family. The foregoing was a material inducement for the trustee of the SNP who are trusts to enter into the Settlement Agreement, because otherwise there would be nothing left of the trusts' property for the benefit of their beneficiaries. Nevertheless, until forced to do so by the Bankruptcy Court (as discussed below), and despite numerous requests by Mr. Schwartz, the ONH Liquidating Trust never made any of these 10% payments to the SNP from the millions of dollars of proceeds of net asset sales it had received under the Settlement Agreement.

The Manhattan apartment in which Mr. Schwartz and his family reside (the "Apartment") is ultimately owned by one of the SNPs that is a trust, and it was purchased by Mr. Schwartz and contributed into the trust in 2018, well before the events giving rise to the Criminal Case. The Apartment is subject to two mortgages with an outstanding principal balance of approximately $14.7 million, plus accrued interest. If the Apartment is sold, these mortgages would need to be paid off, and brokers' fees, transfer taxes, and other closing costs would need to be paid, before any net proceeds would be realized by the ONH Liquidating Trust. (In addition, the SNP would be entitled to 10% of those proceeds, as noted above.) For these and other reasons, the Settlement Agreement contemplated that in lieu of a sale of the Apartment, the SNP could propose an alternative transaction that would allow the Schwartz family to remain in the Apartment while providing an equivalent amount of value to the ONH Liquidating Trust, which proposal would be considered by the ONH Liquidating Trust in good faith. The foregoing was a material inducement for the trustee of the trust that owned the Apartment to sign on to the Settlement Agreement, because it was protective of the interests of the trust's beneficiaries (i.e., Mr. Schwartz's children) not to lose their home if equivalent value could otherwise be provided to the ONH Liquidating Trust for the benefit of investors. Nevertheless, the SNP have made a number of proposals for alternative transactions that would result in *greater* value to the ONH Liquidating Trust than a sale

The Hon. Steven D. Grimberg
May 9, 2025
Page 4

of the Apartment to a third party (including in the weeks prior to Ms. Phillips's March 31 letter), and in my view, the ONH Liquidating Trust has failed to consider them in good faith.[4]

On May 23, 2024, at the direction of the ONH Liquidating Trust, Mr. Schwartz and the SNP that owns the Apartment entered into a month-to-month lease for the Apartment that permitted Mr. Schwartz and his family to reside there in exchange for payment of homeowners-association charges, which have been (and continue to be) paid current.[5]  In January 2025, the ONH Liquidating Trust purported to terminate this lease, the efficacy of which has been disputed by the Schwartz Family in the context of an eviction proceeding brought by the ONH Liquidating Trust in New York state court, which dispute remains pending.

### Litigation in the Bankruptcy Court

On January 15, 2025, shortly after purporting to terminate the lease for the Apartment but before commencing the eviction proceeding in New York state court, the ONH Liquidating Trust filed a motion in the Bankruptcy Court [Bankr. D.I. 381] to enforce the Settlement Agreement against Mr. Schwartz and the other SNP.  In this motion, the ONH Liquidating Trust raised many (but curiously, not all) of the alleged breaches of the Settlement Agreement cited in pages 3-5 of Ms. Phillips's letter and sought to compel (i) certain of the SNP to execute a confession of judgment and (ii) Mr. Schwartz to vacate the Apartment.

The SNP objected to the motion [Bankr. D.I. 386], among other reasons, on the grounds that it amounted to an improper request for specific performance of the Settlement Agreement when the ONH Liquidating Trust itself was in breach of its obligations thereunder (i) to pay the SNP 10% of the net proceeds of the sale of millions of dollars of SNP assets, and (ii) to consider in good faith alternative proposals for the Apartment that would permit the Schwartz family to remain there.

At a hearing in the Bankruptcy Court on February 5 and 6, 2025, Ms. Phillips testified under oath in support of the ONH Liquidating Trust's motion.[6]  At that time, she struck a much different tone regarding Mr. Schwartz's cooperation than in her March 31 letter.  For instance, she described the negotiations concerning the Settlement Agreement as "constructive" and commended Mr. Schwartz as being "very engaged" and "work[ing] very hard . . . to come up with a consensual settlement that was capable of being actioned and voted upon by the creditors in the context of forming the basis of a Chapter 11 plan." (2/5/25 Hr'g Tr at 17:18, 17:25-18:4.)  And when questioned by Mr. Rose with respect to Mr. Schwartz's supposed failure to deliver security documents in accordance with the Settlement Agreement, she said, "I want to be very clear here

---

[4]    The buyer for the Apartment identified by the ONH Liquidating Trust in mid-October 2024 (as referenced on page 3 of Ms. Phillips's March 31 letter) offered $18.15 million, which, after payment of the mortgage principal and interest, closing costs, and the 10% due to the SNP would yield the ONH Liquidating Trust no more than $1.4 million.  That the ONH Liquidating Trust always describes this asset as a "$19 million penthouse" rather than a "source of $1.4 million of potential recovery" suggests that the "trophy" value of the Apartment exceeds its economic value to the ONH Liquidating Trust (which is absurd, given the ONH Liquidating Trust's sole purpose is to recover value for the investors).

[5]    The statement on page 4 of Ms. Phillips's March 31 letter that "Mr. Schwartz has previously told the Trust that he is currently not paying any of these expenses" is false.

[6]    Transcripts of this hearing are available on the Bankruptcy Court's docket at D.I. 403 and 404, and are cited herein, e.g., as "(2/5/25 Hr'g Tr. at ___)."  For ease of reference, relevant excerpts of the transcripts are enclosed.

The Hon. Steven D. Grimberg
May 9, 2025
Page 5

that it wasn't that it was non-performance but it was definitely an issue with getting certain of the security interests that were part of the [S]ettlement [A]greement . . . ."[7] (*Id.* at 19:8-11.) Again in response to questioning by her own counsel, she said "it wasn't that Mr. Schwartz was uncooperative, he certainly was helping us in some aspects" with respect to monetizing assets for the benefit of investors. (*Id.* at 20:9-11.) She also testified that the Settlement Agreement "was predicated on Mr. Schwartz being able to continue to do business and in the course of doing business to generate income that could be used to fund" the restitution to investors, that "it was never our intention to stop Mr. Schwartz pursuing his work in commercial real estate," and that she understood Mr. Schwartz "intended to go out and do deals to try and generate income to repay" investors, (*Id.* at 21:16-20 and 21:25-22:1)—all which calls into question what the ONH Liquidating Trust hopes to accomplish for its investor beneficiaries by seeking a harsher sentence for Mr. Schwartz in the Criminal Case. With respect to the Apartment, she testified that Mr. Schwartz "had definitely been very accommodating, I think, during the marketing process" for the Apartment (*id.* at 24:23-24), and that he had become uncooperative with them only when the ONH Liquidating Trust decided to move forward with the $18.15 million offer it received in mid-October 2024. On cross examination by me regarding the SNPs' physical assets (watches, jewelry, etc.) securing their payment obligations under the Settlement Agreement, Ms. Phillips stated: "I want to be clear that Mr. Schwartz was cooperative in handing over those assets. There is no issues in getting possession of them in and around those assets." (*Id.* at 31:11-13.) And she admitted the ONH Liquidating Trust had not paid the SNP any of the 10% of net asset liquidation proceeds due to them under the Settlement Agreement, which she believed was appropriate "because the contract has been defaulted on," so she didn't "believe we owe anything." (*Id.* at 31:19.)

At that same hearing, Mr. Schwartz testified at length regarding the three different alternative proposals the SNP had made with respect to the Apartment, all of which would have yielded more net proceeds to the ONH Liquidating Trust than the proposed sale transaction. He also testified that, even if the Bankruptcy Court determined he was required to leave the Apartment and compelled him to do in furtherance of the Settlement Agreement, he did not believe his wife and children (who are not party to the Settlement Agreement) would leave the Apartment because they have no other place to go.

At the continuation of the hearing on February 6, 2025, the Bankruptcy Court ruled, in pertinent part, as follows:

> Everyone agrees that the [Settlement A]greement hasn't been complied with. I'm inclined to enforce it, and that means enforce it as to both of you. And that means, to the extent the agreement requiring to vacate the building, you know, again, subject to what I can do to say, No, look, you've got to meet your obligations.

---

[7]    This is in stark contrast to the statement on page 3 of the March 31 letter that "when it came time to provide the promised security interests . . . the [SNP] failed to abide by promises in the Settlement Agreement and fully perform." It seems to me the ONH Liquidating Trust's counsel failed to get the appropriate security documents finalized with the SNP's prior counsel and are trying to hang that on Mr. Schwartz, but Ms. Phillips, while under oath, was unwilling to do that. Tellingly, since my involvement in November 2024, counsel for the ONH Liquidating Trust have not requested execution of any security documents (or even told me which security documents they believe are still missing).

The Hon. Steven D. Grimberg
May 9, 2025
Page 6

> And if the obligations are also, to the extent there are proceeds, you
> get 10 percent of them, I'll enforce that, too. And you can both
> point, at some level, to each other's defaults and say, because of the
> other side's default, I'm off the hook. And my reaction to this is,
> no, neither of you is off the hook; you're both going to be held to
> the contract as it's written.

(2/6/25 Hr'g Tr. at 33:17-34:4.) The Bankruptcy Court later elaborated that the order embodying its ruling would contain language conditioning the ONH Liquidating Trust's ability to enforce the order against the SNP on the ONH Liquidating Trust having honored its obligations to make the 10% payments to the SNP. (*Id.* at 56:24-57:2 and 57:13-19.) It also acknowledged during a colloquy with me that it had no authority to order the Schwartz Family to leave the Apartment (*see id.* at 56:1-4), which the ONH Liquidating Trust's counsel acknowledged was a matter for the New York court to resolve in connection with the ONH Liquidating Trust's eviction proceeding (*see id.* at 14:11-17).

An order embodying this ruling was entered by the Bankruptcy Court on February 27, 2025 [Bankr. D.I. 413], and it directed the ONH Liquidating Trust to make the 10% payment and provide a calculation supporting that payment within 30 days, as a condition of its ability to enforce Mr. Schwartz's obligation to leave the Apartment (a detail conveniently omitted from Ms. Phillips's March 31 letter). It also provided for the Bankruptcy Court to resolve any disputes regarding the calculation of the 10% payment amount. For ease of reference, a copy of this order is enclosed.

The SNP do not agree that the ONH Liquidating Trust has paid the 10% amount owing to them under the Settlement Agreement on March 31 as required, and the issue has been teed up for resolution in the Bankruptcy Court at a hearing currently scheduled for May 12, 2025. If the SNP are correct, then the ONH Liquidating Trust has not yet complied with the conditions precedent for requiring Mr. Schwartz to leave the Apartment. And regardless, the *Schwartz Family* have every right to oppose the relief sought against them by the ONH Liquidating Trust in the New York state court eviction proceeding, and to remain in the Apartment while they do so.

### Other Misstatements in the March 31 Letter

In addition to the issues discussed above, the following statements on pages 4-5 of Ms. Phillips's March 31 letter, which are cited as instances of Mr. Schwartz not cooperating with the Trust, are also false or misleading:

> (1) *"Mr. Schwartz transferred money to another bank from the liquidation of securities that were pledged to the Trust <u>to shield the funds from the Trust</u> and refused to identify who received the money. The Trust <u>learned this through counsel for the brokerage firm</u> rather than Mr. Schwartz. Although the Trust eventually did recover these funds, the <u>Trust spent months and legal fees to pursue the funds.</u>"*

The securities at issue were in a JPMorganChase ("JPM") securities account of one of the SNPs, as was the $171,223 cash resulting from the sale of such securities, but JPM had swept the cash balances of a number of other SNPs' accounts to apply them to amounts owing to JPM (which JPM had no right to do, in the SNPs' view). To prevent JPMorgan from similarly sweeping the proceeds of the sale of the pledged securities, and on the advice of his counsel at the time, Mr.

The Hon. Steven D. Grimberg
May 9, 2025
Page 7

Schwartz wired the $171,223 from the JPM account to his account with Bank of America on August 7, 2024. Mr. Schwartz's counsel told the ONH Liquidating Trust's counsel about all of this. Over the next several weeks, in connection with discussions around payment to the SNP of the 10% amounts they were then due under the Settlement Agreement, the parties discussed whether the $171,223 would be paid to the ONH Liquidating Trust or applied to the 10% payments due to the SNP. The ONH Liquidating Trust ultimately took the position (which was later rejected by the Bankruptcy Court, as discussed above) that it did not owe any amounts to the SNP, so it demanded payment of the $171,223. The funds were willingly turned over to the ONH Liquidating Trust in October 2024. No "pursuit" was necessary.

> (2) "*Mr. Schwartz stated he is unable to recall the purpose of several large payments (all exceeding $300,000) that the Trust would seek to recover for the benefit of defrauded investors.*"

We have no idea what this even refers to. It was not raised in the motion practice in the Bankruptcy Cases, and counsel for the ONH Liquidating Trust have never raised it with me since I became involved in November 2024. In any event, it's a stretch to suggest that an *inability to recall* information requested by the ONH Liquidating Trust is somehow tantamount to a *lack of cooperation* on Mr. Schwartz's part.

> (3) "*Mr. Schwartz <u>refused to provide additional detail to the Trust regarding his commercial real estate interests</u> to determine whether the Trust may realize any value from these interests. This refusal required the Trust to investigate the commercial real estate interests on its own—further costing time and money.*"

Again, we have no idea what this refers to. Mr. Schwartz prepared and provided to the ONH Liquidating Trust an incredibly detailed "roadmap" of the various assets to be monetized, which included his and the other SNPs' commercial real estate investments, and he arranged three separate calls with the ONH Liquidating Trust's financial advisor (including their in-house real estate expert), the SNPs' asset management team, and the management of every one of the properties (including properties that are not managed by the SNPs), to go through any questions the ONH Liquidating Trust had about the commercial real estate investments. He also provided the ONH Liquidating Trust's financial advisor with all of the individual property-level information he had requested. Since I became involved in November 2024, the ONH Liquidating Trust's financial advisor has asked a handful of follow-up questions, which we have answered.

***Conclusion***

It is outrageous—on many levels—for the ONH Liquidating Trust to submit a letter to this Court that is rife with falsehoods and asks for adverse inferences to be drawn against Mr. Schwartz in connection with his criminal sentencing because Mr. Schwartz, the other SNP, and the Schwartz Family are choosing to enforce their rights under the Settlement Agreement and applicable law rather than acceding to the ONH Liquidating Trust's settlement demands in the context of pending

The Hon. Steven D. Grimberg
May 9, 2025
Page 8

civil litigation proceedings.[8]  It is worse that the ONH Liquidating Trust seems to have used its bully pulpit in the bankruptcy case to rile up investors to submit statements containing many of the same half-truths and falsehoods that are rampant in Ms. Phillips's March 31 letter.  Under the circumstances, in determining the appropriate sentence for Mr. Schwartz, I urge the Court not to credit any assertions made in unsworn statements by Ms. Phillips or others as to the level of Mr. Schwartz's cooperation with the ONH Liquidating Trust under the Settlement Agreement.

Thank you for your consideration in this matter. Should you have any questions, please do not hesitate to contact me.

Respectfully,

*/s/ Patrick A. Jackson*

Patrick A. Jackson
Partner

PAJ/s
Enclosures
Cc:     Colin Garrett (colin_garrett@fd.org)

---

[8]    What's even more galling is the amount in controversy.  The ONH Liquidating Trust, SNP, and Schwartz Family had agreed in concept on the terms and documentation of a global resolution of open issues between them, mostly centered around an alternative transaction regarding the Apartment, the only sticking point being the economics.  And based on the most recent bid and ask, the parties were only about $265,000 apart on the economics. Apparently the ONH Liquidating Trust believes that applying leverage against Mr. Schwartz in the Criminal Case to try and obtain that $265,000 from the Schwartz Family is worth risking the possibility of Mr. Schwartz actually receiving a harsher sentence that would prevent him from working to pay off the more than *$42 million* that remains outstanding under the Settlement Agreement.

1                    UNITED STATES BANKRUPTCY COURT
2                       DISTRICT OF DELAWARE

                                      .  Chapter 11 (Subchapter V)
3    IN RE:                           .  Case No. 23-10931 (CTG)
                                      .
4    ONH AFC CS INVESTORS LLC,        .  (Jointly Administered)
     *et al.,*                        .
5                                     .
                                      .  Courtroom No. 7
6             Debtors.                .  824 North Market Street
                                      .  Wilmington, Delaware 19801
7                                     .
                                      .  Wednesday, February 5, 2025
8    . . . . . . . . . . . . . . . .  .  2:30 p.m.

9                       TRANSCRIPT OF HEARING
10        BEFORE THE HONORABLE CRAIG T. GOLDBLATT
                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Liquidating
13   Trustee:                Matthew Pierce, Esquire
                             LANDIS RATH & COBB LLP
14                           919 Market Street
                             Suite 1800
15                           Wilmington, Delaware 19801

16                           Jorian Rose, Esquire
                             BAKER & HOSTETLER LLP
17                           45 Rockefeller Plaza
18                           New York, New York 10111

19
     (APPEARANCES CONTINUED)
20
     Audio Operator:         Teasha Marsh, ECRO
21
     Transcription Company:  Reliable
22                           1007 N. Orange Street
                             Wilmington, Delaware 19801
23                           (302)654-8080
                             Email: gmatthews@reliable-co.com
24
25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

1 | <u>APPEARANCES (Continued)</u>:

2 | For the Schwartz
3 | Nightingale Parties:      Patrick Jackson, Esquire
    |                          FAEGRE DRINKER BIDDLE & REATH LLP
4 |                          222 Delaware Avenue
    |                          Suite 1410
5 |                          Wilmington, Delaware 19801

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  A     The results of the investigation were that the funds

2  had been misappropriated, not used for what they had been

3  raised for.  Specifically, the purchase of real estate, the

4  purchase of watches, paying of personal expenses,

5  investigating in equities, servicing on some other

6  properties, the payment of a down payment for one of the

7  buildings -- down payment for one of the buildings.  So,

8  basically, they shouldn't have been released from the

9  account.  They weren't used for the purpose for which the

10 fundraise was done.

11 Q     And with that information what did you decide to do

12 next with respect to the role?

13 A     So, the job then really became, for me, a question of

14 recovery and trying to get the funds back for creditors.  So,

15 I, together with my advisors, commenced to dialog with Mr.

16 Schwartz and his advisors to see whether we could reach a

17 consensual agreement for some sort of a settlement with

18 investors.  I think those negotiations were constructive and

19 we reached a settlement agreement which involved quarterly

20 payments by Mr. Schwartz.  And in the event that he was not

21 able to make those payments the -- he provided security over

22 certain assets that we will be able to claim on in that

23 instance if the investors weren't paid.

24       I would tell you that I think the negotiations were

25 intense, robust but I think both parties worked very hard,

1  you know, to the Judge's point earlier, to come up with a

2  consensual settlement that was capable of being actioned and

3  voted upon by the creditors in the context of forming the

4  basis of a Chapter 11 plan.

5  Q    Was Mr. Schwartz represented during this process?

6  A    Yes -- well, I certainly know he had Jones Day,

7  (indiscernible) as his legal advisor. I'm not sure whether he

8  had another advisor.

9  Q    And about how long did the settlement process last with

10 Mr. Schwartz?

11 A    The negotiation of the settlement?

12 Q    The negotiation process.

13 A    Look, from memory it was about four months.  They were

14 pretty intense negotiations. I think that Mr. Schwartz was

15 very engaged and stated that he was very committed to working

16 to get investors repaid.

17 Q    Did part of that settlement agreement involve a plan of

18 reorganization?

19 A    Yes. It was -- it really was the basis of a plan of

20 reorganization that investors then voted upon.  And from my

21 perspective, I wanted to get it out of Chapter 11 and get it

22 into a liquidating trust to, frankly, minimize the

23 professional fee burn and to try and be, you know, as cost

24 effective as possible in making collections and getting them

25 out to investors which I think was everybody's intention all

1  around the table.

2  Q      Prior to -- after the settlement agreement, before

3  confirmation, did Mr. Schwartz perform and do everything he

4  was supposed to do under the settlement agreement?

5  A      So, he did not.  We didn't get all of the security

6  interests that we were promised.  We didn't get

7  (indiscernible), you know, on the bank accounts.  You know,

8  we got some of the stuff. I want to be very clear here that

9  it wasn't that it was non-performance but it was definitely

10  an issue with getting certain of the security interests that

11  were part of the settlement agreement and, frankly, you know,

12  I think that was raised at the time of the confirmation

13  hearing.  My very firm instructions at the time were to try

14  and work consensually to achieve and get those sorted over

15  the couple of months, you know, post-filing to try and

16  minimize the professional fee burn to get these issues

17  resolved but here we are, you know.

18  Q      Was there another transaction taking place at this time

19  which was -- which would have been beneficial to the plan and

20  confirmation process?

21  A      Yeah, there was at the time a sale agreement or

22  negotiations around a sale agreement for the 1601 property in

23  Miami.  That would have, at the numbers shown, delivered a

24  meaningful return to the investors.  That subsequently fell

25  over, unfortunately, and descended into litigation.  So,

1  unfortunately that turned out to be not a source of proceeds

2  for the estate.

3  Q     And did the Trust -- sorry, the debtors, decide to move

4  forward towards confirmation in any event?

5  A     Yes, they did.

6  Q     Why was that?

7  A     Well, again, you know, my focus was on trying to keep

8  the professional fee burn down to try to maximize the return

9  to investors.  You know, I felt that -- and it wasn't that

10 Mr. Schwartz was uncooperative, he certainly was helping us

11 in some aspects of it, and my view was that we would be able

12 to resolve whatever the issues were early in the timeframe of

13 the Trust's existence in a way that we didn't need to come

14 running back to Court and incurring time on lawyers, sorry.

15 I just want to maximize what is going back to investors

16 instead of spending money funding fights.  So, I really tried

17 to get to a point where we cooperatively tried to get it

18 resolved.  You know, we just haven't been able to.

19 Q     Was the penthouse an issue in the settlement process?

20 A     The penthouse, from my perspective, was an important

21 component of the settlement in the sense that it felt, from

22 my perspective, and I was definitely getting a lot of

23 feedback from investors, a tremendous amount of feedback,

24 that any settlement that did not involve the penthouse in the

25 event that they were not repaid from other sources, right,

1   that any settlement that it didn't involve him contributing

2   the equity in his penthouse was not a settlement that they

3   would support in the plan situation.

4   Q     Just because of confidentiality I am going to ask you a

5   question about financial disclosure but I'm not going to ask

6   questions about it.

7         Was there a financial disclosure requirement in the

8   settlement agreement?

9   A     Yes, there was.

10  Q     And was the Trust provided with significant financial

11  disclosure from the Schwartz Nightingale Parties?

12  A     Yes, they were.

13  Q     In your view was there any way that Mr. Schwartz

14  Nightingale Parties could make the required payments without

15  sale of the condo?

16  A     Well, maybe. I think that at the end of the day the

17  settlement was predicated on Mr. Schwartz being able to

18  continue to do business and in the course of doing business

19  to generate income that could be used to fund, you know, the

20  return to creditors. So, in terms of a statement of assets

21  and liabilities, his ability to repay investors outside of

22  the sale of assets was not apparent but it was always -- it

23  was never our intention to stop Mr. Schwartz pursuing his

24  work in commercial real estate if counterparties chose to

25  deal with him. My understanding was that he intended to go

1    out and do deals to try and generate income to repay

2    creditors.

3    Q      Why was it an important feature in the -- why was it a

4    feature of the settlement agreement that Mr. Schwartz sell --

5    market the premises or, otherwise, provide the Trust with a

6    financial recovery on account of that asset?

7    A      Well, it -- I mean Mr. Schwartz defaulted after the

8    first payment and it was very clear that his -- that we are

9    not going to receive any further payments and so we moved to

10   a default collection position of the assets that the Trust

11   had security over and the penthouse was, obviously, a

12   material asset.

13          Now there was a period of time before we could market

14   it and Mr. Schwartz would have the ability to come up with a

15   proposal to keep it that we needed to understand specifics

16   around.  So, you know, he made clear to us that it was not

17   his preference to move.  I understand that.  Frankly, from my

18   perspective I just simply wanted to maximize the return for

19   my constituency and was going to -- and that had to involve

20   the penthouse.

21   Q      And did Mr. Schwartz make his payments under the

22   settlement agreement?

23   A      He only made the first payment of $3 million.

24   Q      Did he make any of the second payment?

25   A      No.

1  welcome to keep going and working on his proposal.

2        So, I can't remember the question but, yeah, he was

3  definitely working on it and kept working on it after that

4  period.  No problem.  You know, we were open to hearing from

5  him and were specific about what needed to be in that

6  proposal.

7  Q    And did you also market the property?

8  A    Yes.  So, we appointed realtors who specialize in

9  properties of that type in that area of New  York City to

10 market the property.  I mean it's a beautiful property

11 apparently.  And, you know, we received a number of offers,

12 several of which were, you know, on the face of it I think

13 would have been acceptable to the Trust and there were

14 several interested parties out there and waiting.

15 Q    Did there come a time that Mr. Schwartz stopped

16 cooperating with the --

17 A    Yeah, I think once it got to the point where we had one

18 party that I think we were comfortable with, you get to an

19 agreement with, and its sort of a weird situation because in

20 New York you do you inspections before the contract which is

21 a little wacky compared to other places but he then declined

22 -- he had been allowing showings and some on very short

23 notice.  So, he had definitely been very accommodating, I

24 think, during the marketing process.  Once it then came time

25 for one of the buyers to actually to perform an inspection of

1   the property, he, unfortunately, denied permission for that

2   to be done.

3   Q      Has he cooperated at all since in any of the marketing

4   or sale of the property?

5   A      No.

6              MR. ROSE:  Your Honor, I think that is all I had

7   for Ms. Phillips.

8              THE COURT:  Okay.  Any cross-examination, Mr.

9   Jackson?

10              MR. JACKSON:  I do, Your Honor.  If I may just

11   have a moment to ask my client a question here.

12              THE COURT:  Certainly.

13         (Pause)

14              MR. JACKSON:  Thank you, Your Honor.  Again, for

15   the record Patrick Jackson, Faegre Drinker, for the Schwartz

16   Nightingale Parties.

17                      CROSS-EXAMINATION

18   BY MR. JACKSON:

19   Q      Good afternoon, Ms. Phillips.

20   A      Good afternoon.

21   Q      I will try to be efficient. You testified that you were

22   appointed as the independent manager of the debtors, if I

23   recall, is that right?

24   A      Yes.

25   Q      And you were independent of the Schwartz Nightingale

1  A     Yes, there have.  There was -- I'm just trying to think
2  of the assets.  I'm sorry, it's a little while since I have
3  looked at it.  I didn't do it in preparation for this
4  hearing.  I think the rest of the proceeds that have been
5  recovered have all been from wrong payor legal actions. I'm
6  just trying to think through what we have collected.  Look,
7  there may have been some collections, you know, sort of bits
8  and bobs from other assets but really the large portion has
9  been from the settlement of legal actions.
10 Q     Okay.
11 A     And I want to be clear that Mr. Schwartz was
12 cooperative in handing over those assets.  There is no issues
13 in getting possession of them in and around those assets.
14 Q     Okay, thank you.
15        And just to -- I think this is clear from the legal
16 papers but just to put a finer point on it, the Trust has
17 never remitted any percentage of asset liquidation proceeds
18 to the Schwartz Nightingale Parties, is that correct?
19 A      No, because the contract has been defaulted on.  So, I
20 don't believe we owe anything.
21 Q     So, let's stay on the settlement agreement which could
22 be open in front of you. Let's turn to  page 3, and I am
23 actually looking at Section 3.  Is it -- so, I will let you
24 read this first paragraph after settlement payments and
25 familiarize yourself with that.

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                February 7, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                February 7, 2025

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 11 (Subchapter V) |
|  | . Case No. 23-10931 (CTG) |
|  | . |
| ONH AFC CS INVESTORS LLC, | . (Jointly Administered) |
| *et al.*, | . |
|  | . |
|  | . Courtroom No. 7 |
| Debtors. | . 824 North Market Street |
|  | . Wilmington, Delaware 19801 |
|  | . |
|  | . Thursday, February 6, 2025 |
| . . . . . . . . . . . . . . . . | . 2:00 p.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Liquidating
Trustee:                    Matthew Pierce, Esquire
                            LANDIS RATH & COBB LLP
                            919 Market Street
                            Suite 1800
                            Wilmington, Delaware 19801

                            Jorian Rose, Esquire
                            BAKER & HOSTETLER LLP
                            45 Rockefeller Plaza
                            New York, New York 10111

(APPEARANCES CONTINUED)

Audio Operator:             Alyce Doody, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

1    APPEARANCES (Continued):

2    For the Schwartz
     Nightingale Parties:          Patrick Jackson, Esquire
3                                   FAEGRE DRINKER BIDDLE & REATH LLP
                                    222 Delaware Avenue
4                                   Suite 1410
                                    Wilmington, Delaware 19801
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  otherwise agreed to or directed with the debtors which is

2  sort of what happened.

3           THE COURT:  What is your response to the argument

4  that Mr. Schwartz is a signatory and is obligated to vacate

5  but that his family -- I don't know if his family has

6  independent ownership interests in the property or not but if

7  they do that they're not bound by his agreement.

8           MR. ROSE:  Well, Your Honor, first the settlement

9  agreement says Mr. Schwartz and his family shall vacate.

10          THE COURT:  I understand that.

11          MR. ROSE:  And they aren't signatories but then,

12  Your Honor, they're not going to be held in contempt if they

13  fail to abide by -- in other words, we're seeking to do that

14  which the settlement agreement required.  Their tenancy

15  issues are not an issue we are seeking to have this Court

16  resolve.  That is going to be resolved in New York where

17  tenancy rights are.

18          Thirdly, the apartment, the condo is owned by an

19  LLC.  Mr. Schwartz created the structure and that LLC is a

20  judgment debtor to the Trust. Those rights are -- I mean that

21  was his --

22          THE COURT:  So, is the LLC a party -- the LLC is

23  not a party -- or is that a Nightingale Party?

24          MR. ROSE:  It is, Your Honor.

25          THE COURT:  Okay.

1  stop them from doing that; it just means that if I'm

2  specifically enforcing this agreement, they don't get the 10

3  percent, but they don't walk away from their rights if they

4  have them as an *in personam* creditor and they get a judgment

5  and they use whatever their creditor remedies are and they

6  can get that money in any other way, they aren't walking away

7  forever from that money in that respect.

8          MR. JACKSON:  I suppose that's fair.  I hadn't

9  really thought of that, but, certainly, we're not asking here

10 today -- what we're objecting to here today is what's being

11 asked of you today, right.

12         So, certainly, if there's another way that they

13 can get at the 10 percent, it's just not through the

14 contract --

15         THE COURT:  Right.  So here's where I am.  Where I

16 am is I'm inclined to enforce this agreement.  The agreement,

17 right, was part of a plan that I confirmed.  Everyone agrees

18 that the agreement hasn't been complied with.  I'm inclined

19 to enforce it, and that means enforce it as to both of you.

20 And that means, to the extent the agreement requiring to

21 vacate the building, you know, again, subject to what I can

22 do to say, No, look, you've got to meet your obligations.

23         And if the obligations are also, to the extent

24 there are proceeds, you get 10 percent of them, I'll enforce

25 that, too.  And you can both point, at some level, to each

1  other's defaults and say, because of the other side's

2  default, I'm off the hook.  And my reaction to this is, no,

3  neither of you is off the hook; you're both going to be held

4  to the agreement as it's written.

5        Is that -- do you think I'm missing anything

6  there?  I know you'd like to be off the hook.

7        MR. JACKSON:  Well, no -- I mean, honestly, Your

8  Honor, my goal is to -- is for the motion to be denied.

9        THE COURT:  Right.  I understand that.

10        Assume it's not going to happen.

11        MR. JACKSON:  I mean, there's issues, yeah --

12        THE COURT:  Well, no, I mean, I'll hear your

13  arguments --

14        MR. JACKSON:  Yeah.

15        THE COURT:  -- but you understand where my head is

16  at the moment.

17        MR. JACKSON:  Yeah, understood.

18        And we understand at the conclusion of the process

19  in New York, absent an agreement or absent something else

20  happening that moots all of this, then, yes, if there's an

21  order in New York that says everybody get out, everybody's

22  out, what happens, happens and that -- and I think Mr. Rose

23  conceded that's not what they're seeking today --

24        THE COURT:  Right.

25        MR. JACKSON:  -- they're seeking to enforce it as

1          THE COURT:  Well, what's my authority to direct

2     his family to leave?

3          MR. JACKSON:  You cannot.

4          THE COURT:  Right.

5          MR. JACKSON:  But that's my point is that -- but

6     you have a scenario where --

7          THE COURT:  Look, if the -- it seems to me the

8     trustee is entitled to enforce the agreement she has and if

9     that doesn't help her all that much, that's her problem, but

10     it doesn't prevent her from enforcing the rights she has.

11          MR. JACKSON:  Okay.  I'm envisioning a scenario,

12     and I guess it's a future hypothetical, of he leaves, his

13     family is still there, they let him in, and now we're back on

14     contempt because he went and had breakfast with his -- it's a

15     bizarre scenario, but, I mean, it is what it is and it's not

16     a today issue.  So --

17          THE COURT:  Right.

18          MR. JACKSON:  -- I hear you.

19          THE COURT:  We'll deal with that if -- we'll cross

20     that bridge when we get there.

21          MR. JACKSON:  I think -- I think we've covered --

22     or mooted the other points I had in my outline, but let me

23     just double check that.

24          THE COURT:  And look, just to be clear, I'm

25     inclined to include in the order language that directs the

 1   trustee to honor her obligations to make the ten percent

 2   payments.

 3             MR. JACKSON:  That would certainly go a long way

 4   and, kind of similarly, like we'll see what happens and then

 5   in the future, if it doesn't --

 6             THE COURT:  Exactly.

 7             MR. JACKSON:  -- then we're back here.  Okay.

 8             THE COURT:  Exactly.  And --

 9             MR. JACKSON:  That would go a long way, I think,

10   toward resolving our concerns is just that it's not -- and

11   actually, this -- to circle back around to the adversary

12   proceeding point --

13             THE COURT:  Actually, the way I would do it, just

14   because we're technically here on their motion to enforce and

15   not yours, it would be their -- their ability to enforce the

16   terms of this order would be conditioned on their satisfying

17   --

18             MR. JACKSON:  Right.

19             THE COURT:  -- their obligations.

20             MR. JACKSON:  And that's fair.  And I was going to

21   say that was really the primary concern and the -- with the

22   adversary proceeding point, it wasn't ticky-tack procedural,

23   it was there's a train leaving the station here and it seems

24   that if an order is entered saying, you know, you're

25   obligated to do this and the contract is to be enforced

1                         CERTIFICATION

2            We certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of our

5     knowledge and ability.

6

7     /s/ William J. Garling                    February 7, 2025

8     William J. Garling, CET-543

9     Certified Court Transcriptionist

10    For Reliable

11

12    /s/ Tracey J. Williams                    February 7, 2025

13    Tracey J. Williams, CET-914

14    Certified Court Transcriptionist

15    For Reliable

16

17

18

19

20

21

22

23

24

25

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ONH AFC CS INVESTORS LLC, *et al.*,[1] | Case No. 23-10931 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Ref. D.I. 378** |

**ORDER GRANTING LIQUIDATING TRUST'S MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE CONFIRMATION ORDER, SCHWARTZ NIGHTINGALE SETTLEMENT, AND SECURITY AGREEMENT, (II) APPROVING THE TRUST'S EXERCISE OF VOTING RIGHTS AND THE TRUST ACTING AS ATTORNEY-IN-FACT OF CERTAIN SCHWARTZ NIGHTINGALE PARTIES, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the ONH Liquidating Trust (the "Trust"), for entry of an order (this "Order") (I) enforcing the *Order Confirming Debtors' Amended Small Business Debtors' Joint Plan of Liquidation* [D.I. 214] (the "Confirmation Order"), Settlement and Conditional Release Agreement attached to and an integral part of the Confirmation Order (the "Schwartz Nightingale Settlement" the "Settlement" or the "Settlement Agreement"), and the Security Agreement related to the Schwartz Nightingale Settlement and Confirmation Order (together with the Schwartz Nightingale Settlement, the "Agreements"), (II) approving the Trust's exercise of voting rights and appointing the Trust as attorney-in-fact for certain of the Schwartz Nightingale Parties (defined below), and (III) granting related relief [D.I. 378] (the "Motion to Enforce"); and having reviewed the *Objection* by the Schwartz Nightingale Parties to the Motion to Enforce [D.I. 386] (the "Schwartz Nightingale Parties Objection") and the Trust's *Reply* in

---

[1] The last four digits of the Debtors' federal tax identification numbers are 1199 (ONH AFC CS Investors LLC, hereinafter referred to as ONH AFC CS) and 6326 (ONH 1601 CS Investors LLC, hereinafter referred to as ONH 1601 CS). ONH AFC CS and ONH 1601 CS's mailing address was 3445 Peachtree Road, Suite 1225 Atlanta, GA 30326.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Settlement Agreement.

support of the Motion to Enforce [D.I. 388] (the "Trust's Reply"); and the Court having held an

evidentiary hearing on the Motion on February 5 and 6, 2025 (the "Hearing"); and the Court having

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 3 the *Amended Standing Order of

Reference* from the United States District Court for the District of Delaware dated February 29,

2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)

and the Court may enter a final order consistent with Article III of the United States Constitution;

and the Court having found that venue of this proceeding and this Motion in this District is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that sufficient notice of the Motion has

been given; and good and sufficient cause appearing for the relief requested in the Motion; and the

Court having considered the evidence adduced and arguments of counsel at the Hearing; and for

the reasons set forth on the record at the Hearing;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      To the extent consistent with applicable law, the Trust is authorized to exercise its

voting rights and act as attorney-in-fact under the Security Agreement for the following entities:

One Night Holdings LLC, Nightingale Properties, LLC, One Night Properties LLC, ES28

Investments LLC, Nightingale Property Group LLC, The Nightingale Group, LLC, Five Park 3003

LLC, 1 Westend PH-A LLC, 320 Mountain Rd. LLC, Midnight Capital Partners LLC, ES 1

Westend Residence Trust, The Elchonon Schwartz Family Trust, ES28 Investments Trust, ES

ONH Trust, and ES Family Life Insurance Trust.

3.      To the extent consistent with applicable law, the Trust's authority to act for the

foregoing entities described in Paragraph 2 shall include the right to sell or liquidate any assets

owned by these entities, control any account owned by these entities, and take any and all actions in furtherance of these rights.

4. The following Schwartz Nightingale Parties are in default of their obligations under Paragraph 5 of the Settlement Agreement, which constitutes an event of default under Paragraph 9 of the Settlement Agreement: ONH 2226 Third Avenue LLC, 1835 Market Street Partners LLC; 1635 Market Partners LLC; 1500 Spring Garden Investors LLC; NG 1601 Washington Ave LLC; Nitesky Management LLC; ONH Promote LLC; Nightingale Realty, LLC; One Night Philly LLC (the "Judgment Parties"). Pursuant to Paragraph 5 of the Settlement Agreement, and subject to the satisfaction of the condition in paragraph 6 below, the Judgment Parties are directed to sign a consent judgment in the form attached as **Exhibit A** within 5 days of the earlier of (i) agreement between the Trust and Schwartz Nightingale Parties as to the amount thereof, or (ii) this Court's determination of the amount thereof. The Trust and the Schwartz Nightingale Parties shall confer in good faith to reach agreement on the amount of the consent judgment for purposes of this paragraph.

5. The Schwartz Nightingale Parties are in default of Section 4(f)(viii) of the Settlement Agreement. Pursuant to Section 4(f)(viii) of the Settlement Agreement, the Schwartz Nightingale Parties are directed to:

    a. Vacate 1 Westend within 30 days of entry of this order; and

    b. Cooperate with the Trust in the marketing and sale of 1 Westend as provided for in the Settlement Agreement, including, without limitation, permitting showings and inspections, provided that Mr. Schwartz shall not be obligated to offer showings or inspections during Shabbat or a Jewish Holiday as defined in the Side Letter, dated May 23, 2024.

6.     As a condition to the Trust's ability to enforce this Order, the Trust is required to pay the Schwartz Nightingale Parties an amount equal to 10% of the net proceeds of the sale of any assets of the Schwartz Nightingale Parties within 30 days of entry of this Order, together with a good faith calculation of such amounts showing in reasonable detail how such amounts have been calculated; provided, however, should there be any dispute over the appropriate calculation of such amounts, such dispute shall be resolved by this Court.

7.     Going forward, the Trust is directed to pay the Schwartz Nightingale Parties an amount equal to 10% of the net proceeds of the sale of any of the Schwartz Nightingale Parties' assets within three business days of receiving such proceeds by the Trust, as provided in Section 4(b) of the Settlement Agreement (or in the event of a sale of 1 Westend, then an amount equal to 10% of the proceeds payable to the Trust from such sale, as provided in Section 4(f)(viii)(2) of the Settlement Agreement).

8.     The Trust is authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Order.

9.     The Court shall retain jurisdiction to (i) enforce and implement the terms and provisions of the Schwartz Nightingale Settlement, Plan, and Confirmation Order and (ii) resolve any disputes arising under or in connection with the foregoing.

10.     The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**Dated: February 27th, 2025**
**Wilmington, Delaware**

**CRAIG T. GOLDBLATT**
**UNITED STATES BANKRUPTCY JUDGE**

## **Exhibit A**

Consent Judgment

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ONH AFC CS INVESTORS LLC, *et al.*,[3] | Case No. 23-10931 (CTG) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF CONSENT TO ENTRY OF JUDGMENT

I, Elchonon Schwartz, hereby declare the following under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am party to a settlement agreement with the debtors and debtors in possession in the above-captioned bankruptcy cases (the "Debtors") dated October 2, 2023 (the "Settlement Agreement"),[4] a copy of which was attached to the Debtors' chapter 11 plan (the "Plan").

2.      I am authorized to the extent of my interest in or as managing member to execute this declaration on behalf of the following entities that are also parties to the Settlement Agreement: ONH 2226 Third Avenue LLC, 1835 Market Street Partners LLC; 1635 Market Partners LLC; 1500 Spring Garden Investors LLC; NG 1601 Washington Ave LLC; Nitesky Management LLC; ONH Promote LLC; Nightingale Realty, LLC; One Night Philly LLC (collectively referred to as the "Consent Schwartz Nightingale Parties").

---

[3] The last four digits of the Debtors' federal tax identification numbers are 1199 (ONH AFC CS Investors LLC, hereinafter referred to as ONH AFC CS) and 6326 (ONH 1601 CS Investors LLC, hereinafter referred to as ONH 1601 CS). ONH AFC CS and ONH 1601 CS's mailing address was 3445 Peachtree Road, Suite 1225 Atlanta, GA 30326.

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Agreement.

3.      The Consent Schwartz Nightingale Parties hereby consent to the entry of judgment against them in the above-captioned bankruptcy cases in the Aggregate Repayment Amount.[5]

4.      The basis for this consent to the entry of judgment is set forth in the Settlement Agreement attached to the Plan.

5.      This consent to the entry of judgment is for a debt to come due as a result of a default under the Settlement Agreement. The Consent Schwartz Nightingale Parties hereby authorize this Court to enter judgment based on this consent to the entry of judgment upon the filing of a declaration under penalty of perjury on behalf of the Debtors or the Plan Trust, as applicable (the "Declaration of Default") that a default has occurred under the Settlement Agreement, and as a result of such default, the Debtors or Plan Trust are authorized by the Settlement Agreement to file this consent to the entry of judgment. A copy of the judgment is attached as Exhibit A.

6.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on February ___, 2025

New York, New York                         _____
                                           Elchonon Schwartz

---

[5] The Aggregate Repayment Amount terms are more fully set forth in Section 3 of the Settlement Agreement. The information about the Settlement Agreement in this consent is for descriptive purposes only and is not intended to amend the Settlement Agreement.  In the event of any discrepancy between this consent and the Settlement Agreement, the terms of the Settlement Agreement govern.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ONH AFC CS INVESTORS LLC, *et al.*,[6] | Case No. 23-10931 (CTG) |
| Debtors. | (Jointly Administered) |

## FINAL JUDGMENT

These cases came before the Court to consider entry of a final judgment based on the Declaration of Consent to Entry of Judgment (Doc. No. ___) filed on [insert date] (the "Declaration"). The Declaration was executed in connection with a settlement agreement dated October 2, 2023 (the "Settlement Agreement"). Based upon the Declaration, the Consent Schwartz Nightingale Parties consent to the entry of a final judgment due to a breach of the Settlement Agreement.

Accordingly, the Court orders that: The Debtors and Plan Trust recover from the Consent Schwartz Nightingale Parties the amount of the Aggregate Repayment Amount, which includes prejudgment interest and postjudgment interest at the federal judgment interest rate for which execution lie.

---

[6] The last four digits of the Debtors' federal tax identification numbers are 1199 (ONH AFC CS Investors LLC, hereinafter referred to as ONH AFC CS) and 6326 (ONH 1601 CS Investors LLC, hereinafter referred to as ONH 1601 CS). ONH AFC CS and ONH 1601 CS's mailing address was 3445 Peachtree Road, Suite 1225 Atlanta, GA 30326.

1                      UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

                                         .  Chapter 11 (Subchapter V)
3    IN RE:                              .  Case No. 23-10931 (CTG)
                                         .
4    ONH AFC CS INVESTORS LLC,           .  (Jointly Administered)
     *et al.*,                           .
5                                        .
                                         .  Courtroom No. 7
6              Debtors.                   .  824 North Market Street
                                         .  Wilmington, Delaware 19801
7                                        .
                                         .  Monday, May 12, 2025
8    . . . . . . . . . . . . . . . .  .  2:30 p.m.

9                        TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE CRAIG T. GOLDBLATT
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Liquidating
13   Trustee:                 Matthew Pierce, Esquire
                               LANDIS RATH & COBB LLP
14                             919 Market Street
                               Suite 1800
15                             Wilmington, Delaware 19801

16                             Jorian Rose, Esquire
                               BAKER & HOSTETLER LLP
17                             45 Rockefeller Plaza
                               New York, New York 10111
18

19
     (APPEARANCES CONTINUED)
20

     Audio Operator:          Alyce Doody, ECRO
21

     Transcription Company:   Reliable
22                            1007 N. Orange Street
                              Wilmington, Delaware 19801
23                            (302)654-8080
                              Email:  gmatthews@reliable-co.com
24

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Schwartz
Nightingale Parties:          Patrick Jackson, Esquire
                              FAEGRE DRINKER BIDDLE & REATH LLP
                              222 Delaware Avenue
                              Suite 1410
                              Wilmington, Delaware 19801

1                              INDEX

2    MOTION:                                              PAGE

3    Agenda
     Item 1: [SEALED] Motion for Contempt Related to      4
4            Order Granting Liquidating Trust's
             Motion for Entry of an Order Enforcing
5            the Confirmation Order and Schwartz
             Nightingale Settlement [D.I. 422, filed
6            April 28, 2025]

7            Court's Ruling:                              82

8
     WITNESS CALLED BY THE
9    SCHWARTZ-NIGHTINGALE PARTIES:                        PAGE

10            ELCHONON SCHWARTZ

11        Direct examination by Mr. Jackson               15

12        Cross-examination by Mr. Rose                   29

13        Redirect examination by Mr. Jackson            40

14        Recross-examination by Mr. Rose                43

15   WITNESS CALLED BY
     THE LIQUIDATING TRUST:                               PAGE
16
              JOSEPH PEGNIA
17
          Direct examination by Mr. Rose                  46
18

19

20

21

22

23

24

25

1          (Proceedings commenced at 2:30 p.m.)

2               THE COURT OFFICER:  All rise.

3               THE COURT:  Please be seated.  So, good afternoon.

4          We are on the record in In Re ONH AFC CS

5     Investors, Case Number 23-10931.

6               MR. PIERCE:  Good afternoon, Your Honor.  Matthew

7     Pierce of Landis Rath & Cobb on behalf of the ONH Liquidating

8     Trust.

9               Your Honor, the Trust filed an agenda for this

10    hearing at Docket 430.  There is one matter going forward

11    today which is the Trust's motion for contempt related to the

12    enforcement order.

13              Your Honor, unless you have any questions, I will

14    turn the podium over to Mr. Rose who will address the motion.

15              THE COURT:  Okay, very well.  Thank you.

16              Mr. Rose.

17              MR. ROSE:  Good afternoon, Your Honor.  Jorian

18    Rose, BakerHostetler, on behalf of the ONH Trust.

19              Your Honor, the case for contempt is simple. The

20    legal arguments are clearly met. The existence of a valid

21    order, a bankruptcy order -- in fact, we have two orders.

22    The person charged with contempt must be on knowledge of the

23    order, the persons were involved in creation of both sets of

24    orders, and the person has to have disobeyed the orders which

25    I think we have.  The equitable --

1          THE COURT:  So, Mr. Rose, can I -- I want to give

2    everyone a chance to present their case but I have read the

3    papers and I have some preliminary thoughts before having you

4    go on. It might make sense to give you -- maybe "benefit"

5    isn't the right word but let's be charitable to me and say

6    the benefit of my, sort of, preliminary thoughts.

7          So, the order that I entered that said 30 days did

8    not, by its terms, contemplate the question of what would

9    happen if there's a disagreement about how much is owed.  So,

10   whether its genuinely ambiguous about what happens if there

11   is disagreement or not, I think there is all of this law,

12   with which I very much agree, about the strong medicine that

13   is the Court's contempt power and how all doubt should be

14   resolved against invoking the power of contempt.

15         On the other hand, I will -- let me be clear, my

16   intent, if I had thought about this, would have been to say,

17   in clearer words then I actually used in the order, if there

18   is a disagreement about how much is owed Mr. Schwartz is

19   required to vacate the premises and I am happy to resolve a

20   dispute about how much is owed.

21         So, I will hear everyone out and resolve this, you

22   know, after listening but where my head is coming in is what

23   I am inclined to say is, look, I understand there is a

24   dispute about how much is owed.  Regardless, X days from

25   today the premises need to be vacated and if its not by that

1  date then Mr. Schwartz owes Y dollars a day for every day

2  he's there thereafter.  And just as a starting point, for

3  conversation, my -- where my head is, is like X is like seven

4  days from today and Y is like $10,000 a day.

5       To the extent there is a dispute about what is

6  owed, I'm happy to resolve that as appropriate. If the

7  parties want me to do that today -- and I think that is up to

8  Mr. Schwartz though.  Its his claim. If he wants me to go

9  forward and resolve it based on materials that we have I'm

10  happy to do that. If he would rather come back another day

11  and present the case in the way he chooses, he can proceed

12  that way.

13       That is -- I want to listen, not talk, but just so

14  you all know where my head is as I get on the bench, that is

15  sort of what I am thinking.  I guess I am interested in

16  hearing from all of you about, you know, in light of that

17  preliminary view, you know, you should make whatever argument

18  you want to make.

19       MR. ROSE:  And, Your Honor, I think the Trust's

20  sole goal is to get finality and to get whatever has happened

21  in the past, I think, is to get to a place where the victims

22  are getting some recovery on behalf of an asset that was

23  promised.  That is the sole goal.  So, I think that, you

24  know, if that is where we end up today, I think that is --

25  you know, that would be great.

1          Your Honor, the one point I think we would make is

2    that the enforcement order, even if it wasn't clear, was,

3    let's say, a warning about the actual enforceability of the

4    original confirmation order which the Court found to be

5    enforceable.  So, Your Honor, I think to say that the warning

6    might have been unclear is not to say the original order

7    isn't --

8          THE COURT:  No, none of this is -- look, if I had

9    to resolve the question of what -- look, I agree the

10   confirmation order said what it said.  The point of my

11   earlier -- the subsequent order was to set up the ability, if

12   the premises weren't vacated, that I would enter a contempt

13   order but I did, and this was my idea, say that it was

14   conditioned on the Trust meeting its obligations.  We didn't

15   say expressly what happened if there was a dispute about

16   whether it met those obligations.

17          Look, I don't want -- this -- I hear your concern

18   about, look, let's get this done and I am not unsympathetic,

19   which is why I am inclined to have short timeframes and a

20   pretty strict mechanism -- nearly automatic enforcement

21   mechanism but I -- look, I don't mean to get philosophical

22   but I am a slow trigger with contempt and the reason I am is

23   because I think, candidly, what we mean by the rule of law is

24   courts enter orders with which parties voluntarily comply

25   because they respect that we ran a process that was fair and

1  took account of their rights and treated them fairly.

2          Look, what contempt is, is the authority of the

3  state backstopping voluntary compliance. I am not against

4  using it when I have to but it is not the first resort.  So,

5  that is what informs how I am thinking about this if that

6  speech is helpful at all.

7          MR. ROSE:  Yeah, it is, Your Honor. I think -- you

8  know, one of the issues that has been, at least, bothering

9  the Trust is that the argument that if the -- the Schwartz-

10 Nightingale parties were the original defaulters under the

11 settlement.  I think that, sort of, is not in dispute.  They

12 defaulted, you know, originally four quarters ago, five

13 quarters ago.  Then after the enforcement order was entered,

14 I think all parties became, sort of, fully aware that the

15 Court was going to enforce independently the obligations on

16 the part of each party.

17          So, I don't know that it's possible to say that

18 the Schwartz-Nightingale parties actually thought that their

19 obligations to comply were somehow dependent when the whole

20 enforcement process was about --

21          THE COURT:  I hear you, which is why, again, I

22 think that we're talking about seven days, not another long

23 period of time.  It did say -- look, to be charitable to the

24 Schwartz-Nightingale parties, and I understand why you are

25 not inclined, given the history, to come at this with a

1   charitable mindset but to be charitable their condition --

2   their obligation to leave was premised on you meeting your

3   obligations and they're here saying you haven't met your

4   obligations so, therefore, you haven't paid me what you owe

5   me and, therefore, the condition of my duty hasn't been

6   triggered.

7           I don't think that that is right, that is not how

8   I would read my order, but I don't think it's so obviously

9   wrong that it's a basis for contempt.  So, I want to make the

10  ambiguity go away and say its seven days from today, come

11  hell or high water, and if there is a dispute about what you

12  are owed, you're welcome to come back to me and we will

13  figure that out and get you what you are owed.

14          MR. ROSE:  Your Honor, I think, you know, to speak

15  for the Trust, which I guess I do, I think that would be

16  acceptable, Your Honor, that we would -- but I don't know --

17  I mean, maybe I will let the Schwartz-Nightingale parties

18  speak for themselves before we decide how far to --

19          THE COURT:  Sure.  Look, if the parties want to

20  present evidence and make argument, I'm  not -- you know, I

21  don't want to highjack your proceedings but I did think

22  before you go and present it against a vacuum, understanding

23  where my head is will be useful.

24          MR. ROSE:  Understood.  So, I am going to turn it

25  over to Mr. Jackson.

1              THE COURT:  Very well. Thank you.

2              MR. JACKSON:  Good afternoon, Your Honor.  For the

3    record Patrick Jackson, Faegre Drinker, on behalf of the

4    Schwartz-Nightingale parties.

5              I appreciate the framing comments, Your Honor. It

6    is certainly helpful and I think if at the end of the day

7    Your Honor would not be inclined to enter a finding of

8    contempt but rather to kind of resolve ambiguities, enter

9    another order come hell or high water, as you said.  I think

10   that would streamline a lot of the legal issues.

11             Since we're here and have -- and we were looking

12   at this hearing and we didn't necessarily think it was going

13   to come up as a contempt hearing so much as a motion by the

14   Trust to enforce the enforcement order and then we would say,

15   hey, we didn't think you paid the 10 percent.  But we were

16   planning to proceed today to resolve the open 10 percent

17   issues and we're prepared to make a record on that and have

18   argument on that.

19             So, I think, you know, we would be happy to move

20   forward on that. Then I think the presentation would be

21   streamlined by not having to argue the technical point of is

22   there contempt today but rather, you know, what is the scope

23   of the 10 percent. I think we have crystalized the issues.

24   They're down to the issues that have been briefed.

25             THE COURT:  So, it's down to a question of how do

1  you calculate 10 percent.

2          MR. JACKSON:  And there's a couple of -- there is,

3  essentially, four assets.  You know, there's three that kind

4  of rolled into the initial $3 million payment and then

5  there's a Miami condo and those are, basically the issues.  I

6  think,  Your Honor, my hope is that we will make a record and

7  you can call balls and strikes on that.

8          THE COURT:  That's fine with me, Mr. Jackson.

9          Mr. Rose, any objection to proceeding that way?

10          MR. ROSE:  No, Your Honor.

11          THE COURT:  Okay.  So, I am happy if anyone wants

12  to make argument on that point or you can --

13          MR. ROSE:  Your Honor, I think just for the

14  purposes of the record should we be treating this as a motion

15  on behalf of the Schwartz-Nightingale parties because I just

16  don't know what posture we're in.

17          THE COURT:  So, that is fair.  Look, that was my

18  comeback -- my comeback later to deal with that was, sort of,

19  a formalist response because its technically you're a burden

20  and you should bring the motion. That said, if you are not

21  going to insist on getting those procedural protections and

22  are prepared to proceed, I have no problem being pragmatic

23  and getting this issue resolved.

24          MR. ROSE:  Your Honor, how about treating this

25  like a -- we don't have a motion before Your Honor and how

1  about treating this as a status conference on the Schwartz-

2  Nightingale because that is what, I believe, your order says;

3  come to the Court and if there is an objection regarding the

4  payment -- I just, you know --

5        THE COURT:  Mr. Rose, look, you are entitled, if

6  you want, to say until they -- look, if you wanted to be a

7  pinhead about it, not that you would ever do that, you could

8  say I am entitled to an adversary proceeding before I am

9  required to pay money.  You know, I'm not sure that process

10 would do you that much good.

11       They are defending against your contempt motion by

12 saying you haven't paid me what you owe me and we're here to

13 prove, right, in defense of the contempt motion that there

14 are amounts outstanding.  I am open-minded about how to bring

15 this to a number but at the end of the day there is going to

16 be a number and I am going to determine what it is and you

17 are going to have to pay it and they're going to have to

18 leave.  Both of these things are going to happen.

19       I guess to the extent they are prepared to go

20 forward today on what is a pretty straight forward question

21 of what is the number -- look, if you want more process, I am

22 not saying you can't have it but why don't we just do that.

23       MR. ROSE:  Yeah, Your Honor, I mean I was just

24 focused on burdens that the burdens were in the right place,

25 that's all.

1          THE COURT:  Look, if the evidence is an equipoise

2    and it matters whose burden it is we can figure that out but

3    I think this is a pretty straightforward question where I'm

4    not going to be sort of twisting my hands about the burden of

5    proof and its going to be what does the document say, what

6    has happened.  And even those things are barely contested in

7    that I just need to make a decision and I guess I get on the

8    bench prepared to do my job if the parties want me to make a

9    decision.

10         MR. ROSE:  Okay.  Your Honor, if we want to treat

11   this as a motion by the Schwartz-Nightingale parties that is

12   --

13         THE COURT:  Okay, happy to --

14         MR. ROSE:  I will turn over the microphone.

15         THE COURT:  -- Mr. Jackson, do you want to feel

16   free to -- if there is anything you want to tell me by way of

17   opening you are welcome to; otherwise, I am happy to let you

18   call your first witness.

19         MR. JACKSON:  You know, Your Honor, I think we can

20   just proceed.  Let me just -- if I may have one moment just

21   to confer with my client.

22      (Pause)

23         MR. ROSE:  Your Honor, Mr. Jackson sort of brings

24   up a good point that seven days from today is Mr. Schwartz's

25   sentencing trial.

1          THE COURT:  Oh, that is a fair point.

2          MR. ROSE:  So, if we make it eight days, or nine

3   days, or six days, I don't know that -- I mean, I think part

4   of this was all about a short timeframe.

5          THE COURT:  Yeah, it's going to be short but --

6          MR. JACKSON:  Manageable.

7          THE COURT:  -- if eight or nine days works -- any

8   reason we can't do nine days from today?

9          MR. ROSE:  That works, Your Honor.

10         THE COURT:  Okay.

11         MR. JACKSON:  Just wanted to flag the issue since

12  you had thrown out seven --

13         THE COURT:  I appreciate that.  That is totally

14  fair.  I should also mention, for what it's worth, I've got a

15  hard stop, at least briefly, at 4:30.  I suspect we can get

16  this done before then. If not, I just need like -- I've got a

17  15-minute call with a lot of other people that I have to do.

18         MR. JACKSON:  I agree, Your Honor, and with that I

19  would dispense -- I think you have read the papers. I think

20  the issue of is there contempt today as we stand here is off

21  the table in light of your inclination.  So, I think we can

22  just jump in and make a record -- make our record on the

23  remaining issues that are in dispute on the 10 percent

24  amount.

25         THE COURT:  Okay.

1          MR. JACKSON:  With that, I would call Mr. Elie

2     Schwartz as our witness.

3          THE COURT:  Mr. Schwartz, if you could take the

4     stand.

5          Ms. Barksdale, if you could swear the witness.

6       ELCHONON SCHWARTZ, SCHWARTZ-NIGHTINGALE WITNESS, SWORN

7          THE COURTROOM DEPUTY:  Please state your full name

8     and spell your last name for the record.

9          THE WITNESS:  Elchonon Schwartz, S-C-H-W-A-R-T-Z.

10         THE COURTROOM DEPUTY:  You may be seated.

11         THE COURT:  Mr. Jackson, you can proceed.

12         MR. JACKSON:  Thank you, Your Honor.

13                         DIRECT EXAMINATION

14    BY MR. JACKSON:

15    Q     Good afternoon, Mr. Schwartz.

16          Just by way of kind of reorienting, are you familiar

17    with the motion and the objection that we're here on today?

18    Have you read both of those?

19    A     I have and I am.

20    Q     I will just ask, generally speaking, are you familiar

21    with the provisions of the settlement agreement that we will

22    be talking with the Judge about shortly about the 10 percent

23    proceeds owed to the Schwartz-Nightingale parties?

24    A     I am.

25    Q     And I believe you testified about this.  Do you

1  remember testifying previously about that provision before

2  this Court?

3  A      I do.

4  Q      And do you remember -- could you explain again, just to

5  kind of refresh from your perspective what was the purpose of

6  that provision and its importance, if any, to the Schwartz-

7  Nightingale parties?

8  A      The 10 percent was an inducement for the entities --

9  the Schwartz-Nightingale entities that were trusts and so

10 that the beneficiaries of those trusts would still have some

11 form of cash, dollars, whatever you want to call it, to live

12 on.

13 Q      And who are the beneficiaries of those trusts?

14 A      My children.

15 Q      Okay.  So, with that we will be talking, you know, I'm

16 sure with the Judge about the contract but that is helpful as

17 a framing comment.

18        So, let's just jump right into the remaining open

19 issues.  Are you familiar with what we have referred to in

20 the papers as the Miami condo?

21 A      I am.

22 Q      Can you provide just kind of an overview to the Court

23 of what is that asset and what --

24 A      The condo in Miami was actually a contract that I

25 signed to purchase a condominium -- not I, but we, the

1   Schwartz-Nightingale parties signed to purchase a condominium

2   in Miami.  It was for $4.25 million. It was originally listed

3   for $5 million but we got a friends and family pricing and a

4   further discount from that because it was early on in the

5   build of that -- the construction of that building.

6        We had to fund four different deposits.  Each one was

7   approximately $425,000 over a period of, you know, time that

8   -- it was every six months from the time that the contract

9   was signed.

10  Q     And at the time the contract was signed, when was that?

11  A     My recollection was approximately November 2021.

12  Q     And was that prior to the events giving rise to these

13  bankruptcy cases?

14  A     It was.

15  Q     Okay.  And you said the Schwartz-Nightingale parties

16  signed the contract which was the entity that was the party

17  to the purchase contract?

18  A     5 Park 303 LLC.

19  Q     Okay, and is that entity owned by one of the trusts

20  that you referenced?

21  A     It is.

22  Q     Okay.  There is a small binder down to your right.

23        MR. JACKSON: Your Honor, I think you should have

24  copies.  This is the Schwartz-Nightingale parties exhibit

25  list.  I am just -- we won't be reading these unless we have

1    to.

2    BY MR. JACKSON:

3    Q      If I could turn your attention to Exhibit 7 of your

4    small binder.  And I will describe that as a packet of

5    documents.  If you could leaf through that and let me know if

6    you recognize that.

7    A      I do.

8    Q      What is that?

9    A      This is the contract and amendments, ancillary

10   documents, for the purchase of Unit 3003 in a condominium

11   development called 5 Park.

12   Q      Okay.  That is the Miami condo that we are referring

13   to?

14   A      Yes.

15   Q      Could you turn to Exhibit 6.

16          THE COURT:  My apologies, Your Honor, for not

17   putting these in the order of presentation.

18   BY MR. JACKSON:

19   Q      Same thing, if you could just let us know when you are

20   through that and whether you recognize this document.

21   A      Yes.

22   Q      What is this?

23   A      These are the escrow instructions and I believe the

24   deposit receipts for the deposits that were sent to the

25   escrow agent for the condominium.

1   Q    And how many deposits were sent?

2   A    Three.

3   Q    What was the total amount of those?

4   A    $1.275 million.

5   Q    Okay.  So, your rights under this contract, is it fair

6   to say at the time that you settled with the debtors in this

7   case that the -- that your rights under the contract hadn't

8   fully materialized, right?

9   A    The building was still being constructed and they were

10  going to first start doing closings in December of 2024.

11  Q    Okay, and you said just now you had made three of the

12  deposits but not the fourth, is that right?

13  A    That's correct.

14  Q    And then in addition to that deposit there would have

15  been a balance of the purchase price owed at a closing,

16  right?

17  A    Correct.

18  Q    So, there -- what was -- I will note that under the

19  settlement agreement, and I think we previously talked about

20  this, the Schwartz-Nightingale parties were responsible for

21  marketing and selling their assets.  Did you undertake any

22  activities to monetize this particular asset, the contract?

23  A    I did.

24  Q    What activities were those?

25  A    I sourced a buyer for the contract who was willing to

1  pay more then the offer that the ONH Liquidating Trust

2  secured by going to the existing developer and offering them

3  the opportunity to buy out the contract.

4  Q    And what was the offer that the Trust had on the table

5  from the developer?

6  A    To receive, effectively -- you know, I'm not sure how

7  it was exactly structured but $1.175 million.

8  Q    Of the --

9  A    Of the $1.275 million.

10 Q    Okay, so almost all of the deposit back?

11 A    Correct.

12 Q    Now the offer that you sourced form a third party, can

13 you describe that offer?

14 A    Yes.  So, it was a third-party buyer that was going to

15 come in and buy the rights to the contract so that they would

16 be able to proceed -- they would, effectively, buy the LLC

17 interest for 5 Park from the Trust -- from one of my trusts.

18 Then they would have paid -- originally, they offered $1.2

19 million and they upped their offer, I think, to $1.275

20 million and also offered a kicker at a later point once they

21 monetized the sale of the unit.

22 Q    So, this -- was this buyer, essentially, a flipper or

23 an investor that they were going to turn around and sell it?

24 A    An investor.

25 Q    Okay.  They wouldn't be rehabilitating it and flipping

1   it but -- if you could turn to Exhibit 2 in your binder,

2   please.  This is a series of emails. I guess I will turn you

3   to -- if you could look at the last one first or the last

4   page and kind of work backwards.

5        Do you recognize these email exchanges?

6   A    Yes.

7   Q    I am on the second to last page here where your email

8   says:

9        "Hi, Ann and Jorian.  Thank you for making time

10  yesterday to meet with me."

11       What is that in reference to?

12  A    This is in reference to meeting on May 15th on Mr.

13  Rose's office between myself and my counsel at the time, two

14  representatives of Jones Day, and Mr. Rose and Ms. Phillips

15  the Trustee.

16  Q    And at this meeting, did you discuss the disposition of

17  the Miami condo?

18  A    We did.

19  Q    And what did you discuss?

20  A    I discussed with them that we had this offer.  I gave

21  them the name of the buyer and the name of his company.  I

22  offered to put them directly in touch with him and told him,

23  you know, what his offer was.

24  Q    Okay.  Then, as I'm kind of turning backwards through

25  the document, through the email exchange it looks like --

1  well, I will go to the first page here. It looks like this is

2  an email from Ms. Phillips to you.  Are you there?

3  A     Yeah.

4  Q     She says:

5        "Without wishing to rehash my messaging from yesterday

6  but for reasons we discussed, we can't approve anything that

7  is TBD or a handshake deal."

8        Do you see that?

9  A     Yes.

10 Q     What was her message and what had been discussed as far

11 as her response to your third-party buyer idea?

12 A     So, despite the fact that the offer that I brought to

13 the table had a higher face value from the onset, Ms.

14 Phillips did not like the uncertainty around a non-defined

15 upside kicker. She didn't want it to be, you know, loose.

16 The buyer didn't want to commit to a specific amount because

17 he didn't know how much the profit was going to be.  So, he

18 wanted to see what it was going to ultimately work out to be

19 and then, you know, there was a range of between 10 and 20

20 percent. There was going to be a formula that he was going to

21 put together that would have specified that.

22 Q     I think you testified that the upfront amount that he

23 was offering was more then a return -- more then what the

24 Trust had lined up with their proposal with a developer, is

25 that fair?

1    A      That is correct.

2    Q      Now did you, in the context of that discussion or

3    afterward, make that observation to the trustee that even

4    putting the kicker aside the upfront amount was still more?

5    A      Both in person and I believe via email as well.

6    Q      Okay, and what was the response?

7    A      The response was that they wanted to go with a third-

8    party arm's length transaction not with one that I brought to

9    the table.

10   Q      Did you think that either, settling with the developer

11   or selling to this third-party buyer, was the optimal outcome

12   for the Miami condo?

13   A      No.  I specifically told the Trust that I believed that

14   the smart move would be to hold the asset until December once

15   it was complete because there was significant value in

16   waiting.  They did not want to wait.

17   Q      Why did you think there would be significant value in

18   waiting?

19   A      Because the market as a whole in Miami was very strong

20   and this particular building and this particular line of

21   condos within the building was completely sold out and there

22   was enormous demand for it.

23   Q      And do you know what actually happened to this

24   particular unit after the developer terminated the purchase

25   agreement under the settlement agreement with the Trust?

1    A    Yes.  Brown Harris Stevens sold it in February of this

2    year for $7.5 million.

3    Q    Let's switch gears to some of the other disputed items.

4    If you could turn to Exhibit 3 in your binder.

5    A    3?

6    Q    Yeah.  Do you recognize this document?

7    A    I do.

8    Q    What is this?

9    A    This is a settlement statement from Sotheby's Auctions

10   for $745,000 from the sale of some of my watches.

11   Q    And was this a sale that you had orchestrated?

12   A    It is.

13   Q    Okay, and can you describe the process and why you

14   chose Sotheby's?

15   A    Sure. So, I have a relationship with multiple auction

16   houses.  I have done business with them for the better part

17   of 15 years and Sotheby's is a very reputable organization.

18   They attract a large amount of bidders and because of the

19   relationship that I have with them they don't charge any fees

20   to the selling side of the equation, only to the buyers.  So,

21   you can -- I had the ability to list any of the watches with

22   them at no cost to the seller.

23   Q    Okay, so this settlement statement reflecting the

24   $745,000 what happened to the $745,000 after it was collected

25   by Sotheby's?

1   A    They turned it over to me and I turned it over to the

2   Trust as part of the initial $3 million payment.

3   Q    Okay.  Can you turn to Exhibit 4 in the binder, please.

4   A    Sure.

5   Q    Do you recognize that email exchange?

6   A    Yes.

7   Q    What is that?

8   A    This is an email that I sent to Joe Pegnia alerting him

9   to the $745,000.

10  Q    And if you look further down is there a wire

11  confirmation there as well?

12  A    There is.

13  Q    Okay.  We can turn to Exhibit 5 in your binder, please.

14  A    Okay, I'm there.

15  Q    Just let me know if you recognize this document?

16  A    I do.

17  Q    And what is this?

18  A    This is me forwarding an email to Joe Pegnia with a

19  confirmation from UBS for a wire transfer they send from the

20  sale of $695,000 worth of securities.

21  Q    This was a wire directly from UBS to the Trust?

22  A    That is correct.

23  Q    And what did -- you said this was a sale of securities.

24  Can you describe that a little bit more for the Court?

25  A    Sure.  So, at UBS I owned several -- the Schwartz-

1  Nightingale parties owned private equity investments and

2  these were liquidated in order to fund the initial payment

3  that was required under the settlement agreement.

4  Q     So, these were securities accounts?

5  A     Correct.

6  Q     And securities were -- did the Schwartz-Nightingale

7  parties orchestrate the liquidation of those securities?

8  A     We did.

9  Q     Okay, and these are proceeds that were then wired to

10 the Trust?

11 A     That is correct.

12 Q     Okay.  There is another element.  I don't think I have

13 anything in my binder, but do you recall in the $3 million

14 initial payment that one component of that payment related to

15 InterVest?

16 A     Yes.

17 Q     Can you explain that to the Court?

18 A     Sure.  So, InterVest was going to purchase my ownership

19 interest within the joint assets that we had.  They were

20 going to pay $5 million towards that.  They wired $1.3675 --

21 $1.325 million as a down payment towards that directly to the

22 Trust in order to help satisfy that initial $3 million

23 payment.

24 Q     Can you pick up the big binder, I think its Trust

25 exhibits.  Turn to 18 in the binder.

1   A      There is no 18 in this binder.  This only goes to 15.

2   Q      Okay, sorry.  Can you look at Exhibit 15.

3   A      Okay.

4   Q      Do you recognize this document?

5   A      Yes.

6   Q      And what is this?

7   A      This is an email from Joe Pegnia confirming receipt of

8   the money from InterVest and asking to provide a full-term

9   sheet just detailing the terms.

10  Q      The first email in this chain, which is on the last

11  page.

12  A      Yes.

13  Q      Do you see that?  What is this?

14  A      This was Joe acknowledging receipt of the wire.

15  Q      Oh, I'm sorry, the one from you to him.

16  A      From me to him?

17  Q      Yeah, it should be on the page 4 of 4.

18  A      Oh, this is an email of me detailing for him the three

19  wires that he would receive towards the $3 million payment.

20  Q      And the $1.325 here from InterVest.  Is that what you

21  were just talking about, about the downpayment from the

22  InterVest parties?

23  A      Yes.

24          MR. JACKSON:  Let me just look at my notes for

25  BY MR. JACKSON:

1  Q     One last question.  Throughout the Trust's motion there

2  are some references to the 10 percent dispute around these

3  certain items that we have talked about being contrived or

4  pretextual.  Do you agree with that characterization?

5  A     I do not.

6  Q     Why is that?

7  A     Because they all came from the sale of assets.

8  Q     And had you previously raised all of these issues with

9  the Trust other than in the context of the enforcement order?

10 A     I raised them via my prior lawyer from Jones Day.  I

11 raised them in person at the meeting that we had on May 15th

12 and I raised them multiple times after that, both, you know,

13 via email -- in the emails that you have in your binder with

14 Ms. Phillips and as well, through my prior lawyers, multiple

15 conversations.

16 Q     Just to be clear, when you say you raised these issues,

17 you raised that the InterVest, watch sale proceeds, UBS

18 securities proceeds that were included in the $3 million that

19 you believed you were owed -- the Schwartz-Nightingale

20 parties were owed 10 percent of that.

21 A     I raised the full $3 million because I didn't know

22 about the date issue originally with the CrowdStreet dollars

23 that were funded in November.  So, there was another $252,000

24 I believe or so that was part of the original payment that

25 was funded prior to the -- or ratification of the settlement.

1   Q     Thank you for clarifying.  That is a good

2   clarification. I will get into that with the Judge in a

3   minute.

4         Then you had also raised, after the settlement of the -

5   - or the entry of the settlement agreement with the Miami

6   developer you had also raised the 10 percent issue with

7   respect to the Miami condo?

8   A     I did, multiple times.

9   Q     And this was before my involvement?

10  A     Before your involvement.

11        MR. JACKSON:  No further questions, Your Honor. I

12  pass the witness.

13        THE COURT:  Any cross-examination?

14        MR. ROSE:  Thank you, Your Honor.

15                        CROSS-EXAMINATION

16  BY MR. ROSE:

17  Q     Mr. Schwartz, as it relates to the claim for 10

18  percent, as Mr. Jackson said, I sort of think about it the

19  same way with two buckets: one, the $3 million payment and,

20  two, the Miami condo payments.

21        Focusing on the $3 million payment first, did a portion

22  of the $3 million come from InterVest?

23  A     Yes.

24  Q     What assets of yours were actually sold in exchange for

25  that payment?

1    A      No asset was sold but the assets were contracted for

2    and is common, just like with the Miami condo, where a

3    deposit was funded for either the purchase or the sale of an

4    asset, this was no different.

5    Q      I'm sorry, I didn't -- could you explain there was a

6    contract.  Did you provide that contract to the Trust?

7    A      There was no contract that was ultimately signed.  As a

8    courtesy to me for the longstanding relationship that we had

9    they funded the money without the paperwork in place.

10   Q      So, Mr. Schwartz, first there was a contract and now

11   it's a courtesy.  Which is it?

12   A      So, there would have been a contract that would have

13   been signed had they proceeded with the purchase.  They

14   ultimately did not proceed with the purchase and just walked

15   away from their $1.325 million deposit.

16   Q      So, now assets were sold?

17   A      No assets were sold.  They instead chose to just cram

18   it down via the provisions within the operating agreements

19   after many months of failed negotiations with you, I believe.

20   Q      With respect to the other portion of the $3 million

21   payments, meaning the -- and I'm referring to the sales of

22   watches and then the liquidation of securities which I think

23   would comprise, other then the 250 that we were talking about

24   which you are not seeking payment for, which comprised the

25   remaining amount of the $3 million. Am I right about that

1  part so far?

2  A    Yes.

3  Q    Okay.  Where did the -- when those assets were sold, I

4  think you testified that you sold those assets or you were

5  responsible for selling those assets through Sotheby's and

6  through your broker, is that correct?

7  A    Yes.

8  Q    Where did the cash for those sales go?

9  A    They wired them to me.

10 Q    And were you free to do anything you wanted with those

11 assets -- with that cash, sorry?

12 A    Technically yes.

13 Q    And what did you choose to do with those proceeds?

14 A    I chose to pay the $3 million -- pay towards the $3

15 million settlement.

16 Q    If the Schwartz-Nightingale parties hadn't paid that $3

17 million initial payment what would have  happened?

18 A    It would have been in breach of the agreement.

19 Q    Is there a provision in the --

20         THE WITNESS:  Your Honor, may I go back just for

21 one second because there's something I think I should

22 clarify?

23         THE COURT:  Mr. Rose, any objection to allowing

24 the witness to clarify?

25         MR. ROSE:  No.

1            THE WITNESS:  Mr. Rose's question was, was I free

2    to do whatever I wanted with that money. The answer is, no,

3    as I think about it because the money that was wired to me

4    was from the sale of assets that were pledged as part of the

5    collateral pool on the settlement agreement.  Had I taken

6    that money and done whatever I wanted with it I would have

7    not only been in breach of not funding the $3 million payment

8    but also in breach of selling assets that were part of the

9    collateral.  So, no, I was no free to do whatever I wanted

10   with those.

11   BY MR. ROSE:

12   Q     So, your testimony is that because you were under

13   contract and you were required to use those for a purpose

14   that you were not free to use those for whatever you wanted?

15   A     Correct.

16   Q     For the investor, $54 million, Mr. Schwartz, were you

17   free to use that for whatever you chose?

18   A     I assert my Fifth Amendment right under the grounds

19   that it may incriminate.

20   Q     Is there a provision in the settlement agreement you

21   can point to that would reduce the initial $3 million payment

22   by 10 percent in any way?

23   A     No.  I don't think there was a specific provision

24   detailing $3 million as a standalone payment. I think the 10

25   percent provision encompassed all monies that were either

1 received by me directly or sent directly to the Trust.

2 Q    So, there was no provision in the agreement that said

3 that you were required to pay $3 million unless you need to

4 take 10 percent out for sales of proceeds?

5 A    No, but it doesn't say that for any of the other

6 payments either. All the payments are treated the same.

7 Money is to be paid to the bankruptcy trust and then the 10

8 percent is to be subtracted and sent to me.  If I received

9 the money directly, I had a right but not an obligation to

10 take out my 10 percent and then send the Trust the balance

11 but that wasn't an obligation of mine that I had to do it. I

12 could have chosen to send all the money to the Trust, which

13 is what I chose to do and then they were required under the

14 agreement to send me 10 percent of the sale -- from the sale

15 of assets.

16 Q    And can you provide me with a reference to that part of

17 the settlement agreement where you are citing to?

18 A    Its Section 4B.  I don't remember the specific number.

19 I think it was 4BF.  If I remember 4(iii)(f)(5) if I

20 remember.

21        THE COURT:  Let me stop you here just so that I'm

22 following.  If you could point me to where in the record,

23 which document, which exhibit so that I --

24        MR. ROSE:  Trust Exhibit 3, Your Honor.  It's an

25 attachment to that.  Its in, as Mr. Schwartz testified,

1  paragraph 4(b), page 5 of the settlement agreement.

2            THE COURT:  So, you're talking about provision

3  4(b) of the settlement agreement?

4            MR. ROSE:  Yes, Your Honor.  Page PDF 66 of 77.

5            THE COURT:  Okay.

6  BY MR. ROSE:

7  Q    Mr. Schwartz, I am going to read just from this section

8  and you tell me which one applies.

9        "From and after the effective date, the Schwartz and

10 Nightingale parties must make good faith efforts to give

11 direction that all net proceeds of the sale of the Schwartz-

12 Nightingale parties are to be paid directly to the debtors."

13        Did that occur here?

14 A    Well, part of it.  The InterVest money was sent

15 directly.  The money from UBS and from the watches from

16 Sotheby's it was too late to change who the payee was and get

17 the money in on time for the payment date.  So, that money

18 was sent to me but further in that provision it says that if

19 the money was to come to me that I am to turn it over to the

20 Trust and I did exactly that.

21 Q    "The debtors, in turn, will pay the Schwartz-

22 Nightingale 10 percent of the net proceeds."  That -- does

23 that only apply when the proceeds are being paid directly to

24 the Trust?

25 A    It does not.  Again, further in that provision, if you

1  point me to which exhibit it is, I can read it out for you if

2  that would be helpful.

3          MR. ROSE:  Does Mr. Schwartz have -- do you want

4  to --

5          MR. JACKSON:  Its in your big binder at 3.  Page

6  66 of 77.

7  BY MR. ROSE:

8  Q    Mr. Schwartz, I think the second to last paragraph sort

9  of deals with the situation and it says:

10      "To the extent net proceeds of sale are paid directly

11 to the Schwartz-Nightingale parties, the Schwartz-Nightingale

12 parties will pay 90 percent of the proceeds of the sale to

13 the debtors and retain 10 percent."

14 A    What number was that?

15 Q    Sorry, its (b) and it's the second to last sentence of

16 (b) -- oh, you're looking for the section?

17 A    I got it.  Then if you look right in the middle it

18 says:

19      "To the extent that the net proceeds of the sales are

20 paid to Schwartz-Nightingale parties directly, the Schwartz-

21 Nightingale parties will pay 90 percent of the net proceeds

22 to the sale to the debtors and retain 10 percent of the

23 proceeds.  The Schwartz-Nightingale parties shall provide an

24 accounting to the debtors."

25      So, it doesn't say that we're obligated to do that. It

1    says that we should do that.  We chose instead to send in the

2    full amount of the money so that we would satisfy the $3

3    million payment.  And there is nothing that says that if we

4    do that or we haven't satisfied it just as it does with the

5    other payments.

6    Q    I think we may just disagree.

7         Could the Schwartz-Nightingale parties have paid this

8    10 percent from other amounts to satisfy the $3 million

9    amount?

10   A    No, not at the time.

11   Q    And is that -- and why is that?

12   A    Because there was no other assets that were liquid.

13   Q    Okay, so it's because they didn't have the sufficient

14   proceeds, is that what you are testifying to?

15   A    No.  We clearly had sufficient proceeds because we made

16   the payment.  We weren't required to make $3.3 million of

17   payments.  We were required to make $3 million of payments.

18   Q    Sorry, let me ask it differently.  To the extent the

19   Schwartz-Nightingale parties chose to use other proceeds to

20   satisfy the 10 percent that they would, otherwise, be

21   entitled to they could have put 10 percent in and used that

22   to pay the Trust?

23   A    I'm not sure I follow your question.  If you wouldn't

24   mind repeating it one more time.

25   Q    Yeah.  Let's assume that the Schwartz-Nightingale

1  parties retained the 10 percent that you are disputing, why

2  couldn't that 10 percent be put into your account and

3  transferred to the trust to make the $3 million payment?

4  A     I mean from a technical standpoint maybe it could have

5  been but that is not what happened, right.  All the money

6  that came in, which copies of those wire transfers from

7  Sotheby's and UBS were provided to Mr. Pegnia. So, he knows

8  exactly every dollar that came in.  We submitted all the

9  money that came in to satisfy the $3 million obligation.

10 Q     Did he have access to every asset that you had?  Would

11 he have known if you used 10 percent from another source?

12 A     He was certainly provided with, at that point, a

13 summary of -- a financial statement with what every asset

14 was.  Whether or not he had access to every single account at

15 that point I don't know.

16 Q     You don't know if he had access to every single

17 account?

18 A     I don't, no.  Meaning you filed all sorts of account

19 control agreements and things. I don't think that happened at

20 that particular point but I don't know that it didn't happen

21 then.

22 Q     Did you provide him with every bank account that the

23 Schwartz-Nightingale parties had under its possession?

24 A     I did.

25 Q     You provided him and he had access to all of the

1  amounts in those accounts?

2  A    Bank statements of every single account were provided

3  for every single month prior and then forward.

4  Q    Were there accounts that you would not provide him

5  access to?

6  A    No.

7  Q    I would like to turn to the Miami condo for a minute.

8  Did you use $850,000 of the investor money to make down

9  payments to the -- for the Miami condo?

10  A    Not that I'm aware of.

11  Q    Are you aware of whether or not the Trust sent a

12  litigation demand letter to the Miami project owner for

13  return of money that was originally debtor proceeds?

14  A    No, I am not.

15  Q    Do you know if that letter was sent either way?

16  A    I don't.

17  Q    Were you part of the negotiations with the Miami

18  project owner on return of that money?

19  A    I was not.

20  Q    Did you sign the settlement agreement?

21  A    Which settlement agreement?

22  Q    The settlement agreement with the Miami project owner.

23  A    I believe I must have.

24  Q    If you take my representation that you did.

25  A    I was being cooperative, so why wouldn't I have been.

1   Q     Yes.  Did this settlement agreement, to your knowledge,

2   provide for any sale, any assignment, of any asset?

3   A     Yes.

4   Q     It did?

5   A     I mean, I don't have a copy of the agreement but it

6   must have.

7   Q     Are you aware if it used the word "sale" or

8   "assignment?"

9   A     I am not.

10  Q     Do you know if it provided for litigation releases?

11  A     I mean presumably it would have to have -- for anybody

12  to sell any asset they would have wanted that even if it was

13  done not in the form of a bankruptcy proceeding.

14  Q     So, it's your testimony that every sale has litigation

15  releases?

16  A     I wouldn't say every sale but I would say every sale

17  that is unwinding of a contract, which this was, where there

18  is the potential for litigation through releases that are for

19  either side so that, you know, one side gets their asset, one

20  side gets their money, and everybody goes home without having

21  risk of further litigation or expense.

22  Q     Did the Trust provide you with any sort of credit for

23  any of the Miami proceeds?

24  A     I believe I was provided credit for one of the

25  deposits.

1  Q     And what was your understanding of what portion was

2  credited and what portion was not?

3  A     I was provided with credit for the portion that was not

4  considered part of a claw back.

5             MR. JACKSON:  Your Honor, that is all the

6  questions that I have for Mr. Schwartz.

7             THE COURT:  Can I just ask this question: Do the

8  parties agree that all of the exhibits on both sides are in

9  evidence?

10             MR. ROSE:  Yes.

11             THE COURT:  So, they will all be admitted.

12             Mr. Jackson, is there any redirect?

13             MR. JACKSON:  Very brief.

14                      REDIRECT EXAMINATION

15  BY MR. JACKSON:

16  Q     Actually, let's just stick with this last point first.

17  Can you turn to page 10 in your big binder.

18             THE COURT:  Sorry, page 10 of which exhibit?

19             MR. JACKSON:  Sorry, the Trust's exhibit binder.

20             THE COURT:  Which exhibit?

21             MR. JACKSON:  10.

22             THE COURT:  Oh, sorry, Exhibit 10.

23             MR. JACKSON:  Yeah, Exhibit 10.  Tab 10 in the

24  binder.

25             THE COURT:  I'm sorry for interrupting.

1          MR. JACKSON:  That's all right.

2    BY MR. JACKSON:

3    Q     I'll represent that this is the settlement and

4    conditional release agreement with the Miami developer.

5    A     Yes.

6    Q     Okay.  And I'll just turn your attention, if you could

7    turn to page 3, and I'm looking at 3(a), the first sentence,

8    if you could just read that.

9    A     Release by the Schwartz-Nightingale parties and the

10   plan trust in exchange for the actual payment and release of

11   the escrow deposits provided for in Section 2, the Schwartz-

12   Nightingale parties and the plan trust each agree that the

13   purchase agreement, including any related or ancillary

14   agreements, shall be terminated.  The escrow agent and TCH

15   500-E (ph) shall be released and discharged from all actions,

16   causes of action, suits (indiscernible) due sums of money,

17   accounts, reckonings, bonds, bill, specialties, covenants,

18   contracts, controversies, agreements, promises, variances,

19   trespasses, damages, judgment extends, executions claims and

20   demands, whatsoever in law (indiscernible) or equity, which

21   the Schwartz-Nightingale parties and plan trust now have or

22   hereafter can, shall, or may have for upon or by reason of

23   any manner, cause (indiscernible) whatsoever have as of the

24   date of this release, including, without limitation, any and

25   all claims that could have been brought in or with respect to

1  the purchase agreement and 5 Park Condominium, except that

2  the foregoing shall not release, waiver, or discharge the

3  right to enforce this agreement and all documents ancillary

4  thereto, if any.

5  Q     Thank you.  And I'll apologize, I was --

6  A     Run-on sentence.

7  Q     -- I highlighted a portion of that, and then I asked

8  you to read the sentence and you obliged.  So it's an example

9  of be careful what you ask for.

10        The very beginning of that, the first romanette,

11 providing for termination of the purchase agreement, do you

12 understand that reference to the purchase agreement?

13 A     I do.

14 Q     And what is that in reference to?

15 A     The purchase agreement that was signed by the LLC to

16 purchase the condominium.

17 Q     Okay.  So, do you think it would be fair to say that

18 the developer received, in exchange for the payment of the

19 escrow deposit, the ability to remarket and relist the condo?

20 A     Clearly, they did.

21 Q     The other question, just a point of clarification.  I

22 think on direct, going back to that $3 million payment, there

23 was a component of that was -- I believe it was 695,000 from

24 UBS, does that ring a bell?

25 A     Yes.

1   Q     So, I think you testified on direct that was a

2   securities account with UBS.  UBS liquidated the securities,

3   and then made a wire directly to the trust --

4   A     That's correct.

5   Q     -- do you remember testifying?

6         And the reason I bring that up is, I think when Mr.

7   Rose asked a question about -- he had asked a compound

8   question about the BofA wire and the UBS wire, and whether

9   they had gone to you first and then to the trust, and I think

10  you said yes, I just wanted to bring that to your attention.

11  Do you agree that the UBS wire went to you first and then to

12  the trust, or did that proceed differently?

13  A     No, it went directly to the trust.

14  Q     From UBS?

15  A     Yes.

16  Q     Okay.

17  A     The goal was just to get the money to the trust as

18  quickly as possible.

19  Q     Okay.

20          MR. JACKSON:  No further questions.

21          THE COURT:  Okay.  Mr. Rose, any recross?

22                      RECROSS-EXAMINATION

23  BY MR. ROSE:

24  Q     Yeah, just one -- two quick question, Mr. Schwartz.

25  One, were there remaining deposits that be made under the

1  Miami condo in order to complete that sale?

2  A    There was one more deposit contract -- or contract

3  deposit, excuse me, and then there was the balance of the

4  purchase price that would have had to have been paid.

5  Q    So, in order to complete the transaction, there would

6  have had to have been remaining payments?

7  A    Well, yes, but the plan was to get a mortgage for the

8  balance originally, and the buyer that we lined up was

9  prepared to take on the responsibility to fund those.

10  Q    Okay.  And are you aware if there's a non-transfer --

11  non-assignability, non-transferability clause in your

12  contract with -- for the purchase of the building?

13  A    There's a non-transferability clause of the contract,

14  but we were going to sell the LLC, which didn't have a

15  transfer.

16  Q    Okay.  Are you aware if that was going to be contested

17  by the landlord?

18  A    Not to my knowledge.  We had a relationship with them,

19  and so we believed that it would have been fine.

20  Q    So you would have taken that risk?

21  A    Not me, the buyer because he --

22  Q    The buyer would have taken the risk?

23  A    Yes.

24  Q    Wouldn't the trust have been taking that risk if we

25  turned down the deal with the landlord?

1    A      No, you would have had your money in your account

2    already and then, if it would have failed, then it would have

3    been their responsibility.

4    Q      And could the trust have been sued by this buyer --

5    A      I think --

6    Q      -- for a return?

7    A      -- the same way you have releases in the contract with

8    the developer, you could have had the same releases in the

9    contract with the buyer.

10   Q      Okay.

11              MR. ROSE:  I think that's it, Your Honor.

12              THE COURT:  Okay.  Any other re-redirect?

13              MR. JACKSON:  No re-redirect, Your Honor.

14              THE COURT:  Okay, all right.  So, I guess, Mr.

15   Jackson, you called the witness, any further evidence for Mr.

16   Schwartz?

17              MR. JACKSON:  No, not for the witness.

18              THE COURT:  Okay.

19              MR. JACKSON:  We would just at this time move in

20   the exhibits in our binder, and I understand that Mr. Rose is

21   putting in everything from his as well.

22              THE COURT:  Okay.  So can I deem all of the

23   exhibits in both parties' binders admitted into evidence?

24              MR. ROSE:  Yes, Your Honor.

25              THE COURT:  Okay, so they are admitted.

1    (Exhibits received in evidence)

2         THE COURT:  Mr. Schwartz, thank you for your

3    testimony.  You can step down.

4    (Witness excused)

5         THE COURT:  And I take it, Mr. Jackson, that

6    closes your evidentiary case?

7         MR. JACKSON:  It does, Your Honor.

8         THE COURT:  Okay.  Mr. Rose, any further evidence

9    from you?

10        MR. ROSE:  Yes, Your Honor.  I didn't anticipate,

11   but I do -- I would like to call Mr. Joseph Pegnia, who is

12   the financial representative for the trust.

13        THE COURT:  Okay, you can -- Mr. Pegnia, you can

14   take the stand, and if -- Ms. Barksdale, if you could swear

15   the witness.

16        THE CLERK:  Please raise your right hand.

17         JOSEPH P. PEGNIA, WITNESS, AFFIRMED

18        THE CLERK:  Please state your full name.

19        THE WITNESS:  Joseph P. Pegnia, P-e-g-n-i-a.

20        THE CLERK:  Please be seated.

21        THE COURT:  Mr. Rose, you can proceed.

22        MR. ROSE:  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24   BY MR. ROSE:

25   Q    Mr. Schwartz testified that the trust was aware of all

1   bank accounts in the Schwartz-Nightingale parties' control;

2   do you think that's the case?

3   A      I don't.

4   Q      Did you have -- did the trust have visibility into the

5   contents of all of his accounts -- or all of the Schwartz-

6   Nightingale parties' accounts?

7   A      No.  We were provided some bank statements, but we did

8   not have any kind of access online or anything like that.

9   And, as I just stated, there were some other accounts that we

10  did not have any insight into.

11          THE COURT:  So, Mr. Rose, I apologize for

12  interrupting.  You can proceed however you want, but this

13  testimony might be more helpful to me if I knew who Mr.

14  Pegnia was and what role he plays for the trust.

15          MR. ROSE:  Certainly, Your Honor.

16      (Laughter)

17          THE COURT:  Why don't we do it in the form of a

18  question to the witness?

19          MR. ROSE:  Thank you.

20  BY MR. ROSE:

21  Q      Mr. Pegnia, would you mind telling the Court what your

22  role is with the ONH -- with the case --

23  A      Yes.

24  Q      -- and the ONH trust.

25  A      Yes.  Your Honor, I'm a managing director at

1  GlassRatner Advisory and Capital Group in Atlanta, and our

2  role is as financial advisor to the trust.

3           THE COURT:  Thank you.  Okay, you can pick up

4  where you were --

5           MR. ROSE:  Thank you, Your Honor.

6           THE COURT:  -- I'm now with you.

7  BY MR. ROSE:

8  Q     And how long have you been serving in this capacity?

9  A     We were -- our firm was chief restructuring officer of

10 the debtors, so from the very beginning, I would say.

11 Q     Thank you.

12           THE COURT:  And I apologize for the interruption,

13 that's very helpful.

14           MR. ROSE:  No, very helpful.  Thank you, Your

15 Honor.

16 BY MR. ROSE:

17 Q     And so did -- Mr. Pegnia, did you have access and

18 visibility into all of the Schwartz-Nightingale accounts?

19 A     Well, we just had the bank statements only, and I was

20 aware of additional bank accounts that existed that we did

21 not have bank statements for.

22 Q     And did you -- even the accounts you knew about, did

23 you have ongoing monitoring access to those?

24 A     No, we never had online access to any account.

25 Q     With respect to the Miami condominium, did your firm

1  review the tracing of the assets that started with the debtor

2  and went to the various -- went out of the debtor to the

3  various places that Mr. Schwartz authorized those payments to

4  go to?

5  A    Yes.

6  Q    Did you trace any payments that were made on account of

7  the Miami condominium?

8  A    Yes, there were two deposits that were made using funds

9  from the debtors totaling $850,000.

10         MR. ROSE:  I just want to think if I have any more

11  questions.

12      (Pause)

13         MR. ROSE:  Before handing the witness over, Your

14  Honor, Mr. Pegnia has submitted a declaration and, subject to

15  cross-examination, I just wanted to see if we could admit his

16  declaration into evidence.

17         THE COURT:  Any objection?

18         MR. JACKSON:  I think it's already in, I think it

19  was --

20         THE COURT:  Oh, it's one of the exhibits --

21         MR. JACKSON:  -- in your -- yeah.

22         MR. ROSE:  It's one of the exhibits?

23         THE COURT:  -- that's already been admitted?

24         MR. ROSE:  Okay, yeah --

25         THE COURT:  Okay, very well.

1          MR. ROSE:  Thank you, Your Honor.

2          THE COURT:  Okay, then cross --

3          MR. ROSE:  I turn the witness, Your Honor.

4          THE COURT:  Okay.  Mr. Jackson, cross-examination.

5      (Pause)

6          MR. JACKSON:  No questions, Your Honor.

7          THE COURT:  Okay, very well.

8          Mr. Pegnia, thank you for your testimony, you can

9  step down.

10      (Witness excused)

11          THE COURT:  Mr. Rose, any further evidence?

12          MR. ROSE:  No, Your Honor.

13          THE COURT:  Okay.  So I'm happy to hear the

14  parties' arguments.  Mr. Jackson?

15          MR. JACKSON:  I guess we're treating it as my

16  motion, so I guess that makes me go first.  Again, for the

17  record, Patrick Jackson from Faegre Drinker for the Schwartz-

18  Nightingale parties.

19          I think the -- based on the papers anyway,

20  although I think it's -- I think it's a bit of a moving

21  target, but based on the motion there were some objections

22  raised to these remaining ten percent items based on, well,

23  those were assets sold by Mr. Schwartz and not sold by the

24  trust, and the ten percent only applies to that.  That's not

25  what that provision says.

1          THE COURT:  So, can we back up a second?

2          MR. JACKSON:  Right.

3          THE COURT:  So let's just talk about the structure

4   of this agreement so that I -- and we've talked about this at

5   a previous hearing, but I want to make sure I get how this

6   agreement works.

7          So there's an amount that's referred to as the

8   aggregate repayment amount, which is basically all of the

9   debt in the case, and whether that's 40 or 50 or $60 million,

10  it's something -- we're talking about something in that

11  ballpark?

12         MR. JACKSON:  Yeah, and it's a formula and it's in

13  paragraph 3 of the settlement agreement --

14         THE COURT:  Right.

15         MR. JACKSON:  -- is probably where you're looking

16  at it.

17         THE COURT:  Okay, right, exactly.

18         MR. JACKSON:  And it's essentially the amounts --

19  it's the investor money, so the first, you know, little

20  romanette (v), the amounts invested in the debtors through

21  CrowdStreet, Inc., that's the investor's money.  There's

22  amounts invested in the debtors by Garden Growth LLC, to the

23  extent it executes a joinder, which it did.  So, tack on the

24  Garden Growth amount.  A million for estimate of plan trust

25  budget, repayment of the DIP, so -- and then any additional

1  loans and expenses.  I'm not aware of any --

2          THE COURT:  Okay.

3          MR. JACKSON:  -- of that, but there's a number and

4  that's the number.

5          THE COURT:  Okay.  And do you have a ballpark

6  estimate of what you think that number is?

7          MR. JACKSON:  I think it started at 54, is what

8  the original confessed judgment was --

9          THE COURT:  Okay.

10          MR. JACKSON:  -- that was entered, and it's now

11  subject to reservation of them to come on --

12          THE COURT:  Okay, all right.

13          MR. JACKSON:  -- and add in amounts, it's about

14  42.

15          THE COURT:  So let's talk about 54 --

16          MR. JACKSON:  Right.

17          THE COURT:  -- as a starting point for

18  conversation without prejudice to anyone's ability to say

19  it's a slightly different number.  And the way this agreement

20  worked is there was going to be a $3 million payment on

21  December 31st, 2023, and then there were going to be 12

22  quarterly payments --

23          MR. JACKSON:  Right.

24          THE COURT:  -- for the balance of the, call it,

25  $54 million.  So we're talking about roughly 51 divided by

1    12, so we're talking about quarterly payments of between

2    three and four million, whatever the math turns out to be.

3            MR. JACKSON:  Right.

4            THE COURT:  Okay, all right, so I get that.  So

5    there's the December 31st obligation to pay and there's then

6    quarterly obligations thereafter.

7            Now, in the meantime, we know that Mr. Schwartz

8    and the Nightingale entities, presumably, don't have this

9    money sitting in a bank account ready to be wired to you.  So

10   there's this mechanism for selling assets, and there's

11   paragraph 4, which is the ten percent obligation.

12           MR. JACKSON:  Right.

13           THE COURT:  Now, I'm just trying to puzzle through

14   how -- so imagine we get at any period of time and Mr.

15   Schwartz and the Nightingale entities have not met an

16   obligation, we've got the confession of judgment procedures

17   and what have you, and then the trust has creditor remedies

18   to collect whatever is left.

19           MR. JACKSON:  Right.

20           THE COURT:  Now, imagine, here we are and we're at

21   the -- collecting a judgment and in the mean -- let's say

22   we've sold $30 million worth of assets and, as a result,

23   there's $3 million that Mr. Schwartz has because it's been

24   withheld, because that's what the contract says, but there's

25   a default under the agreement and the trust has a judgment

1    that it wants to enforce.  If those $3 million are reachable

2    through ordinary creditor remedies, doesn't the trust get

3    that $3 million?

4              MR. JACKSON:  I think on judgment remedies, it

5    probably depends -- if they're reachable, I guess is the -- I

6    suppose the loaded term there, depending on where they are.

7    They're payable to the Schwartz-Nightingale parties or

8    they're withholdable by the Schwartz-Nightingale parties.

9    So, conceivably, if it's available to judgment process, then,

10   yes, it could -- but I think that's a separate -- slightly

11   separate question.

12             THE COURT:  Well, the question I have, the reason

13   I'm asking these questions is why don't they have, in effect

14   -- if we're in a world in which these quarterly payments have

15   come due and haven't been paid, why don't they have the

16   ability, effectively -- is there a provision that says

17   setoffs shall not apply with respect --

18             MR. JACKSON:  There's not, yeah, a so-called hell-

19   or-high-water provision to that effect in the agreement.

20   There is -- we talked about it at the last hearing -- there

21   is a reference in -- and I don't have it offhand, but there's

22   a reference in the security agreement that talks about

23   secured party, being them, that from the liquidation of

24   assets following a default, secured parties shall apply the

25   proceeds in accordance with the settlement agreement, and

1    that's kind of an odd statement.

2              If there wasn't something -- if there wasn't some

3    non-default treatment of how you would apply proceeds in the

4    settlement agreement, that would be an odd thing to say in

5    the security agreement, but there's no provision in the --

6    there's no overt hell-or-high-water provision in the

7    settlement agreement.

8              We did spend some time -- there were two things

9    that came out, we reiterated one of them on the record today,

10   two things that came out at the last hearing as far as the

11   overall structure and kind of genesis of the settlement

12   agreement.  One is Mr. Schwartz's testimony, which I don't

13   think anyone disagrees with as far as what was the impetus

14   for them agreeing that the ten percent -- you know, it's a

15   settlement of potential litigation, right, and if these

16   trusts, who are a party who hold all the assets, are giving

17   up a hundred percent, that's not settling anything.  That's a

18   unilateral surrender, there's no -- they're not gaining

19   anything about that.  So, at least by retaining the ten

20   percent for the beneficiaries, that's something that they can

21   with a somewhat straight face sign onto, and they did.

22             So there was -- structurally, there would be a

23   reason why there is a separation of the payment mechanism and

24   the proceeds-sharing mechanism, which I can get -- I do have

25   a grand unified theory of the contract and how it works,

1   which I would like to explain to Your Honor.

2            THE COURT:  Okay.

3            MR. JACKSON:  But there was that, there was also

4   Ms. Phillips' testimony about that -- I believe she testified

5   at the last hearing that the understanding at the time was

6   that Mr. Schwartz was going to be paying this back primarily

7   by working.

8            THE COURT:  Continuing to run his business, right,

9   and generating more proceeds.

10           MR. JACKSON:  Right.  And then it wasn't

11  necessarily that everybody thought that they were going to

12  get $54 million from liquidating assets.

13           THE COURT:  Right.

14           MR. JACKSON:  So --

15           THE COURT:  No, I understand, I recall that.

16  Okay, all right.  So why don't you share your grand unifying

17  theory.

18           MR. JACKSON:  So, my grand unified theory of the

19  contract -- and I think Your Honor was kind of getting at it

20  and I'll -- the judgment question, I understand why you're

21  asking it.  I think it's -- the judgment is a bit of a game-

22  changer, I'll put that aside for the moment, but at least how

23  the contract can work the way that we're arguing is -- as

24  Your Honor noted, there's an aggregate repayment amount in 3

25  and it is -- there's some provisions about like the timing of

1    the payment, but what's clear is the aggregate repayment

2    amount, let's say 54, it's the result of this formula, it

3    needs to be paid, and it's clear that it needs to be paid

4    because there's a reference to it also in paragraph 7(a).

5    This is the conditional releases and this is the provision

6    where, if the aggregate repayment amount is paid, then the

7    Schwartz-Nightingale parties are released of anything, and

8    that makes sense.

9            So that's the kind of bookend it is, up until the

10   point where they satisfy the condition for the release, which

11   is the payment of the aggregate repayment amount, they're on

12   the hook for the items that were otherwise settled by this

13   agreement, and we're in judgment-enforcement mode, we're in

14   all these things.

15           So there's timing provisions in 3, there's an

16   initial payment, there's the quarterly payments.  There's

17   what I'll call a catchall in (d) -- 3 -- which is, to the

18   extent there's additional amounts that get tacked on, whether

19   there's some unanticipated trust expenses or a default, you

20   know, and I imagine that's probably a reference to default

21   and collection costs or the like, that gets tacked on to the

22   last quarterly payment.

23           So there's a mechanism in there where there will

24   be an adjustment --

25           THE COURT:  There's a true-up --

1           MR. JACKSON:  -- true-up --

2           THE COURT:  -- because the number, it's a moving

3    target.

4           MR. JACKSON:  -- so that they can never get off

5    the hook, you know, those releases in 7(a) are never going to

6    be theirs until they've satisfied the aggregate repayment

7    amount, plus whatever amounts are added onto it.

8           THE COURT:  Yes, I'm with you that far.

9           MR. JACKSON:  That's what 3 provides.  The way

10   that I think 4 works, from our perspective, was, again, as an

11   inducement for the, let's say, non-tort feasor parties, so

12   we'll just put that -- you know, the other parties who hold

13   the assets, most of whom -- actually, all of whom are

14   previously established trusts and the like, for them to sign

15   on and be able to sign on, given that they have beneficiaries

16   who are not Mr. Schwartz, the ten percent lives there, and

17   that's the when there is a liquidation of an asset of a

18   Schwartz-Nightingale party which was anticipated to be some,

19   but not all of the repayment, then there's this mechanism.

20          First and foremost, we're supposed to use

21   reasonable efforts to make sure everything gets paid directly

22   to the trust -- I understand why they would want that -- from

23   the amounts that go -- and it does not specify who sold it,

24   it just talks about the net proceeds going to them, I think

25   that's regardless who sold it -- from the amounts that they

1   receive, they give back ten percent within three days or, if

2   the Schwartz-Nightingale parties receive it, they're entitled

3   to keep ten percent and then remit the balance.

4               THE COURT:  And so your vision --

5               MR. JACKSON:  And then all of that gets credited

6   toward the ultimate payment amount, but at the end of the day

7   nobody is getting released on our side until everything is

8   paid back.

9               So, I think they're really two separate

10  mechanisms, is certainly how we understood it.

11              THE COURT:  So, on your grand theory of the world,

12  did the Schwartz-Nightingale parties meet their obligation to

13  make the $3 million payment?

14              MR. JACKSON:  They did.  And then, to the extent

15  that payment included proceeds that then three days later

16  they were required to kick back, they're required to kick

17  that back, but we're not off the hook for that amount

18  because, at the end of the day, we still need to satisfy the

19  aggregate repayment amount.

20              So that ten percent really has to do with whose

21  asset it was and who was necessary to get their assent to

22  sign this to make this work to pledge the assets, and it was

23  all trusts.  Certainly, the items at issue here in the sort

24  of final short strokes on the ten percent, these are assets

25  that were held by trusts, it was important as of -- you know,

1    in terms of in the inception of the agreement, that the ten

2    percent would be there for the benefit of the beneficiaries.

3    It wouldn't make sense for the trustees to execute an

4    agreement that was going to --

5              THE COURT:  So I understand --

6              MR. JACKSON:  -- put all of that at risk, right --

7              THE COURT:  -- I understand that argument.  Can I

8    ask you another question that I'm struggling to understand?

9              So, I understand there -- what were the proceeds

10   from the sale in the Miami condo that the trust received?

11   Not the condo, I understand --

12             MR. JACKSON:  Right, right.

13             THE COURT:  -- but from -- what did it get back?

14             MR. JACKSON:  It got $1.175 million of the 1.275

15   million deposit.  If you look at the --

16             THE COURT:  Okay.

17             MR. JACKSON:  -- settlement agreement, there was

18   100,000 paid to the escrow agent --

19             THE COURT:  All right.  And I understand there's a

20   back and forth about --

21             MR. JACKSON:  Right.

22             THE COURT:  -- maybe you should have done

23   something different and maybe you could have done better.

24   Assume for this purpose that I'm not here to undo or fault

25   anyone for the decisions they made about what they were going

1    to do.  What we're talking about -- holding that -- if I'm

2    going to ignore that -- and I'll give you a hint, I'm

3    inclined to ignore that -- then we're talking about do they

4    get the -- do you get back the three percent on the 1.175.

5              And so the buckets that we're talking about are

6    the -- on the $3 million, are we talking about the full $3

7    million or just --

8              MR. JACKSON:  Almost, most of it, with the

9    exception of -- there was 3.015 million paid --

10             THE COURT:  Right.

11             MR. JACKSON:  -- 250,000 of that was what I'll

12   call old and cold sale proceeds that were received before the

13   effective date.

14             THE COURT:  Okay.

15             MR. JACKSON:  And the mechanism in 4(b) of the

16   settlement agreement is clear, from and after the effective

17   date of the agreement, this ten percent mechanism, we're

18   acknowledging, you know --

19             THE COURT:  Right.

20             MR. JACKSON:  -- and appreciate the back-and-forth

21   with Mr. Rose as far as the timing of that payment.  I was

22   unaware of that, it was before my time, but once we saw that

23   timing, we backed off of that, but it's the remaining

24   element.  So I think it's -- I can't math as -- 3.015 minus 2

25   -- so 2.9 million --

1            THE COURT:  Okay.

2            MR. JACKSON:  -- is at issue, and then that's made

3    up of the Intervest amount, the UBS amount --

4            THE COURT:  Right, the watches and the --

5            MR. JACKSON:  -- and the watch amount --

6            THE COURT:  -- private equity interest --

7            MR. JACKSON:  -- right.

8            THE COURT:  -- that was held at UBS.

9            MR. JACKSON:  But I can go back to the Miami condo

10   for a second because I think -- so there's -- I think there's

11   an overarching question, Your Honor, about the judgment and

12   the like, I'm giving you the overarching explanation of why

13   the ten percent is important and why it would persist,

14   notwithstanding -- and that the $3 million initial and then

15   all the quarterly payments and then the final true-up payment

16   is kind of a separate mechanism from the sharing of proceeds,

17   and that makes sense that it would be given the purpose of

18   that provision of the ten percent sharing.

19            I think the Miami condo presents a -- I think that

20   also presents another interpretative question about what does

21   a sale mean, right?  Like that's -- they're saying, well, no,

22   this was a settlement agreement.  We sent a demand letter for

23   850,000 of the 12 -- you know, 1.275 million.  And I think I

24   can reduce that very simply, the issue is the sale is not

25   defined, like we said in our paper.

1           And the reason for the background, which I

2    understand why Your Honor is inclined to ignore it as far as

3    we're not here to question business judgment, we're not here

4    to say coulda, woulda, shoulda, we're here to say do we get

5    ten percent of what you did get, but the reason why I went

6    into the background on the Miami condo was this asset, it's

7    not reasonable to look at this asset as an $850,000 clawback.

8    This was a contract to purchase a condo for what was at the

9    time a below-market amount that then became a wildly below-

10   market amount.

11          THE COURT:  No, I understand, but it's a little

12   bit of both.

13          MR. JACKSON:  Right?

14          THE COURT:  I think I get the dynamic here.  And,

15   look, I'll tell you, I believe -- because I'm a bankruptcy

16   lawyer by training, I think that, you know, property is

17   defined broadly and that I think of a cause of action as

18   property.  The question is -- whose property it is is a

19   different question, right?  The cause of action wasn't the

20   Schwartz-Nightingale parties' asset to sell.

21          MR. JACKSON:  Right.  And I'll be clear, I will

22   acknowledge that.  The agreement provides that in chapter V

23   actions, it's a separate provision, that's theirs; we don't

24   get a piece of that.  I think the complication is --

25          THE COURT:  So --

1          MR. JACKSON:  -- this asset is kind of both.

2          THE COURT:  So I have an allocation question,

3    don't I?

4          MR. JACKSON:  I don't think so because what you

5    had was there's an opportunity to dispose of this -- let's

6    just -- I'll use this asset --

7          THE COURT:  No, I understand --

8          MR. JACKSON:  -- to just be --

9          THE COURT:  -- but, Mr. Jackson, imagine the

10   developer was holding $850,000 that was subject to be clawed

11   back --

12         MR. JACKSON:  Right.

13         THE COURT:  -- and there was equity, call it, on

14   top of that that was available to be monetized.

15         MR. JACKSON:  Right.

16         THE COURT:  And we did a global transaction in

17   which the $850,000 cause of action was released and the

18   equity piece was monetized.  And so why don't -- and if all

19   the trust had done was pursued and collected on the $850,000,

20   you wouldn't get three percent on that.

21         MR. JACKSON:  Right.

22         THE COURT:  So --

23         MR. JACKSON:  If all they had done is that, we

24   wouldn't have gotten three percent on --

25         THE COURT:  So don't I have an allocation --

1          MR. JACKSON:  -- ten percent on that.

2          THE COURT:  -- question?

3          MR. JACKSON:  No.

4          THE COURT:  Why not?

5          MR. JACKSON:  Because under the agreement, the way

6    that this is structured and with their narrow interpretation

7    of sale as meaning, well, this was a settlement agreement,

8    not a sale, you had a party then who was in a position to

9    exercise discretion.  We brought them a sale, what would have

10   been a sale.  It was a sale of the -- Mr. Schwartz testified

11   it was a sale of the interest in the --

12         THE COURT:  No, I understand.

13         MR. JACKSON:  -- in the contracting party that

14   would have brought more than they got and would have clearly

15   triggered -- even under their reading would have triggered a

16   ten percent obligation.  They said, no, we want to do this

17   our way and we want to get less money.  It creates a perverse

18   incentive to structure the transaction, which they did, in a

19   way to then argue same dollars, actually fewer dollars come

20   in --

21         THE COURT:  Mr. Jackson, how do you think about

22   that, if I'm inclined to credit their business judgment that

23   we're just not going to do business with you and we're not

24   going -- we're going to do -- as I understand what happened

25   here from the email exchange, the statement was, look, we're

1    just going to take the bird in hand here today that doesn't

2    involve uncertainties because we've been burnt once already

3    and we're done.  And imagine I conclude, is that the only

4    thing they could have done, no, but that was a reasoned

5    exercise of someone's business judgment, there we are.  And

6    so we just take that for what it is, then what?

7              MR. JACKSON:  I still argue it is a sale --

8              THE COURT:  Okay.

9              MR. JACKSON:  -- it is a sale that should --

10   because the asset was disposed of.  They settled the

11   $850,000, but in the context of settling the $850,000, they

12   also tore up the purchase agreement.

13             THE COURT:  All right, I understand.  So can you

14   help me with --

15             MR. JACKSON:  And the provision that I walked Mr.

16   Schwartz through -- or that I asked him to read too much of

17   made that clear.  He has a recital, in exchange for release

18   of this we're getting a termination --

19             THE COURT:  All right.

20             MR. JACKSON:  -- of the purchase agreement.

21             THE COURT:  So, I understand your position.  Can

22   you help me with the math of what's at -- what's in dispute

23   as between the parties?  So --

24             MR. JACKSON:  So that's 850 because they did

25   essentially credit us the other amounts --

1          THE COURT:  Okay --

2          MR. JACKSON:  -- they gave ten percent of that.

3          THE COURT:  -- they paid the rest of it.

4          MR. JACKSON:  So 85,000 would be the Miami condo,

5   what we say is the remaining balance that's owed.

6          THE COURT:  So -- okay, I'm sorry.  So they --

7   with -- so the three percent on the $850 million --

8          MR. JACKSON:  Ten percent --

9          THE COURT:  -- is disputed --

10          MR. JACKSON:  -- yeah.

11          THE COURT:  -- and with respect to the $2.9

12   million, all of that is disputed?

13          MR. JACKSON:  All of that is, yeah.

14          THE COURT:  Okay.

15          MR. JACKSON:  So it's three -- I think our math in

16   our -- 361,500 total, 85 is the Miami -- 85,000 would be the

17   Miami condo, if you agree that the entire amount that they

18   received would be treated as a sale.

19          THE COURT:  Okay.  So -- I see -- so what you're

20   saying is that basically there's 2.9 plus 850, so call it

21   2.75 -- I'm sorry, 3.75 --

22          MR. JACKSON:  3.615, yeah.

23          THE COURT:  -- million dollars, on which you're

24   entitled to three percent.

25          MR. JACKSON:  Yeah -- I mean, I got ten percent,

1  but yeah.

2           THE COURT:  Oh, ten percent.

3           MR. JACKSON:  Yeah, yeah --

4           THE COURT:  Got it, got it --

5           MR. JACKSON:  -- you keep saying three percent --

6           THE COURT:  -- got it.  No, my fault, my fault, my

7  fault.  Okay, you're entitled to ten percent on basically

8  $3.75 million --

9           MR. JACKSON:  Right.

10          THE COURT:  -- so that's the 3.75 that you're

11 entitled to.

12          MR. JACKSON:  Yeah.

13          THE COURT:  Okay.

14          MR. JACKSON:  And I think I can -- if I can just

15 touch on the three million actually was -- or the 2.9 --

16          THE COURT:  Yep.

17          MR. JACKSON:  -- and change was actually -- three

18 elements of that, if I could just touch briefly on it.

19          THE COURT:  Yep.

20          MR. JACKSON:  I think, as you said, the facts are

21 barely in dispute.  You know, UBS was a securities account,

22 those securities were pledged, those securities were

23 liquidated, UBS sent the proceeds to the truth, 695,000.  So

24 that would be, in our view, 69,500 that's raining on --

25          THE COURT:  I understand.

1           MR. JACKSON:  The Sotheby's Auction House

2   auctioned a bunch of watches, those were collateral, 745,000

3   came from them.  That one, to the extent it's relevant to the

4   analysis, went to Mr. Schwartz's Bank of America account, was

5   then --

6           THE COURT:  Wired.

7           MR. JACKSON:  -- wired to the trust, $745,000,

8   747,500.

9           THE COURT:  Right.

10          MR. JACKSON:  Intervest, this bears a little bit

11  more explanation.  So Intervest was -- as Mr. Schwartz

12  testified, it was conceived at the time of essentially a down

13  payment of the Intervest parties who were partners of various

14  Schwartz-Nightingale parties to kind of buy out the Schwartz-

15  Nightingale parties' interests in the -- in those entities.

16          Mr. Schwartz, on cross, said, you know, no, that

17  was what it came in, it turned out neither the trust nor

18  Intervest moved forward with that.  He referred to Intervest

19  cramming down, they just walked away from that amount and

20  instead crammed down.  I suppose, in hindsight, I could have

21  had him unpack that, but that's basically the -- under the

22  investment documents, they basically squeeze out --

23          THE COURT:  They just exercised --

24          MR. JACKSON:  -- the Schwartz-Nightingale parties

25  --

1          THE COURT:  -- other remedies they had.

2          MR. JACKSON:  -- for failure to make capital calls

3   and things like that.  So, they essentially -- net-net, it

4   ends up in the same result.  There is no more Schwartz-

5   Nightingale party interest in it Intervest, and Intervest has

6   walked away from 1.325.

7          THE COURT:  Okay.

8          MR. JACKSON:  Those are the facts --

9          THE COURT:  All right.

10         MR. JACKSON:  -- that's the -- you know, but that

11   would be --

12         THE COURT:  I think I understand --

13         MR. JACKSON:  -- 130 --

14         THE COURT:  -- this is helpful.

15         MR. JACKSON:  -- right.

16         THE COURT:  Okay, so I think I understand your

17   position.  Why don't I hear from Mr. Rose?

18         MR. ROSE:  Thank you, Your Honor.

19         So I'd like to start with our grand view of what

20   the settlement agreement says and why it says it.  So the

21   settlement agreement was set up so that all of Mr. Schwartz's

22   and the Schwartz-Nightingale parties' assets were being sold,

23   and as Mr. Schwartz and his counsel, I think, wanted is, in

24   the meantime, they needed something to --

25         THE COURT:  To live on in the meantime --

```
 1              MR. ROSE:  -- to live on.

 2              THE COURT:  -- while they're selling it.

 3              MR. ROSE:  That's --

 4              THE COURT:  And what I think I understand about

 5  this is that where we are is someplace different from what

 6  was really contemplated --

 7              MR. ROSE:  Correct.

 8              THE COURT:  -- when the agreement was entered into

 9  because what people thought was, Mr. Schwartz would continue

10  running his business, it would generate free cash, the free

11  cash would come in.  Yeah, there'd be some asset sales, but

12  to the extent they're asset sales, a piece of that could be

13  held, but that wasn't that big a deal because we were getting

14  paid anyway --

15              MR. ROSE:  Yes, Your Honor.

16              THE COURT:  -- right?

17              MR. ROSE:  And I think there's a provision which

18  will help you further --

19              THE COURT:  Okay.

20              MR. ROSE:  -- in 4 -- in 4(v), which says -- in

21  the middle, it talks about the debtor in turn will pay the

22  Schwartz-Nightingale parties ten percent of the proceeds

23  received, and it says the net proceeds of such sales will be

24  paid to the debtors, shall be paid into escrow and applied to

25  quarterly payments as directed by the Schwartz-Nightingale
```

1    parties or other payments to reduce the aggregate repayment

2    amount.

3            So, Your Honor, the whole mechanism was Mr.

4    Schwartz was free to sell things, put assets in our escrow --

5    we were going to escrow and hold money, he was going to say

6    apply it to this quarter, apply it --

7            THE COURT:  Right, that all assumes that the sales

8    are sort of --

9            MR. ROSE:  Happening.

10            THE COURT:  -- extra money --

11            MR. ROSE:  Right.

12            THE COURT:  -- on top of the payments in in the

13    ordinary course out of free cash.

14            MR. ROSE:  That's right, Your Honor, but --

15            THE COURT:  And that didn't happen, so now what do

16    we do?

17            MR. ROSE:  But it also shows you exactly what the

18    intent was, which is that the quarterly payments were meant

19    -- he was supposed to tell us how to apply the quarterly

20    payments and, when the quarterly payments were made, that was

21    it.

22            And so, Your Honor, while I get there's a

23    difference between the initial payment and a quarterly

24    payment, there really is no difference for these purposes.

25    He was supposed to say, apply my assets --

1                    THE COURT:  Okay.

2                    MR. ROSE:  -- make the payment --

3                    THE COURT:  And so you didn't get the payment, so

4    now what?

5                    MR. ROSE:  Well, but, Your Honor, what I'm saying

6    is more to the point of the $3 million initial payment, he

7    told us to apply all of these proceeds to the initial

8    payment, as per 4(b).  So, in other words, Mr. Schwartz said

9    apply it, I'm going to take care of my quarterly payment.

10   There was no ten percent kickback; the ten percent was merely

11   a live-on money while he made the quarterly payments.  In

12   this case, the initial payment was effectively a quarter

13   payment.  That was the intent of the document because that's

14   -- you know, that's why it reads the way it does.

15                   THE COURT:  So your view of life is that, even if

16   you might have been entitled to $300,000 from those sales, he

17   essentially walked away from that when he said apply it?

18                   MR. ROSE:  That's exactly what I think the

19   agreement says about applying proceeds to quarterly payments.

20                   THE COURT:  Show me -- let's go back and look at

21   the document that talks about the $3 million payment.  Which

22   exhibit is that?

23                   MR. ROSE:  Exhibit 3, Your Honor, it's the

24   settlement agreement --

25                   THE COURT:  No, there was an email --

1              MR. ROSE:  Oh, oh, yes, Your Honor --

2              THE COURT:  -- about the $3 million.

3              MR. ROSE:  -- yeah.  That was, I think -- 15?  15,

4    Your Honor.

5          (Pause)

6              THE COURT:  Okay.  So Mr. Schwartz says, I hope

7    all is well, over the course that you should receive the

8    following three wires.  This plus the 250 you've already

9    received meet the requirements for the first installment.

10             MR. ROSE:  Your Honor, and that is our view of

11   what he was doing, which was applying all of the payments --

12   and, Your Honor, you heard that we really don't know if he

13   used ten percent from here, from here, you know.  He had the

14   right to --

15             THE COURT:  No, I understand.

16             MR. ROSE:  Yeah.  So our view is, whatever

17   happened, he has applied it, and he walked away from whatever

18   rights he had because otherwise, at that point, the trust

19   would have had a default.

20             THE COURT:  No, I understand, I understand that, I

21   understand that.  On the other hand, I think the best

22   argument the other way is, all right, well, what if he had

23   said to you instead here's 90 percent of $3.015 million?

24   That's what I got, I'm holding $300,000, knock yourself out,

25   which he probably could have -- that would have been

1  consistent with the provision entitling him to keep ten

2  percent of the proceeds of the sales --

3          MR. ROSE:  That's correct.

4          THE COURT:  -- it would have put in default of his

5  obligation to pay $3 million.

6          MR. ROSE:  That's correct.

7          THE COURT:  And your view is, you made that

8  choice, too bad.

9          MR. ROSE:  Yeah, he applied it, Your Honor.

10         THE COURT:  You don't dispute that he could have

11  insisted on getting the ten percent of the proceeds of those

12  sales, but had he made that choice, he would have gone into

13  default then and he chose not to.

14         MR. ROSE:  That's right, Your Honor.  And I'm not

15  -- and I'm not sure he proved that he didn't do that.  We

16  don't know what he did, all we know is he sent us $3.15

17  million from his bank accounts that he controlled, he applied

18  it, he made his payment, the trust didn't act accordingly,

19  and that was the initial payment.

20         THE COURT:  Okay, I understand your position.

21         MR. ROSE:  Your Honor, I do -- I just do have to

22  say, we do take issue with the concept that the trust somehow

23  -- you know, I don't know that it's particularly relevant,

24  but we don't agree that the -- we think -- we've always

25  believed that the trusts were created at the time -- many of

1    them at the time of the fraud and they would have been able

2    to be unwound by the --

3           THE COURT:  All right, that's not before me,

4    though, right?

5           MR. ROSE:  It's not before you, Your Honor, I just

6    don't want to not say it --

7           THE COURT:  Fair enough.

8           MR. ROSE:  -- after -- just because Mr. Jackson

9    said we don't dispute it, that's the only reason --

10          THE COURT:  All right, fair enough.

11          MR. ROSE:  -- we do.  And, Your Honor, I think we

12   do have certainly a recoupment right, as well as setoff, and

13   I don't -- I'm just saying --

14          THE COURT:  Yeah, I hear you.

15          MR. ROSE:  -- to answer your question --

16          THE COURT:  I hear you, but the argument is it's

17   implicit in the ten-percent holdback that they get to keep

18   it.  The whole point of that was that they get that money and

19   in the absence of clarity, so I think that -- I mean, I think

20   that was my reasoning before when I concluded and I, you

21   know, said, look, you've got to meet your obligations,

22   whatever they are.

23          MR. ROSE:  Right.

24          THE COURT:  Okay, I think I understand, and I

25   think I've got questions for Mr. Jackson.

1          MR. ROSE:  Yes, Your Honor.

2          THE COURT:  So, Mr. Jackson, I guess I'm

3   interested in your response to the argument that goes, look,

4   I hear you about your entitlement to the first $300,000, but

5   that was your client's choice.  He could have kept it then

6   and paid $2.7 million.  He didn't want to default, so he

7   parted with money he didn't have to part with, that is what

8   it is, don't come crying to me.  And that's essentially what

9   Mr. Rose is saying, slightly more politely, but only

10  slightly.

11         So what's your response to that argument?

12         MR. JACKSON:  My first response is that it's kind

13  of an extra -- there isn't a provision talking about that.

14  There isn't a provision saying, once you apply -- you know,

15  there's nothing in the provision 3(a), talking about the

16  initial payment, that says, when you apply it, other

17  provisions of the contract that might be applicable don't

18  apply anymore, it doesn't say that.

19         So it's possible, again, from my grand unified

20  theory that you comply with both.  There's an aggregate

21  payment amount, it's wrapped up into these payments, you can

22  comply with it --

23         THE COURT:  But it's not --

24         MR. JACKSON:  -- you can pay it, and then --

25         THE COURT:  -- it's not inconsistent with your

1    grand unified -- look, let's accept what you're saying --

2              MR. JACKSON:  Right.

3              THE COURT:  -- about the true-up and that he could

4    have withheld -- not made all of a payment he was required to

5    make or what have you, and then the true-up would clean it

6    up, but -- the true-up provision still does work even if it

7    doesn't capture --

8              MR. JACKSON:  Right.

9              THE COURT:  -- deducting ten percent of the

10   proceeds of sales.

11             MR. JACKSON:  Right.

12             THE COURT:  So it's not inconsistent with your

13   basic theory of the agreement to say, look, if he chooses to

14   take money that he was otherwise entitled to leave in a trust

15   that you contend the debtor would never get, if he chose not

16   to and to pay it, that's a voluntary choice.  I guess I'm

17   still interested in understanding --

18             MR. JACKSON:  I just don't understand where does

19   that live in the contract because we're talking about that it

20   would be -- it would work, yeah, it would work as a

21   mechanism.  Like the world view of Mr. Rose about once you

22   say this is how it's going to be applied, this is the section

23   that applies and these other sections don't apply, the

24   contract could work that way, but it doesn't say that.  What

25   it does say is it has the three per -- sorry, now I'm saying

1    three percent -- the ten percent, three days -- it's three

2    days, ten percent.  So it's a lagging obligation on the part

3    of the trust.  So it's possible that to meet the timing

4    requirements of the payment, you make the payment and then,

5    to the extent --

6              THE COURT:  Right.

7              MR. JACKSON:  -- it's proceeds, ten percent comes

8    back --

9              THE COURT:  But, Mr. Jackson, look --

10             MR. JACKSON:  Right.

11             THE COURT:  -- let me tell you, here's -- let me

12    tell you where I tentatively am and give you -- I want to

13    hear your best response.  Look, I'm inclined to with respect

14    to the Miami condo do the allocation.  I think the 850 they

15    were entitled to as a -- as they say, as a clawback, I think

16    that's a fair allocation of the 1.175.

17             With respect to the other roughly $300,000, I

18    think you were entitled -- as I read the documents, I think

19    that Mr. Schwartz and the Nightingale entities were entitled

20    to insist on getting that -- getting those proceeds from

21    those sales, but had they made that decision, they would not

22    have satisfied the obligation to make the $3 million payment.

23    And when Mr. Schwartz wrote in an email on January 12th, 2024

24    that these payments, quote, "meet the requirements for the

25    first installment of my settlement," I think he's there

1    relinquishing his right to keep those proceeds and instead

2    deciding to apply those proceeds to the payment.

3            And so I'm not disputing that he could have gotten

4    them, and so I'm not really disputing your reading of the

5    documents as a whole, I think that's a voluntary decision to

6    say, whatever my rights might be, I've decided that this is

7    what you should do with these proceeds.

8            And so, for those reasons, I'm inclined to say

9    that the trust's position on this is correct, but let me hear

10   you, to the extent you've got something to say that I haven't

11   considered.

12           MR. JACKSON:  I think I do and that's that, if

13   that's how you're looking at it, I would -- I think that

14   makes the most sense as regards the watch proceeds because

15   that was a situation where watches were sold, amounts were

16   wired from Sotheby's to Bank of America, Mr. Schwartz

17   initiates the wire from Bank of America to the trust.  That's

18   where it falls in the bucket of he got the proceeds --

19           THE COURT:  Right, and he voluntarily transmitted

20   it.

21           MR. JACKSON:  -- he would have been able to keep

22   ten.

23           THE COURT:  Right, right.

24           MR. JACKSON:  The other two, the Intervest amount

25   and the UBS amount were wired directly to the trust.

1          THE COURT:  Sure.

2          MR. JACKSON:  And Mr. Schwartz was saying count

3   that toward, yes, but the way that the agreement works, those

4   were amounts that were going to -- directly to the trust,

5   that falls squarely within.  So I suppose you could split up

6   the three million and you can say if it touched Mr.

7   Schwartz's hands first --

8          THE COURT:  So --

9          MR. JACKSON:  -- he was deciding --

10          THE COURT:  -- I've got to say, I think that's

11   form over substance, and that it doesn't make any sense to

12   think that the parties would think that people's rights

13   should be fundamentally different based on, you know,

14   basically someone serving as a conduit with respect to the

15   transmittal of the funds.

16          MR. JACKSON:  Well, for -- for what it's worth, I

17   think all of it to some extent is form over substance.

18   Again, it's a $54 million obligation, it was not anticipated

19   that the bulk of it would come from asset sales --

20          THE COURT:  Correct.

21          MR. JACKSON:  -- and the ten percent was intended

22   to provide cash for the benefit of the beneficiaries.

23          THE COURT:  I understand.

24          MR. JACKSON:  So the idea that --

25          THE COURT:  And if your client had succeeded in

1  the business and made the quarterly payments out of free cash

2  that he was generating, we wouldn't be here, but we are where

3  we are.

4          MR. JACKSON:  Yeah, I guess I -- I mean, I think

5  I've raised my best argument --

6          THE COURT:  Okay.

7          MR. JACKSON:  -- and Your Honor is not --

8          THE COURT:  Look --

9          MR. JACKSON:  -- it just doesn't -- there's a way

10 that both of the provisions work together and they don't

11 necessarily detract from one another, if you read it our way,

12 but if you're not inclined to read it our way --

13         THE COURT:  So, look, let me say, I'm going to

14 rule.

15         I don't think this argument is pretextual.  I

16 think this is a good faith disagreement and that I don't

17 fault anyone for the fact that we're here today.  I think

18 that your reading of this is colorable, but I think it's

19 incorrect, and that -- at least on the record before me, what

20 I find as a matter of fact is that with respect to the Miami

21 condo transaction that it's fair to allocate $850,000 of that

22 to the estate's cause of action against the developer and the

23 balance to the sale of the Schwartz-Nightingale parties'

24 interest in that asset.

25         And with respect to the $3 million, I find as a

1    matter of fact that while the Schwartz-Nightingale parties

2    would be entitled under the documents to ten percent of those

3    proceeds that the -- Mr. Schwartz's email of January 12th,

4    2024 that is part of Exhibit 15, the Trust Exhibit 15,

5    reflects a voluntary relinquishment of that right and a

6    determination to permit the trust to apply all of those

7    proceeds to the $3 million.  I think the record reflects that

8    Mr. Schwartz's practical alternative at that point was, if he

9    had enforced the right that the contract gave him to get

10   those proceeds, he would have gone into default of his

11   obligation to make the $3 million payment and, therefore,

12   chose, notwithstanding the rights the contract gave him, to

13   have those applied, and he did and can't now essentially undo

14   the consequences of that decision.

15            So that's where I am.  I'm happy to reduce this

16   into -- in an appropriate order.

17            I'm going to do the following:  I'm going to

18   tomorrow draft an order that I think reflects all of what we

19   talked about today, and I'm going to send it to both sides

20   and give you a chance to tell me if you think I've gotten

21   something wrong, and you'll have a short period of time to do

22   that.  And after I've heard back from you or not, I'll tell

23   you what your deadline is, I'll then go ahead and enter that

24   order.

25            MR. JACKSON:  Okay.

1              MR. ROSE:  Your Honor, just one reminder, we

2    didn't talk about the judgment.  So, whenever you're --

3              THE COURT:  Is there anything more that I need to

4    hear about the judgment?

5              MR. ROSE:  I don't think so.  Just to make sure we

6    catch them, I think it's just about compliance based on the

7    Schwartz-Nightingale parties.  If the ten percent issue goes

8    away, I believe the -- that should --

9              THE COURT:  And that form of judgment the parties

10   have agreed to, it's just a question of whether you're

11   obligated to deliver --

12             MR. JACKSON:  It's already been delivered.

13             MR. ROSE:  Your Honor, I think we disagree that

14   it's been delivered without strings.  I think that it's been

15   delivered, but they have said it's not -- it's not effective,

16   it's --

17             MR. JACKSON:  Actually --

18             THE COURT:  Tell me what the dispute is.

19             MR. ROSE:  Your Honor --

20             MR. JACKSON:  I would like to, actually, on this

21   point.

22             THE COURT:  Go ahead.

23             MR. JACKSON:  It's -- we delivered the judgment.

24   In line with the position that we've taken that we didn't

25   believe that the ten percent had been complied with --

1            THE COURT:  Right.

2            MR. JACKSON:  -- I delivered the judgment, noting

3    that this technically isn't due yet, so to the extent you're

4    clamoring for it and saying it's due, it's not, but here you

5    go.

6            THE COURT:  Okay.

7            MR. JACKSON:  It was executed on April 28 by Mr.

8    Schwartz in the form agreed.  I provided it to them, I did

9    not attach any strings to it; to the extent they thought I

10   did, they could have followed up, they didn't.  They said in

11   the contempt motion that -- they acknowledged that I had

12   delivered it, but said I hadn't released it.

13           In our objection, I said it has been released, you

14   could have filed it then, you could file it now.  And then,

15   amazingly, in their reply and just now, they said it hasn't

16   been released.

17           THE COURT:  All right.

18           MR. JACKSON:  They can file that, it's been --

19           THE COURT:  All right, so I think I now have a

20   record that's clear enough.  I don't think my order needs to

21   say anything further about --

22           MR. ROSE:  No, Your Honor.

23           THE COURT:  -- the judgment --

24           MR. JACKSON:  You can file it, yeah.

25           THE COURT:  All right, all right.  I'm glad to be

1  so helpful.

2          MR. JACKSON:  Thank you, Your Honor.

3          THE COURT:  Okay.  Look, this has been helpful.  I

4  appreciate everyone here.  This is, you know, a difficult

5  circumstance for all involved.  I appreciate the good

6  lawyering and good faith -- you know, what I consider to be

7  good faith of both parties.  I will put together a form of

8  order.

9          Is there anything else that I can do to be helpful

10 to the parties while we're here?

11         MR. ROSE:  No, Your Honor.

12         MR. JACKSON:  No.

13         THE COURT:  Okay.

14         MR. ROSE:  Thank you, Your Honor.

15         Well, then with thanks to everyone, we're

16 adjourned.  Thank you.

17         COUNSEL:  Thank you, Your Honor.

18      (Proceedings concluded at 4:15 p.m.)

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

1

2      We certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of our

5  knowledge and ability.

6

7  <u>/s/ William J. Garling       </u>      <u>May 13, 2025</u>

8  William J. Garling, CET-543

9  Certified Court Transcriptionist

10  For Reliable

11

12  <u>/s/ Tracey J. Williams      </u>      <u>May 13, 2025</u>

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17

18

19

20

21

22

23

24

25